# EXHIBIT 1

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT
Case Type:  Other Civil

TWN Holdings, Inc.,

                Plaintiff,

vs.

SS MSP Holdings, Inc. and L Squared Capital
Partners LLC,

                Defendants.

Court File No. _____

**SUMMONS**

THIS STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS:

    **1.**     **YOU ARE BEING SUED**.  The Plaintiff has started a lawsuit against you.  The Plaintiff's Complaint against you is attached to this Summons.  Do not throw these papers away. They are official papers that affect your rights.  You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

    **2.**     **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

        Randi J. Winter, Esq.
        Johanna R. Hyman, Esq.
        Spencer Fane LLP
        100 South 5th Street, Suite 2500
        Minneapolis, MN 55402

    **3.**     **YOU MUST RESPOND TO EACH CLAIM**.  The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

    **4.**     **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS**. If you do not answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to

respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

      **5.**    **LEGAL ASSISTANCE**.  You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance.  **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

      **6.**    **ALTERNATIVE DISPUTE RESOLUTION**.  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  April 22, 2025

              **SPENCER FANE LLP**

              By:    */s/ Randi J. Winter*
                     Randi J. Winter, #0391354
                     Johanna R. Hyman, #0397151
              100 South 5th Street, Suite 2500
              Minneapolis, Minnesota 55402
              Phone:  (612) 268-7000
              Fax:  (612) 268-7001
              rwinter@spencerfane.com
              jhyman@spencerfane.com

              **ATTORNEYS FOR PLAINTIFF TWN HOLDINGS, INC.**

27-CV-25-8808

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                            Case Type:  Other Civil

TWN Holdings, Inc.,                         Court File No. _____

                    Plaintiff,
vs.                                         **COMPLAINT**

SS MSP Holdings, Inc. and L Squared Capital
Partners LLC,

                    Defendants.

Plaintiff TWN Holdings Inc. ("TWN"), by and through its undersigned counsel, hereby alleges for its Complaint against Defendants SS MSP Holdings, Inc. ("SS MSP") and L Squared Capital Partners LLC ("L Squared," and collectively with SS MSP, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' improper refusal to release funds held in escrow pursuant to the terms of an Equity Purchase Agreement ("EPA") and related Escrow Agreement.

2.      Plaintiff seeks a declaratory judgment that Defendants' indemnification claim is substantively without merit and resolved in Plaintiff's favor, an order directing immediate release of all escrowed funds, and an award for damages arising from Defendants' breach of contract, tortious interference with contract, and wrongful refusal to release the escrowed funds.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff TWN Holdings, Inc. is a Minnesota corporation with its principal place of business located in Hennepin County, Minnesota.

4.      Defendant SS MSP Holdings, Inc. is a Delaware corporation with its principal place of business in Hennepin County, Minnesota.

5.      Defendant L Squared Capital Partners, LLC is a Delaware limited liability company.

6.      L Squared is the ultimate parent company of SS MSP.

7.      Jurisdiction is proper in this Court under Minnesota law, including Minn. Stat. § 484.01.

8.      Venue is proper in this Court under Minnesota law, including Minn. Stat. Ch. 542 because at least one of the Defendants, SS MSP, has a place of business located in Hennepin County, Minnesota, contracts at issue in this action were entered into with residents of Hennepin County and performed in part in Hennepin County, and because at least some of the causes of action set forth in this Complaint arose in Hennepin County.

9.      Jurisdiction and venue are also proper in this Court pursuant to the Equity Purchase Agreement giving rise to the causes of action herein because that Equity Purchase Agreement states:

> The parties hereby consent and agree that the state court or federal court located in Hennepin County in the State of Minnesota, shall have exclusive jurisdiction to hear and determine any claims or disputes among the parties pertaining to this Agreement or to any matter arising out of or related to this Agreement. The parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, hereby waive any objection which any of them may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court.

## STATEMENT OF FACTS

I.      **PLAINTIFF'S SALE OF A COMPUTER CONSULTING BUSINESS TO DEFENDANTS**

10.      Plaintiff TWN's sole shareholder, Erik Thorsell, founded a successful Minnesota-based computer consulting business known as SUCCESS Computer Consulting ("SUCCESS").

11.      Defendant L Squared is a private equity firm that desired to acquire SUCCESS.

12.      L Squared's Managing Partner, Sean Barrette, traveled to Minnesota during the due diligence process prior to the closing of the sale of SUCCESS to Defendants.

13.     In January 2024, L Squared formed Defendant SS MSP for the primary purpose of acquiring substantially all of the issued and outstanding equity interests of SUCCESS pursuant to an Equity Purchase Agreement.

14.     Also in January 2024, Mr. Thorsell formed Plaintiff TWN and thereafter contributed 100% of SUCCESS's outstanding shares to TWN in anticipation for TWN to sell those outstanding shares to Defendants.

15.     On January 22, 2024, the parties entered into an Equity Purchase Agreement (the "EPA"), whereby Defendants purchased from TWN certain interests in SUCCESS (also known in the EPA as the "Acquired Company").

16.     A true and correct copy of the Execution Version of the parties' EPA without its Exhibits is attached to this Complaint as **Exhibit 1** and incorporated herein by reference.

17.     Pursuant to the EPA, Plaintiff TWN transferred all of the issued and outstanding equity in SUCCESS to Defendant SS MSP.

18.     As contemplated in the EPA, an amount of cash equal to $2.5 million of the total purchase price that Defendants agreed to pay TWN for SUCCESS, which was defined in the EPA as the "Indemnity Escrow Amount," was deposited by Defendants into an escrow account, which was defined in the EPA as the "Indemnity Escrow Fund."

19.     The purpose of the Indemnity Escrow Fund was to temporarily hold back a portion of the purchase price for a period of one year to cover potential post-closing liabilities arising that might arise from representations and warranties made by TWN.

20.     Pursuant to the EPA, Plaintiff TWN and Defendant SS MSP entered into a related Escrow Agreement, along with a third-party Escrow Agent, Citibank, N.A., governing how the Escrow Agent should hold and distribute the Indemnity Escrow Fund.

5

21.     A true and correct copy of the Execution Version of the parties' Escrow Agreement is attached to this Complaint as **Exhibit 2** and incorporated herein by reference.

22.     The EPA and Escrow Agreement both provide that they are governed by the law of the State of Delaware.

23.     The EPA and Escrow Agreement both require Plaintiff TWN and Defendant SS MSP to deliver joint instructions to the Escrow Agent to release the balance of the Indemnification Escrow Fund to TWN within five business days of the one-year anniversary of the EPA's Closing Date, except for any escrowed amounts associated with "Unresolved Claims" that remain in dispute between the parties.

24.     For such "Unresolved Claims," the EPA states that "[t]he portion of the Indemnity Escrow Fund retained for the Unresolved Claims shall be released by the Escrow Agent to [TWN] (to the extent not utilized to pay for any Unresolved Claims resolved in favor of [SS MSP]) upon the resolution of such Unresolved Claims." EPA § 6.7(d).

25.     The Escrow Agreement reflects a similar obligation. *See* Escrow Agreement § 5(d).

26.     The EPA's Closing Date was January 22, 2024.

27.     As such, the parties were required to issue joint direction to the Escrow Agent to release the balance of the Indemnification Escrow Fund to TWN by no later than January 29, 2025, which was the fifth business day following the one-year anniversary of the EPA's Closing Date.

28.     Defendants refused to join TWN in issuing a joint direction to the Escrow Agent to release the Indemnification Escrow Funds balance to TWN by January 29, 2025.

29.     Defendants' refusal to join TWN in issuing the required joint direction remains ongoing.

30.    Defendants' stated basis for refusing to issue the joint direction for release of the Indemnification Escrow Funds balance to TWN is an alleged claim for indemnification against TWN for purported breaches of certain representations and warranties as detailed further herein, which Defendants maintain is an "Unresolved Claim" under the EPA.

31.    TWN brings this action in part to secure the resolution of Defendants' manufactured Unresolved Claim, thereby requiring the Escrow Agent to release the Indemnity Escrow Fund balance in its entirety to TWN.

## II. DEFENDANTS' BELATED AND MANUFACTURED DIRECT CLAIM FOR INDEMNIFICATION

32.    Article 6 of the EPA sets forth the parties' agreement with respect to indemnification, including a specified method of asserting third-party and direct claims. *See* EPA Section 6.4(a) and (b).

33.    No third-party claims for indemnification are at issue in this action.

34.    Rather, Defendants have asserted a purported direct claim for indemnification against TWN, and Defendants are refusing to join TWN in directing the Escrow Agent to release the Indemnity Escrow Fund balance to TWN based on that alleged direct claim.

35.    The rights to indemnification under Article 6 of the EPA are subject to certain limitations, including that, unless otherwise specified, any representation or warranty contained in the EPA would survive only until the first-year anniversary of the Closing Date (the "Indemnification Escrow Release Date"), which as alleged above, was January 22, 2025.

36.    Section 6.4(b) of the EPA mandates that a party seeking indemnification for a direct claim must "promptly deliver written notice" of the claim to the indemnifying party.

37.    Approximately six months after the Closing Date of Plaintiff TWN's sale of SUCCESS to Defendants, one of Defendant L Squared's principals and executives, Brian Scott,

7

advised one of SUCCESS's Vice Presidents that "everything was going great," and there "were no indemnity claims or concerns that would risk any escrow amounts."

38.     At no point in the calendar year of 2024 did any representative of Defendants suggest to TWN that Defendants believed TWN had breached any of the EPA's representations and warranties in connection with the sale of SUCCESS to Defendants.

39.     Yet, on January 18, 2025, merely four days prior to the one-year anniversary of the Closing Date when the majority of those representations and warranties would expire, Defendants transmitted to TWN an indemnification notice (hereinafter, "Defendants' Indemnity Notice").

40.     Defendants' Indemnity Notice was submitted on letterhead indicating the Notice was being issued from "SS MSP Holdings, Inc. c/o L Squared Capital Partners LLC."

41.     Defendants' Indemnity Notice was signed by L Squared's Managing Partner, Sean Barrette.

42.     A true and correct copy of Defendants' Indemnity Notice is attached to this Complaint as **Exhibit 3**.

43.     Defendants' Indemnity Notice claimed, for the first time, that TWN had failed to disclose certain facts related to certain of SUCCESS's customers and a single, one-time vendor expense prior to closing, and as a result, TWN had breached representations and warranties set forth in Section 3.9(s), 3.22 and 3.6, and "may also" have breached Section 3.8 of the EPA (the "Direct Claim").

44.     Specifically, the Notice claimed that TWN failed to disclose that, prior to Closing, one of SUCCESS's customers had notified SUCCESS that it was materially decreasing the volume of services it purchased and the price it paid for such services.

8

45.    Defendants' Notice also alleged "[o]ther customers similarly notified [SUCCESS] and at least one customer terminated its relationship with [SUCCESS]."

46.    The Notice went on to claim that TWN "failed to correctly disclose expenses associated with Watchguard in the Company Statements."

47.    As a result, Defendants claimed that TWN's "failure to disclose these facts breached the warranties and representations in Sections 3.9(s), 3.22 and 3.6," and that "failure to disclose these facts may also give rise to a breach of the representations and warranties in 3.8 (No Material Adverse Change)."

48.    The Notice also stated that pursuant to Section 6.7(b) of the EPA, Defendants would look to satisfy their alleged losses for the Direct Claim, which Defendants estimated to be $3,524,937 from the funds in the Indemnity Escrow Account.

49.    The Notice also provided written notice to the Escrow Agent to retain the amount of Defendants' alleged losses in the escrow account as an "Unresolved Claim," pursuant to Section 6.7(d) of the EPA.

50.    Defendants' Direct Claim is premised entirely on information that Defendants learned prior to, at, or shortly after the January 22, 2024, Closing Date of the sale of SUCCESS.

51.    Defendants' Direct Claim is premised entirely on information that Defendants learned well in advance of the assurances made by L Squared's principal, Brian Scott, approximately six months after the Closing Date that "everything was going great," and there "were no indemnity claims or concerns that would risk any escrow amounts."

52.    Defendants did not promptly deliver Defendants Indemnity Notice asserting their purported Direct Claim, as required by the EPA.

53.    Defendants failure to promptly deliver notice of their alleged Direct Claim for indemnification caused harm to and prejudiced Plaintiff TWN, by *inter alia*, depriving TWN of the opportunity to timely investigate, redress, cure, and/or mitigate the alleged customer and vendor issues upon which Defendants' Direct Claim is premised.

## III.    TWN RESPONDS, REFUTING DEFENDANTS' BELATED DIRECT CLAIM AND DEMANDING RELEASE OF THE ESCROWED FUNDS

54.    On February 14, 2025, TWN timely responded to Defendants' Indemnity Notice by disputing and objecting to Defendants' Direct Claim for indemnification (hereinafter, "TWN's Response and Objection").

55.    A true and correct copy of TWN's Response and Objection is attached to this Complaint as **Exhibit 4**.

56.    In TWN's Response and Objection, TWN disputed Defendants' claim on several grounds.

57.    TWN's Response explained that TWN was taken by total surprise upon receipt of Defendants' Indemnity Notice in light of L Squared Principal Brian Scott's assurances in mid-2024 that there were no indemnification concerns.

58.    TWN also objected to the untimeliness of Defendants' Indemnity Notice, which was sent just before the expiration of the EPA's relevant representations and warranties.

59.    Defendants' delay violates the EPA's "prompt notice" requirement.

60.    In its Response and Objection, TWN detailed its primary objections and bases for disputing each of the alleged breaches of representations and warranties described in Defendants' Indemnity Notice.

61.    For example, TWN demonstrated that Defendants could not assert a claim for breach of the representation and warranty stated in Section 3.6(b) of the EPA, alleged in Defendants'

10

Indemnity Notice, based on the $25,000 expense from a vendor, Watchguard, because SUCCESS incurred that expense outside time period covered by the Section 3.6(b) representation.

62.    Indeed, Section 3.6(b)'s representation covered certain of SUCCESS's reviewed financial statements for the years of 2020, 2021, and 2022, as well as SUCCESS's latest balance sheet for 11 months in 2023, ending on November 30, 2023.

63.    In contrast, SUCCESS did not incur the $25,000 Watchguard expense identified by Defendants at issue until December 2023, which was outside the time period covered by EPA Section 3.6(b)'s representation.

64.    Additionally, TWN explained in its Response and Objection that Defendants' allegation of a breach of a representation and warranty stated in Section 3.9(s) of the EPA, which addressed undisclosed changes to "Company Contracts," was unavailing as to both the vendor expense and all but one of the customer disputes identified in Defendants' Indemnity Notice because there were no contracts with any of those at-issue customers identified on the "Company Contracts" Schedule to the EPA, which was Schedule 3.12(a). Therefore, Section 3.9(s) could not apply.

65.    Further, with respect to the one customer with contracts identified on Schedule 3.12(a), TWN explained that that no breach of any representations or warranties occurred because Section 3.9(s) of the EPA concerned company actions, not client-initiated decisions.

66.    TWN's Response and Objections detailed additional reasons why the alleged breaches of representations and warranties upon which Defendants' Direct Claim were premised in Defendants' Indemnity Notice were unavailing.

67.    TWN further explained in its Response and Objection that even if Defendants could credibly establish breaches of the representations and warranties at issue, Defendants had grossly

overestimated their purported damages, such that any damages would fall well under the $100,000 basket threshold for Direct Claims, as stated in Section 6.6(b) of the EPA.

68.     Finally, TWN objected to Defendants' attempt to reserve a right to supplement its Notice such that any additional claim for alleged indemnification would fall outside the contractually agreed upon indemnity period.

69.     Given no breach of any representations and warranties had occurred, and Defendants' Notice purporting to allege a direct claim for indemnification was unsupported by fact and law, TWN demanded the immediate release of all escrowed funds.

70.     In subsequent correspondence sent by Defendants' counsel after Defendants received TWN's Response and Objections, Defendants refused to cooperate to direct release of the balance of the Indemnity Escrow Fund.

71.     Instead, Defendants responded by making a vague threat, without offering any factual allegations in support, that they intended to bring a claim against TWN, and potentially Mr. Thorsell, for fraud, based on the customer and vendor issues identified in Defendants' Indemnity Notice.

72.     Principals and executives of Defendant L Squared have intentionally and improperly interfered with Defendant SS MSP's performance of its obligations under both the EPA and Escrow Agreement.

73.     For example, principals and executives of Defendant L Squared, including both Sean Barrette and Brian Scott, have intentionally and improperly caused SS MSP to assert that TWN breached representations and warranties based on customer and vendor concerns that were not covered by the very representations and warranties that Defendants have alleged TWN breached.

74.     Similarly, principals and executives of Defendant L Squared, including both Sean Barrette and Brian Scott, have intentionally and improperly caused Defendant SS MSP to breach the

EPA and Escrow Agreement by preventing Defendant SS MSP from timely issuing the joint direction to the Escrow Agent to release the balance of the Indemnity Escrow Fund to TWN.

75.     L Squared intentional and improper interference with SS MSP's performance of its contractual obligations to TWN were without justification and were not done in good faith.

76.     L Squared's actions in procuring SS MSP's breach of its contractual obligations to TWN have not caused SS MSP to pursue legitimate profit making activities, but rather, to pursue illegitimate retention of funds rightfully belonging and owed to TWN.

## COUNT I – BREACH OF CONTRACT
### (against Defendant SS MSP)

77.     Plaintiff repeats and realleges the allegations stated above.

78.     The EPA and Escrow Agreement are valid and enforceable contracts.

79.     Defendant SS MSP's conduct in refusing to issue joint direction to the Escrow Agent for release of the balance of the Indemnity Escrow Fund to TWN, based on an invalid and untimely indemnification claim, constitutes a breach of the EPA and the Escrow Agreement.

80.     As a direct and proximate result of Defendant SS MSP's breaches, Plaintiff has suffered and continues to suffer harm and are entitled to recover not only the escrowed funds, but also all consequential damages, as well as applicable prejudgment and post-judgment interest.

81.     As a direct, foreseeable, and proximate result of Defendant SS MSP's breaches of contract, Plaintiff has been damaged in an amount exceeding $50,000.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACTS
### (against Defendant L Squared)

82.     Plaintiff repeats and realleges the allegations stated above.

83.     The EPA and Escrow Agreement are valid and enforceable contracts.

84.     At all relevant times, Defendant L Squared has had knowledge of the existence of the EPA and Escrow Agreement, as well as the terms of those contracts.

85.     Principals and executives of Defendant L Squared, on behalf of L Squared, have intentionally and improperly interfered with Defendant SS MSP's complete performance of its obligations under the EPA and Escrow Agreement.

86.     L Squared's intentional and improper interference with Defendant SS MSP's performance of its obligations under the EPA and Escrow Agreement has been without justification.

87.     Defendant SS MSP's breaches of the EPA and Escrow Agreement resulting from Defendant L Squared's intentional and improper interference with those contracts has caused injury to Plaintiff TWN.

88.     As a direct and proximate result of Defendant L Squared's intentional and improper interference with Defendant SS MSP's performance of the EPA and Escrow Agreement, Plaintiff TWN has suffered and continues to suffer harm and are entitled to recover not only the escrowed funds, but also all consequential damages, as well as applicable prejudgment and post-judgment interest.

89.     As a direct, foreseeable, and proximate result of Defendant L Squared's tortious interference with the contracts between SS MSP and Plaintiff, Plaintiff has been damaged in an amount exceeding $50,000.

### COUNT III – DECLARATORY JUDGMENT
### (against Defendants SS MSP and L Squared)

90.     Plaintiff repeats and realleges the allegations stated above.

91.     An actual, justiciable controversy exists between the parties regarding whether Defendants' Direct Claim for indemnification – which forms the purported basis for Defendants'

refusal to direct release of the Escrowed Funds to Plaintiff TWN – is valid under the terms of the EPA

or Escrow Agreement, and whether Defendants are entitled to retain the Escrowed Funds.

92.    TWN seeks a declaratory judgment that, *inter alia*:

a.    Defendants' Direct Claim is resolved in TWN's favor;

b.    TWN did not breach any of the EPA's representations and warranties identified as at issue in Defendants' Indemnity Notice;

c.    TWN made no misrepresentations or omissions constituting fraud;

d.    Defendants' Direct Claim for indemnification under the EPA is untimely and unsupported by the factual record;

e.    Defendants are not entitled to a recovery of any attorneys' fees incurred in connection with litigation of their Direct Claim by contract or under applicable law; and

f.    The Escrowed Funds must be immediately released by the Escrow Agent to Plaintiff TWN.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.    Enter judgment in favor of Plaintiff and against both Defendants;

B.    Declare Defendants' purported indemnification claim under the EPA as void as a matter of law;

C.    Declare resolution of the Defendants' Direct Claim in Plaintiff's favor;

D.    Order the immediate release and disbursement of all Escrowed Funds held pursuant to the EPA and Escrow Agreement to Plaintiff;

E.    Awarding damages to Plaintiff in an amount to be determined at trial;

F.    Awarding Plaintiff the fees, costs, and disbursements of this action, as permitted under applicable contract and law; and

G.    Entering an Order for any such other and further relief in favor of Plaintiff as allowed by law, contract, or determined to be just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  April 22, 2025

**SPENCER FANE LLP**

By:    _/s/ Randi J. Winter_
      Randi J. Winter, #0391354
      Johanna R. Hyman, #0397151
100 South 5th Street, Suite 2500
Minneapolis, Minnesota 55402
Phone:  (612) 268-7000
Fax:  (612) 268-7001
rwinter@spencerfane.com
jhyman@spencerfane.com

**ATTORNEYS FOR PLAINTIFF TWN HOLDINGS, INC.**

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.211, subd. 2, to the party against whom the allegations in this pleading are asserted.

The undersigned hereby further acknowledges that this pleading is prepared pursuant to Rule 11 of the Minnesota Rules of Civil Procedure.

Dated:  April 22, 2025

By:  _/s/ Randi J. Winter_
      Randi J. Winter, #0391354

# EXHIBIT 1

to Plaintiff's Complaint dated April 22, 2025

*TWN Holdings, Inc. v. SS MSP Holdings, Inc. & L Squared Capital Partners LLC*
Minnesota State Court – Hennepin County District Court

*Execution Version*

**EQUITY PURCHASE AGREEMENT**

by and among

**SUCCESS COMPUTER CONSULTING, LLC,**

**TWN HOLDINGS, INC.,**

**ERIK A. THORSELL**

and

**SS MSP HOLDINGS, INC.**

**January 22, 2024**

# TABLE OF CONTENTS

**Page**

1. SALE AND TRANSFER OF THE COMPANY INTERESTS ..............................................1

    1.1    Transaction......................................................................................................1
    1.2    Purchase Price.................................................................................................2
    1.3    Company Closing Date Schedule; Payments at Closing ...............................2
    1.4    Purchase Price Adjustment ............................................................................3
    1.5    Escrow.............................................................................................................6
    1.6    Purchase Price Allocation ..............................................................................6
    1.7    Accounts Receivable that are Sixty (60) Days or More Past Due .................7

2. REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES ......................7

    2.1    Authorization..................................................................................................7
    2.2    No Violation....................................................................................................8
    2.3    Capitalization..................................................................................................8
    2.4    Governmental Consent, etc ...........................................................................8
    2.5    Brokerage........................................................................................................9
    2.6    Litigation........................................................................................................9

3. REPRESENTATIONS AND WARRANTIES RELATING TO THE ACQUIRED
COMPANY .....................................................................................................................9

    3.1    Restructuring...................................................................................................9
    3.2    Organization and Power................................................................................10
    3.3    Subsidiaries...................................................................................................10
    3.4    Company Interests.........................................................................................10
    3.5    Authorization; No Breach.............................................................................10
    3.6    Financial Statements.....................................................................................11
    3.7    Absence of Undisclosed Liabilities..............................................................12
    3.8    No Material Adverse Change ........................................................................12
    3.9    Absence of Certain Developments................................................................12
    3.10   Title and Condition of Properties .................................................................14
    3.11   Taxes.............................................................................................................15
    3.12   Contracts.......................................................................................................18
    3.13   Proprietary Rights.........................................................................................20
    3.14   Litigation; Proceedings.................................................................................21
    3.15   Brokerage......................................................................................................21
    3.16   Governmental Consent, etc ..........................................................................21
    3.17   Employee Benefit Plans................................................................................21
    3.18   Insurance.......................................................................................................23
    3.19   Affiliated Transactions.................................................................................24
    3.20   Compliance with Laws.................................................................................24
    3.21   Environmental Matters..................................................................................24
    3.22   Customers and Suppliers...............................................................................25
    3.23   Product Warranties; Product Liability ..........................................................26
    3.24   Labor and Employment Matters ...................................................................26
    3.25   Inventory.......................................................................................................27

**TABLE OF CONTENTS**
(continued)

Page

3.26    Bank Accounts; Directors and Officers ................................................. 28
3.27    Permits ................................................................................................... 28
3.28    Customs & International Trade; Regulatory Filings ............................. 28
3.29    Anti-Corruption Laws ........................................................................... 29
3.30    No Other Representations and Warranties ............................................ 30

4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ............................. 30
4.1    Organization and Power ......................................................................... 30
4.2    Authorization ......................................................................................... 31
4.3    No Violation ........................................................................................... 31
4.4    Litigation ................................................................................................ 31
4.5    Brokerage ............................................................................................... 31
4.6    Governmental Consent, etc .................................................................... 31
4.7    Investment Representations .................................................................... 31
4.8    Independent Investigation ...................................................................... 32

5.    CLOSING TRANSACTIONS ...................................................................................... 32
5.1    The Closing ............................................................................................ 32
5.2    Actions to Be Taken at the Closing ....................................................... 32
5.3    Closing Deliveries .................................................................................. 33

6.    INDEMNIFICATION .................................................................................................. 34
6.1    Indemnification by Seller Parties .......................................................... 34
6.2    Losses ..................................................................................................... 35
6.3    Indemnification by the Purchaser .......................................................... 35
6.4    Method of Asserting Claims .................................................................. 36
6.5    Adjustments ............................................................................................ 37
6.6    Limitation ............................................................................................... 37
6.7    Manner of Payment ................................................................................ 39
6.8    Remedies ................................................................................................ 40
6.9    [Intentionally Omitted] .......................................................................... 40

7.    ADDITIONAL AGREEMENTS .................................................................................. 40
7.1    Survival .................................................................................................. 40
7.2    Press Release and Announcements ........................................................ 40
7.3    Expenses ................................................................................................. 41
7.4    Tax Matters ............................................................................................ 41
7.5    Directors' and Officers' Liability .......................................................... 43
7.6    WARN ..................................................................................................... 43
7.7    Release and Waiver ................................................................................ 44
7.8    Confidentiality ....................................................................................... 45
7.9    Data Room .............................................................................................. 45

8.    DEFINITIONS ............................................................................................................ 45

VP/#63856056.10

**TABLE OF CONTENTS**
(continued)

**Page**

8.1   Cross-Reference of Other Definitions................................................................53

9.   MISCELLANEOUS....................................................................................................56

9.1   Amendment and Waiver.......................................................................................56
9.2   Notices..................................................................................................................56
9.3   No Third Party Beneficiaries ..............................................................................57
9.4   No Strict Construction.........................................................................................57
9.5   Captions................................................................................................................57
9.6   Complete Agreement............................................................................................57
9.7   Counterparts.........................................................................................................57
9.8   Governing Law; Consent to Forum .....................................................................57
9.9   Binding Effect; Assignment.................................................................................58
9.10   Rules of Construction..........................................................................................58
9.11   Specific Performance...........................................................................................58
9.12   Attorney-Client Privilege.....................................................................................59

**EXHIBITS**

Exhibit A   —   Net Working Capital Schedule
Exhibit B   —   Membership Interest Assignment Agreement
Exhibit C   —   Payoff Indebtedness
Exhibit D   —   Transaction Expenses Schedule
Exhibit E   —   Contribution and Exchange Agreement

VP/#63856056.10

## EQUITY PURCHASE AGREEMENT

**THIS EQUITY PURCHASE AGREEMENT** (this "**Agreement**") is made as of January 22, 2024, by and among **SUCCESS COMPUTER CONSULTING, LLC**, a Delaware limited liability company (together with all of its organizational predecessors, including, Success Computer Consulting, Inc., a Minnesota corporation (the "**Predecessor Company**"), "**Acquired Company**"), and **Erik A. Thorsell** (the "**Shareholder**"), **TWN HOLDINGS, INC.**, a Minnesota corporation (the "**Seller**," and together with Shareholder, each a "**Seller Party**" and together, "**Seller Parties**"), and **SS MSP HOLDINGS, INC.,** a Delaware corporation (the "**Purchaser**").

## W I T N E S S E T H:

**WHEREAS**, prior to the Closing Date (defined below), Acquired Company underwent a restructuring (collectively, and as further described in Section 3.1, the "**Restructuring**") whereby (i) Shareholder formed Seller; (ii) the Shareholder contributed 100% of the outstanding shares of Success Computer Consulting, Inc. to Seller in exchange for 100% of the issued and outstanding shares of Seller, (iii) Seller made an election for Success Computer Consulting, Inc. to be classified as a "qualified subchapter S subsidiary" within the meaning of Section 1361(b)(3)(B) of the Code, and (iv) Success Computer Consulting, Inc. converted into a Delaware limited liability company (whether by merger or otherwise);

**WHEREAS**, for U.S. federal income Tax purposes, (a) the steps contemplated in the Restructuring are intended to qualify as a reorganization under the provisions of Section 368(a)(1)(F) of the Code, and (b) consistent with Revenue Ruling 2008-18 (2008-113 C.B. 674), following the Restructuring, the Acquired Company's status as an S Corporation pursuant to Section 1362(a) of the Code will not terminate and will carry over to the Seller;

**WHEREAS**, since the Restructuring, Seller has owned 100% of the issued and outstanding equity of the Acquired Company (the "**Company Interests**"); and

**WHEREAS**, this Agreement contemplates a transaction in which Purchaser will purchase from Seller, and Seller will sell to Purchaser, all of the Company Interests, other than the Rollover Interest (as defined below) (the "**Purchased Interests**"), and concurrently therewith, Seller desires to contribute to SecureITize Solutions Parent, LP, a Delaware limited partnership and indirect parent of Purchaser ("**Parent LP**") the remainder of the Company Interests (the "**Rollover Interests**") in exchange for a number of Class A Units of Parent LP with a fair market value equal to the Rollover Amount ("**Parent LP Equity**") pursuant to a Contribution and Exchange Agreement in form attached hereto as Exhibit E (the "**Rollover Agreement**"), and Parent LP will immediately thereafter contribute the Rollover Interests to Purchaser, in each case, pursuant to the terms and subject to the conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the parties hereto agree as follows.

1.    **SALE AND TRANSFER OF THE COMPANY INTERESTS**

    1.1    **Transaction**.  Subject to the terms and conditions of this Agreement, Seller hereby sells and transfers the Purchased Interests to the Purchaser, and the Purchaser hereby purchases

such Purchased Interests from Seller, in each case free and clear of all Liens, other than transfer restrictions under federal and state securities laws.

1.2    **Purchase Price**.  The aggregate purchase price for the Purchased Interests shall be an amount equal to:

(a)    Thirty-Six Million Seven Hundred Thousand Dollars ($36,700,000), *minus*

(b)    the aggregate amount of all Closing Date Indebtedness, irrespective of whether repaid at Closing, *plus*

(c)    the aggregate amount of all Closing Date Cash, *minus*

(d)    the aggregate amount of all Transaction Expenses that remain unpaid as of immediately prior to the Closing (the "**Unpaid Transaction Expenses**") , *plus*

(e)    the Working Capital Adjustment, if any, *minus*

(f)    the Rollover Amount (the sum of clauses (a) through (f), the "**Purchase Price**").

1.3    **Company Closing Date Schedule; Payments at Closing**.

(a)    At least five (5) Business Days prior to the Closing Date, the Acquired Company shall have delivered to the Purchaser a statement (the "**Company Closing Date Schedule**") including: (i) the Acquired Company's good-faith estimate of (A) the Closing Date Indebtedness (including the wire instructions for the payment of any Closing Date Indebtedness constituting Payoff Indebtedness) (the "**Estimated Closing Date Indebtedness**"), (B) the Closing Date Cash ("**Estimated Closing Date Cash**"), (C) the Unpaid Transaction Expenses (including the wire instructions for the payment thereof) (the "**Estimated Unpaid Transaction Expenses**"), and (D) the Closing Date Working Capital Amount (the "**Estimated Closing Net Working Capital**") and, based on such Estimated Closing Net Working Capital, the Working Capital Adjustment (the "**Estimated Working Capital Adjustment**"), if any; (ii) based on such estimates, a calculation of the Purchase Price to be used at Closing; and (iii) supporting documentation that is reasonably available and in Acquired Company's possession for each of the foregoing deliverables.  The calculations and determinations set forth on or underlying the Company Closing Date Schedule shall be made in accordance:  (A) with the terms of this Agreement and the methodology  in the form attached hereto as Exhibit A (the "**Net Working Capital Schedule**"); and (B) GAAP.

(b)    At the Closing, an amount equal to: (i) the Purchase Price set forth on the Company Closing Date Schedule, *minus* (ii) Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000) (the "**Indemnity Escrow Amount**") *minus* (iii) Four Hundred Thousand and 00/100 Dollars ($400,000) (the "**Adjustment Escrow Amount**") (such net amount, the "**Closing Amount**") shall be paid by the Purchaser to the Seller in accordance with the schedule (the "**Closing Date Payment Schedule**") delivered by the Seller to the Purchaser

2

not less than five (5) Business Days prior to the Closing Date, which Closing Date Payment Schedule shall set forth the wire instructions for the payment of the Closing Amount.

(c)    At the Closing, the Purchaser shall pay or cause to be paid by wire transfer of immediately available funds:

(i)    to the Persons entitled thereto, all of the Payoff Indebtedness included on the Company Closing Date Schedule (in the amounts shown on the applicable payoff letter and in accordance with the wire transfer instructions set forth thereon);

(ii)    to the Persons entitled thereto, all of the Unpaid Transaction Expenses included in the Company Closing Date Schedule (in accordance with the applicable invoices and in accordance with the wire transfer instructions set forth thereon); and

(iii)    to the Escrow Agent for deposit into separate escrow accounts in accordance with wire transfer instructions provided by the Escrow Agent not less than five (5) Business Days prior to the Closing, cash in the amount of (x) the Indemnity Escrow Amount (the "**Indemnity Escrow Fund**" and the escrow account holding such Indemnity Escrow Fund, the "**Indemnity Escrow Account**") and (y) the Adjustment Escrow Amount (the "**Adjustment Escrow Fund**"), which shall in each case be held, invested or disbursed by the Escrow Agent in accordance with the terms and provisions of an escrow agreement entered into by and among Seller, Escrow Agent, and Purchaser (the "**Escrow Agreement**").

(d)    At the Closing, the Acquired Company shall, or the Seller shall cause the Acquired Company to, deliver, or cause to be delivered, (i) appropriate payoff and termination letters from the applicable secured parties or other holders of the Payoff Indebtedness included on the Company Closing Date Schedule and (ii) invoices from each of the payees of the Unpaid Transaction Expenses, in each case form and substance reasonably acceptable to the Purchaser, and, in the case of the payoff letters contemplated by clause (i), evidencing the release of any Liens on the Assets of Acquired Company (except for any Permitted Liens ) utilized to secure any of such Closing Date Indebtedness upon payment of the Closing Date Indebtedness.

(e)    Notwithstanding any other provision in this Agreement, the Purchaser and any other payors hereunder shall have the right to deduct and withhold any Taxes from any payments to be made hereunder, provided that Purchaser shall provide Seller advance written notice of any deduction or withholding and Seller has not objected within a reasonable amount of time.  To the extent that amounts are so withheld and paid to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been delivered and paid to the Seller or any other recipient of payment in respect of which such deduction and withholding was made.

1.4    **Purchase Price Adjustment**.

(a)    After the Closing, the Purchase Price shall be increased, on a dollar-for-dollar basis, by the sum, if greater than zero, of the following, in each case determined as

of the opening of business on the Closing Date unless otherwise specified: (i) the Working Capital Adjustment as finally determined pursuant to this <u>Section 1.4</u> *minus* the Estimated Working Capital Adjustment; *plus* (ii) the Acquired Company's actual Closing Date Cash as finally determined pursuant to this <u>Section 1.4</u> *minus* the Estimated Closing Date Cash; *plus* (iii) the Estimated Closing Date Indebtedness *minus* the Acquired Company's actual Closing Date Indebtedness as finally determined pursuant to this <u>Section 1.4</u>; *plus* (iv) the Estimated Unpaid Transaction Expenses *minus* the actual Unpaid Transaction Expenses as finally determined pursuant to this <u>Section 1.4</u> (items (i) through (iv), collectively, the "**Adjustment Amount**"). In the alternative, after the Closing, the Purchase Price shall be decreased, on a dollar-for-dollar basis, by the absolute value of the Adjustment Amount, if less than zero. Any increase or decrease in the Purchase Price shall be paid in accordance with Section 1.4(f).

(b)    As soon as practicable, but in no event later than ninety (90) days following the Closing Date, the Purchaser shall, at the Purchaser's expense, prepare and deliver to the Seller a statement (the "**Closing Date Statement**") providing a calculation of (i) the Closing Date Working Capital Amount, (ii) the Adjustment Amount and (iii) the amount of Post-Closing Receivables as of such date (collectively, the "**Post-Closing Deliveries**"). The calculations and determinations set forth on or underlying the Closing Date Statement shall be made in accordance: (A) with the terms of this Agreement and the Net Working Capital Schedule; and (B) GAAP.

(c)    During the period of the preparation of the Post-Closing Deliveries, the Dispute Period and the Resolution Period, the Seller shall, and the Purchaser shall cause the Acquired Company to, (i) provide the Purchaser, the Seller and their respective authorized representatives (as applicable) with access reasonably related to the preparation of the Post-Closing Deliveries and the determination of the Adjustment Amount , to the books, records, facilities, employees and accountants of the Acquired Company and to the books, records, employees and accountants of the Seller involved in the preparation of the Company Closing Date Schedule; <u>provided</u>, that such access does not unreasonably interfere with the conduct of the Purchaser's, Acquired Company's or Seller's respective businesses; and (ii) cooperate with the Purchaser and the Seller and their respective authorized representatives (as applicable), including the provision on a timely basis of all information reasonably necessary or useful in connection with analyzing the Post-Closing Deliveries.

(d)    After receipt of the Post-Closing Deliveries, the Seller shall review the Post-Closing Deliveries and, no later than twenty (20) Business Days after receipt by the Seller of the Post-Closing Deliveries (the "**Dispute Period**"), the Seller shall notify the Purchaser in writing that (i) the Seller agrees with the Closing Date Statement and the Adjustment Amount (an "**Approval Notice**") or (ii) the Seller disagrees with such calculations, identifying with reasonable specificity the items, including the amount, basis and supporting documentation for each item in dispute, with which the Seller disagrees (a "**Dispute Notice**"). If neither an Approval Notice nor a Dispute Notice is delivered to the Purchaser within twenty (20) Business Days after delivery of the Post-Closing Deliveries to the Seller, the Post-Closing Deliveries shall be final and binding on the parties hereto. Upon receipt by the Purchaser of a Dispute Notice, the Purchaser and its accountants, on the one hand, and the Seller and its accountants, on the other hand, will use good-faith efforts during the twenty (20) Business Day period following the date of receipt by the Purchaser of a Dispute Notice (the "**Resolution Period**") to resolve any differences they may have as to the amounts set forth in the Closing Date Statement and/or the calculation of the Adjustment Amount. If the Purchaser and the Seller

VP/#63856056.10

cannot reach written agreement during the Resolution Period, within five (5) Business Days thereafter, their disagreements, limited to only those issues still in dispute (the "**Remaining Disputes**"), shall be promptly submitted to the Minneapolis office of Baker Tilly US, LLP or if Baker Tilly US, LLP is unavailable or otherwise unable to serve in such role, then an alternate independent certified public accounting firm of regional standing mutually and reasonably agreed to by the parties (the "**Independent Accountant**"), which firm shall conduct such additional review as is necessary to resolve the specific Remaining Disputes referred to it.  The Seller and the Purchaser will cooperate fully with the Independent Accountant to facilitate its resolution of the Remaining Disputes, including by providing the information, data and work papers used by each party to prepare and/or calculate the Closing Date Statement, the Adjustment Amount and the Remaining Disputes, making its personnel and accountants available to explain any such information, data or work papers and submitting each of their proposed calculations of the Closing Date Working Capital Amount and the Adjustment Amount.  Based upon such review and other information and written submissions from the parties and their respective accountants that the Independent Accountant may request, the Independent Accountant shall determine the calculation for such Remaining Disputes strictly in accordance with (A) the terms of <u>Section 1.3</u> and this <u>Section 1.4</u> and the Net Working Capital Schedule; and (B) GAAP (the "**Independent Accountant Determination**"); <u>provided</u>, that such Independent Accountant Determination of each line item in the Adjustment Amount shall be equal to or between the amount of such line item as used to calculate the Adjustment Amount proposed by each of the Purchaser and the Seller, as adjusted for any differences resolved by the Seller and the Purchaser prior to the submission of the Remaining Disputes to the Independent Accountant.  Such Independent Accountant Determination shall be completed as promptly as practicable and if possible in no event later than thirty (30) days following the submission of the Remaining Disputes to the Independent Accountant, shall be explained in reasonable detail and confirmed by the Independent Accountant in writing to, and shall be final and binding on, the Shareholder, the Seller and the Purchaser for purposes of this <u>Section 1.4</u>, except to correct manifest clerical or mathematical errors.

(e)     The fees and expenses of the Independent Accountant shall be allocated between the Seller, on the one hand, and the Purchaser, on the other hand, based upon the percentage that the amount not awarded to the Seller or the Purchaser pursuant to <u>Section 1.4(d)</u> bears to the amount actually contested by the Seller or the Purchaser, as applicable.

(f)     On or prior to the fifth (5th) Business Day after the earliest of (i) the receipt by the Purchaser of an Approval Notice, (ii) the expiration of the Dispute Period if the Purchaser has not received an Approval Notice or a Dispute Notice within such period, (iii) the resolution by the Seller and the Purchaser of all differences regarding the Closing Date Statement and the Adjustment Amount within the Resolution Period, or (iv) the receipt of the Independent Accountant Determination, the Adjustment Amount, as finally agreed to in accordance with this <u>Section 1.4(f)(i)-(iv)</u>, as applicable, shall be paid as follows:

(i)     if the Adjustment Amount is less than zero and is therefore payable to the Purchaser by the Seller, then the Seller and the Purchaser shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to pay (x) to the Purchaser the absolute value of such Adjustment Amount from the Adjustment Escrow Fund, to the extent of the balance thereof and (y) to the Seller, the remaining balance of the Adjustment Escrow Fund (if any); <u>provided</u>, that if the balance of the Adjustment Escrow Fund is less than the Adjustment Amount (the

amount of such shortfall, the "**Adjustment Escrow Shortfall**"), such Adjustment Escrow Shortfall shall be paid from the Indemnity Escrow Fund, in which case the Seller and the Purchaser shall provide, within two (2) Business Days after the foregoing notice is given to the Seller, joint written instructions to the Escrow Agent to pay such amount to the Purchaser from amounts available in the Indemnity Escrow Fund (Seller Parties shall promptly replenish any amount paid from the Indemnity Escrow Fund pursuant to this <u>Section 1.4(f)(i)</u>); or

(ii)    if the Adjustment Amount is greater than zero and is therefore payable to the Seller by the Purchaser, (x) the Purchaser shall pay the Seller, the Adjustment Amount by wire transfer of immediately available funds to the account(s) designated by the Seller and (y) the Seller and the Purchaser shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to release the remaining balance of the Adjustment Escrow Fund to the Seller by wire transfer of immediately available funds to the account(s) designated by the Seller.

(g)    For greater clarity, in the event either party breaches any provision of this <u>Section 1.4</u>, without limiting any other remedies available to it, the non-defaulting party shall have the right to obtain injunctive relief pursuant to <u>Section 6.8</u> and, if necessary, <u>Section 9.8</u>, to cause the breaching party to comply in a timely manner with its obligations under this <u>Section 1.4</u>.

1.5    <u>Escrow</u>.    Pursuant to <u>Section 1.3(c)</u> of this Agreement, at the Closing the Indemnity Escrow Amount shall be deposited in the Indemnity Escrow Fund and the Adjustment Escrow Amount shall be deposited in the Adjustment Escrow Fund, each of which shall be interest bearing accounts at prevailing market rates, established pursuant to the Escrow Agreement. The Escrow Agent will hold the Indemnity Escrow Amount and the Adjustment Escrow Amount in accordance with the terms and conditions of the Escrow Agreement and this Agreement. The fees and expenses of the Escrow Agent will be borne fifty percent (50%) by the Purchaser and fifty percent (50%) by the Seller.

1.6    <u>Purchase Price Allocation</u>.    Purchaser shall prepare and deliver to Seller, within one hundred twenty (120) days of the Closing Date an allocation of the Purchase Price (as adjusted pursuant to this Agreement, and including any liabilities of Acquired Company and other relevant items to the extent properly included under the Code), among each of the assets of the Acquired Company (such allocation, the "**Purchase Price Allocation**"), which shall be prepared in accordance with the methodology set forth on <u>Schedule 1.6</u> attached hereto. Seller will have thirty (30) days after receipt of the Purchase Price Allocation to notify Purchaser of any objections to the Purchase Price Allocation. If Seller does not so notify Purchaser, the Purchase Price Allocation shall be final. If Seller does notify Purchaser of any objections to the Purchase Price Allocation, and Seller and Purchaser are unable to resolve their differences within thirty (30) days thereafter (the "**Allocation Dispute Period**"), then the disputed items (the "**Allocation Disputes**") shall be submitted to the Independent Accountant for resolution within fifteen (15) days of the end of the Allocation Dispute Period. Seller and the Purchaser will cooperate fully with the Independent Accountant to facilitate its resolution of the Allocation Disputes, including by providing the information, data and work papers used by each party to prepare and/or calculate the Purchase Price Allocation, making its personnel and accountants available to explain any such information, data or work papers and submitting each of their proposed calculations of the Purchase Price Allocation. Based upon such review and other information and written submissions from the parties and their respective accountants that the

Independent Accountant may request, the Independent Accountant shall determine the final Purchase Price Allocation strictly in accordance with the methodology set forth on Schedule 1.6 attached hereto (the "**Independent Accountant Allocation**"). Such Independent Accountant Allocation shall be completed as promptly as practicable and if possible in no event later than thirty (30) days following the submission of the Allocation Disputes to the Independent Accountant, shall be explained in reasonable detail and confirmed by the Independent Accountant in writing to, and shall be final and binding on, Seller and Purchaser for purposes of this Section 1.6 except to correct manifest clerical or mathematical errors. Purchaser and Seller shall (and shall cause each of their respective Affiliates to) file all Tax Returns (including IRS Form 8594) on a basis consistent with the Purchase Price Allocation (as finally determined hereunder). Neither Purchaser, Seller nor Shareholder (nor any of their respective Affiliates) will take or cause to be taken any position or other action inconsistent with the Purchase Price Allocation finally determined under this Agreement for any Tax reporting purpose, upon examination of any Tax Return, in any refund claim, or in any litigation, investigation, or otherwise, unless otherwise required do so pursuant to a "determination" (as defined in Section 1313(a) of the Code or any similar state or local Tax Law).

      **1.7**    <u>**Accounts Receivable that are Sixty (60) Days or More Past Due**</u>. Beginning on the Closing Date and until the Closing Date Statement Date (the "**Receivables Period**"), Purchaser shall cause the Acquired Company to continue to collect accounts receivable, including the Excluded A/R, in a commercially reasonable manner consistent with past practice. Purchaser shall provide Seller with a written reconciliation of payments received in connection with each such payment. To the extent that a payment received by Acquired Company from a customer on or after the Closing Date does not specify the particular invoice to which it relates, then such payment shall be applied to the oldest account receivable for such customer. Any Excluded A/R collected during the Receivables Period will be included as Working Capital Assets in the Closing Date Statement. Payments pursuant to this <u>Section 1.7</u> shall be net of Taxes, if any, imposed on or incurred by the Acquired Company, any of its Affiliates or any direct or indirect member or owner of any of the foregoing (including any income Taxes imposed on any direct or indirect member or owner of Purchaser, as reasonable determined by Purchaser) arising from the Company's actual or constructive receipt of any such receivable amounts, but only if and to the extent that any accounts receivable included in the Excluded A/R did not have a full tax basis in the hands of the Company as of the Closing.

    **2.**     **REPRESENTATIONS AND WARRANTIES OF THE SELLER PARTIES**

    As an inducement to the Purchaser to enter into this Agreement, Seller Parties hereby jointly and severally represent and warrant to the Purchaser that:

      **2.1**    <u>**Authorization**</u>.

        (a)    Seller is corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite power and authority necessary to enter into, deliver and perform its obligations pursuant to this Agreement and each of the Related Documents to which it is a party. Shareholder has the full legal capacity, right, power and authority to enter into, deliver and perform his or her obligations pursuant to this Agreement and each of the Related Documents to which Shareholder is a party.

        (b)    The execution, delivery and performance by each Seller Party of this Agreement and the Related Documents to which such Seller Party is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly

authorized by all requisite corporate and other entity action, if applicable, and no other corporate and other entity proceedings, if applicable, on the part of such Seller Party are necessary to authorize the execution, delivery or performance of this Agreement or the Related Documents. This Agreement and the Related Documents to which any Seller Party is a party have been duly executed and delivered by such Seller Party, and (assuming due authorization, execution and delivery by the Purchaser) this Agreement and the Related Documents to which any Seller Party is a party constitute valid and binding obligations of such Seller Party enforceable against such Seller Party in accordance with their respective terms, except that such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws, or by equitable principles, relating to or limiting the rights of creditors generally and (ii) equitable principles regarding the availability of specific performance, injunctive relief or other equitable remedies.

**2.2    No Violation**. The execution, delivery and performance of this Agreement and the Related Documents to which any Seller Party is a party and the consummation of the transactions contemplated hereby and thereby do not and shall not (a) conflict with or result in any breach of any of the provisions of, (b) constitute a default under, result in a violation of, or cause the acceleration or imposition of any obligation under, or (c) require any authorization, consent, approval, exemption or other action by or notice to any court or Governmental Authority under, the provisions of any Contract to which any Seller Party is bound or affected, any Law to which any Seller Party is subject or the provisions of Seller's Constituent Documents, except where the conflict, breach, default, violation, acceleration, or failure to give notice or obtain consent would not reasonably be expected to materially and adversely affect the Acquired Company.

**2.3    Capitalization**.

(a)    Seller is the sole record and beneficial owner of the Company Interests as set forth on the "**Capitalization Schedule**" attached hereto as Schedule 2.3, which constitute one hundred percent (100%) of the issued and outstanding membership interests in the Acquired Company, and has good and marketable title to (and is the record and beneficial owner of) the Company Interests, free and clear of any Liens, other than transfer restrictions under federal and state securities laws.

(b)    Shareholder has good and marketable title to (and is the record and beneficial owner of) the equity securities of Seller set forth opposite Shareholder's name on the Capitalization Schedule, free and clear of any Liens, other than transfer restrictions under federal and state securities laws.

(c)    Except for this Agreement, there are no outstanding preemptive, conversion, subscription or other rights, warrants, options or agreements to purchase the Company Interests and there are no voting trusts, proxies or any other agreements, instruments or written or other understandings to which any Seller Party is a party with respect to the voting, transfer or other disposition of the equity interests of the Acquired Company. At the consummation of the transactions contemplated by this Agreement, Purchaser shall own all of the Company Interests, free and clear of all Liens.

**2.4    Governmental Consent, etc**. No permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority is required of any Seller Party in

connection with the execution, delivery or performance of this Agreement or any Related Documents, or the consummation by any Seller Party of any of the transactions contemplated hereby and thereby.

**2.5** **Brokerage**.  Except as set forth on the "Broker Schedule" attached hereto as Schedule 2.5, no brokerage commissions, finders' fees or similar compensation are or will be due in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of any Seller Party or any Affiliates thereof.

**2.6** **Litigation**.  There are no actions, suits, proceedings, Orders or investigations pending or, to the Seller's Knowledge, threatened against any Seller Party, at law or in equity, or before or by any Governmental Authority, which would materially and adversely affect any Seller Party's performance under this Agreement and the Related Documents or the consummation of the transactions contemplated hereby or thereby.

**3.    REPRESENTATIONS AND WARRANTIES RELATING TO THE ACQUIRED COMPANY**

Any references to the "Acquired Company" shall be deemed to include references to the Predecessor Company prior to the Conversion unless expressly noted otherwise.  As an inducement to the Purchaser to enter into this Agreement, the Seller Parties hereby jointly and severally represent and warrant to the Purchaser that:

**3.1** **Restructuring**.  The Shareholder has consummated the Restructuring at least one (1) Business Day prior to the Closing Date. The Restructuring has been consummated such that the following has occurred:

(a)    At least three (3) days prior to the Closing Date, the Shareholder formed Seller, and contributed one hundred (100%) of the outstanding shares of Acquired Company to Seller in exchange for one hundred (100%) of the outstanding shares of Seller (the "**Contribution**");

(b)    Seller made a valid election for Acquired Company to be classified as a "qualified subchapter S subsidiary" within the meaning of Section 1361(b)(3)(B) of the Code (a "**Q-Sub**"), effective as of the date of the Contribution, for U.S. federal income tax and applicable state and local income tax purposes (the "**Q-Sub Election**");

(c)    one (1) or more days following the Contribution and the Q-Sub Election and at least one (1) day prior to the Closing Date, Seller caused Acquired Company to convert into a Delaware limited liability company (whether by merger or otherwise) (the "**Conversion**"); and

(d)    from and after the Restructuring, Acquired Company is organized and owned such that it is an entity "disregarded" as separate from its owner, Seller, under Treasury Regulations Section 301.7701-3, and for all state, local and foreign Income Tax purposes, and Seller, at all times after the Restructuring and prior to and including the Closing, shall be an S Corporation for all Income Tax purposes, and (in each case) no election or Tax Return to the contrary will be (or will be permitted to be) filed by Seller or Acquired Company or their respective Affiliates unless expressly directed (in writing) by Purchaser.

9

**3.2**    **Organization and Power**.  Acquired Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Acquired Company is qualified to do business as a foreign company and is in good standing in all jurisdictions in which the ownership of Acquired Company's properties or the conduct of Acquired Company's business as currently conducted requires Acquired Company to be so qualified, a list of which is set forth on the "**Organization Schedule**" attached hereto as Schedule 3.2, except where the failure to be so qualified would not have or would not reasonably be expected to have, individually or in the aggregate together with all other such failures, a Material Adverse Effect.  Acquired Company has all requisite corporate power and authority and all licenses, permits and other authorizations necessary to own and operate its properties and to carry on its businesses as now conducted, except where the failure to have any such license, permit or authorization would not have or would not reasonably be expected to have, individually or in the aggregate together with all other such failures, a Material Adverse Effect.  The copies of the Constituent Documents of Acquired Company, which have been furnished to the Purchaser before the date of this Agreement, reflect all amendments made thereto at any time prior to the date of this Agreement or the Closing Date, as applicable.

**3.3**    **Subsidiaries**.  Acquired Company does not have any Subsidiaries.  Acquired Company does not own (directly or indirectly) any capital stock or other equity securities, including any Options or other rights to purchase capital stock or other equity securities, or any other commitments of any kind for the issuance of additional capital stock or other equity interests or Options, in any other Person or entity.

**3.4**    **Company Interests**.  The authorized Company Interests set forth on the **Capitalization Schedule**: (i) represent the only issued and outstanding equity interests of Acquired Company (including profits interests, phantom interests, appreciation rights and similar equity or quasi-equity interests); (ii) have been duly authorized and are validly issued, fully paid and non-assessable; (iii) are owned of record and beneficially by the Seller free and clear of all Liens and any restrictions on transfer (other than transfer restrictions under federal and state securities Laws); (iv) were issued in compliance with all applicable Laws or exemptions therefrom; and (v) were not issued in violation of Acquired Company's Constituent Documents or any other Contract to which the Seller, Shareholder or Acquired Company was a party or in violation of any purchase or call option, right of first refusal, preemptive right, subscription right or similar rights of any Person.  There are no outstanding or authorized Options or other rights or Contracts of any character relating to the Company Interests or obligating (contingent or otherwise) Acquired Company to issue, sell, repurchase or retire any of its equity interests.  Other than pursuant to the terms of Acquired Company's Constituent Documents, there are no voting trusts, proxies or any other agreements, Contracts or understandings with respect to the voting of the equity interests of Acquired Company.  No bonds, debentures, notes, obligations or other indebtedness having the right to vote under any circumstances (or convertible or exchangeable into, or exercisable for, securities having such right to vote) of Acquired Company are issued and outstanding.  Immediately upon the Closing, the Purchaser shall have good and marketable title to all of the Company Interests, free and clear of all Liens, other than transfer restrictions under federal and state securities Laws.

**3.5**    **Authorization; No Breach**.

(a)    The execution, delivery and performance by the Acquired Companies of this Agreement and the Related Documents to which they are a party, as applicable, and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate action, and no other corporate proceedings on the part of

the Acquired Companies are necessary to authorize the execution, delivery or performance of this Agreement or the Related Documents to which it is a party. This Agreement has been duly executed and delivered by the Acquired Companies, and (assuming due authorization, execution and delivery by the Purchaser) this Agreement constitutes, and the Related Documents upon execution and delivery by each Acquired Company thereof shall each constitute, a valid and binding obligation of such Acquired Company, enforceable against such Acquired Company in accordance with their respective terms, except that such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws, or by equitable principles, relating to or limiting the rights of creditors generally and (b) equitable principles regarding the availability of specific performance, injunctive relief or other equitable remedies.

(b)     Except as set forth on <u>Schedule 3.5(b)</u>, the execution, delivery and performance of this Agreement and the Related Documents to which the Acquired Company is a party and the consummation of the transactions contemplated hereby and thereby do not and shall not (i) result in any material breach of any of the provisions of, (ii) constitute a default under, require notice or consent under, create a right of termination or modification, result in a violation of, or cause the acceleration, modification or imposition of any obligation under (except where the default, failure to give notice or obtain consent, termination or modification, violation, acceleration, or imposition would not reasonably be expected to materially and adversely affect the Acquired Company), (iii) result in the creation of any Lien upon any of the Assets of such Acquired Company under, or (iv) require any authorization, consent, approval, exemption or other action by or notice to any court or other Governmental Authority (except where the failure to make or obtain such authorization, consent, approval, exemption or other action would not reasonably be expected to materially and adversely affect the Acquired Company) under (A) the provisions of such Acquired Company's Constituent Documents, (B) any Lease or Company Contract by which such Acquired Company is bound or, except as would not reasonably be expected to be material to such Acquired Company, under any other Contract to which such Acquired Company is a party, or (C) any Law or Order to which such Acquired Company is subject or by which any of such Acquired Company's Assets are bound.

### 3.6     Financial Statements.

(a)     Attached hereto as <u>Schedule 3.6(a)</u> are copies of the following:

(i)     the reviewed balance sheet of Acquired Company as of December 31, 2020, 2021 and 2022 and the related statement of income, retained earnings and cash flows for the fiscal years then ended (the "**Reviewed Financial Statements**"); and

(ii)     the balance sheet and related statement of income, retained earnings and cash flows of Acquired Company or the eleven-month period ended on November 30, 2023 (the "**Latest Balance Sheet**", and together with the Reviewed Financial Statements, the "**Company Statements**").

(b)     Each of the Company Statements has been based upon the information contained in the Acquired Company's books and records and fairly presents, in all material respects, the financial condition and results of operations of Acquired Company as of the times and for the periods referred to therein, and has been prepared in accordance with GAAP,

except, in the case of the Latest Balance Sheet, for (i) changes resulting from normal year-end adjustments none of which are expected to reflect a Material Adverse Effect to Acquired Company and (ii) the absence of footnote disclosures.

(c)     In the last four (4) years, neither the Acquired Company nor any of its Affiliates has identified or been advised by its reviewers or auditors of any fraud or allegation of fraud, whether or not material, that involves management or other employees who have a role in the Company's internal controls over financial reporting.

**3.7    Absence of Undisclosed Liabilities**.  Acquired Company has no Liabilities, whether or not the type that would have been required to be reflected in, reserved against or otherwise described on the face of the Company Statements prepared in accordance with GAAP, except (a) Liabilities under Contracts described on the applicable Leases Schedule (as defined in Section 3.10(b) herein) and the Contracts Schedule (as defined in Section 3.12(a) herein); (b) Liabilities reflected on the Latest Balance Sheet of Acquired Company; (c) Liabilities which have arisen after the date of the Latest Balance Sheet of Acquired Company in the Ordinary Course of Business; (d) Liabilities otherwise expressly disclosed in this Agreement or in any Schedule referenced herein; and (e) Liabilities disclosed on the "**Outstanding Liabilities Schedule**" attached hereto as Schedule 3.7; provided, however, that none of the Liabilities in the foregoing clauses (a) through (d) result from, arise out of or relate to any material breach of Contract or violation of Law.

**3.8    No Material Adverse Change**.  Except as expressly contemplated by this Agreement or as set forth on Schedule 3.8, since the date of the Latest Balance Sheet, there has been no Material Adverse Change with respect to Acquired Company.

**3.9    Absence of Certain Developments**.  Except as set forth on the "**Absence of Certain Developments Schedule**" attached hereto as Schedule 3.9, since December 31, 2022, Acquired Company has not:

(a)     borrowed or agreed to borrow any money;

(b)     discharged or satisfied, or agreed to discharge or satisfy, any material Lien or paid any material Liability, other than current Liabilities paid in the Ordinary Course of Business or Closing Date Indebtedness;

(c)     subjected to any Lien any portion of its Assets, except for Permitted Liens;

(d)     sold, assigned or transferred, or agreed to sell, assign or transfer, any of its Assets in excess of $25,000.00 (except for sales of inventory in the Ordinary Course of Business) or any of its Assets outside of the Ordinary Course of Business or canceled or compromised any portion of debts or claims owing to or held by it;

(e)     sold, assigned, transferred, abandoned or permitted to lapse any Proprietary Rights or other material intangible assets or agreed to do any of the foregoing;

(f)     licensed or otherwise authorized any other Person to use any Proprietary Rights except for non-exclusive licenses granted in the Ordinary Course of Business;

12

(g)    (i) made or granted, or agreed to make or grant, any wage or salary, bonus or other compensation or benefits (including severance) increase to (x) any officer or (y) any other employee or group of employees with an individual salary of each such employee in excess of $60,000.00 per year, (ii) adopted, modified or terminated any employment, severance, retention or other such agreement with any employee (current or former), (iii) adopted or modified any severance or retention plans or policies or (iv) made any change or granted any increase in any Employee Benefit Plan, in each case other than as required by Law or written contract provided or made available to Purchaser prior to the date hereof;

(h)    made, or agreed to make, any item or series of related items of capital expenditure or capital commitment that would exceed $25,000.00;

(i)    made, or agreed to make, any loans or advances to, or guarantees for the benefit of, any Person;

(j)    suffered any uninsured (in full or in part) damage, destruction or casualty loss to any material Assets;

(k)    amended the charter, by-laws or other Constituent Documents;

(l)    split, combined or reclassified any of its equity securities;

(m)    issued, sold or otherwise disposed of any of its capital stock or other equity interests, or granted any Options, or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital stock or other equity interests;

(n)    made any investment in any other Person;

(o)    entered into any agreement or transaction with any Seller Party or any of their respective Affiliates;

(p)    settled or compromised any Action if such settlement or compromise involved (i) material payments by Acquired Company in respect of such Action or (ii) any relief other than money damages, which would be materially adverse to Acquired Company;

(q)    made, changed or revoked any election relating to Taxes or adopted or changed any method of Tax accounting, or prepared any material Tax Returns in a manner that is inconsistent with past practice, filed an amendment to any Tax Return, filed a claim for refund of Taxes, surrendered any right or claim to a refund for Taxes, entered into a closing or similar agreement with a Governmental Authority, submitted to a Governmental Authority any request for a ruling or closing agreement or similar agreement with respect to Taxes, settled and/or compromised any Tax Liability, or consented in writing to any claim or assessment relating to any Taxes or waived the statute of limitations for any such claim or assessment (other than with respect to any extension of time to file any Tax Return);

(r)    entered into a new line of business, abandoned or discontinued existing lines of business, or significantly changed its business practices, including with respect to pricing, distribution, warranties, refunds or returns;

VP/#63856056.10

(s)    amended or modified, renewed, extended, replaced, or granted any release or waiver under or terminated any Company Contract;

(t)    purchased, redeemed or otherwise acquired or retired for value any equity security of Acquired Company or engaged in any recapitalization, issuance, declaration, setting aside or paying of any dividend or making any distribution involving any equity security of the Acquired Company; or

(u)    committed in writing to do any of the foregoing.

3.10    **Title and Condition of Properties**.

(a)    Acquired Company owns no real property in fee, nor has ever owned any real property in fee.

(b)    The leased real property (the "**Leased Real Property**") and the leases described on the "**Leases Schedule**" attached hereto as Schedule 3.10(b) (individually, a "**Lease**", and collectively, the "**Leases**") are in full force and effect, and Acquired Company holds a valid and existing leasehold interest under each of the Leases for the term set forth on the Leases Schedule. The Leases constitute all of the leases under which Acquired Company holds a leasehold interest in real estate. The Acquired Company has furnished to the Purchaser complete and accurate copies of each of the Leases, and none of the Leases has been modified, except to the extent that such modifications are disclosed by the copies of the Leases furnished to the Purchaser. Acquired Company is not and, none of the other party to a Lease is in default under such Lease and, to Seller's Knowledge, no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material default, or permit the termination, modification or acceleration of rent under such Lease. To Seller's Knowledge, no party to the Leases or sublease has repudiated any provision thereof, and there are no disputes, oral agreements, or forbearance programs in effect as to the any of the Leases. To Seller's Knowledge, all facilities leased or subleased pursuant to the Leases have received all approvals of governmental authorities (including licenses and permits) required in connection with the operation thereof and have been operated and maintained in accordance with applicable laws, rules and regulations. Except as set forth in Schedule 3.10(b), (i) the Leased Real Property is in good order and condition (except for normal wear and tear), (ii) to Seller's Knowledge, the Leased Real Property is not in violation of applicable setback requirements, zoning laws, and ordinances, (iii) Acquired Company has performed all repairs, maintenance and replacements required of the tenant under the Leases, and (iv) there are no material deferred maintenance items on the Leased Real Property. Acquired Company has not received notice that a security deposit or portion thereof deposited with respect to any Lease has been applied in respect to a breach or default under any Lease that has not been redeposited in full.

(c)    The Leased Real Property constitute all of the real estate used or occupied by Acquired Company and is sufficient for the conduct of the business as currently conducted by Acquired Company in the Ordinary Course of Business.

(d)    Except as set forth on the "**Liens Schedule**" attached hereto as Schedule 3.10(d), Acquired Company owns good and marketable title, free and clear of all Liens, to all of the Assets used or held for use in Acquired Company's business as currently

14

conducted or shown on the Latest Balance Sheet of Acquired Company or acquired since the date thereof, except for Permitted Liens. To Seller's Knowledge, substantially all of Acquired Company's Assets are in good operating condition and repair, except for normal wear and tear, and excluding from this representation scrapped equipment held for spare parts, and there are no material deferred maintenance items on the Leased Real Property that affect the business or operations of Acquired Company, and (ii) are sufficient for its current use by Acquired Company in the Ordinary Course of Business.

(e)     To Seller's Knowledge, there is no violation of any Law relating to the ownership or operation, as applicable, of any of Acquired Company's Leased Real Properties or other Assets, except as would not have a Material Adverse Effect.

**3.11     Taxes**. Except as set forth on the "**Tax Matters Schedule**" attached hereto as Schedule 3.11:

(a)     Acquired Company has timely filed all Tax Returns required to be filed, and all such Tax Returns are true, complete, and correct in all material respects. All Taxes required to have been paid by Acquired Company (whether or not shown on any Tax Return) have timely been paid in full;

(b)     To Seller's Knowledge, neither the IRS nor any foreign, state, local or other taxing authority is in the process of auditing or examining any Tax Return of Acquired Company, and neither has Acquired Company been given written notification of any request for such an audit or other examination that has not yet been resolved;

(c)     no written notice of deficiency or assessment of Taxes has been received by Acquired Company from any Governmental Authority, and there are no currently effective waivers extending the statutory period of limitation applicable to the assessment or collection of any Taxes;

(d)     Schedule 3.11(d) lists all federal, state, local, and foreign Tax Returns filed with respect to Acquired Company for taxable periods ended on or after January 1, 2019, and indicates those Tax Returns that have been audited. Shareholder has delivered to Purchaser correct and complete copies of all federal, state, and foreign Tax Returns (other than immaterial information tax returns such as Forms 1099 and W-2), examination reports, and statements of deficiencies assessed against, or agreed to by Acquired Company since January 1, 2019.

(e)     there are no Liens for Taxes (other than Permitted Liens) upon any of the assets of Acquired Company. Acquired Company is not a party to or bound by any Tax allocation, sharing, or similar agreement, other than pursuant to a Contract entered into in the Ordinary Course of Business the primary purpose of which does not relate to Taxes;

(f)     Acquired Company has not requested a waiver or been granted a waiver of any statute of limitations in respect of, or agreed to any extension of time with respect to a Tax assessment or deficiency of, any Taxes, other than waivers or extensions that have expired. Acquired Company is not the beneficiary of any extension of time within which to file any Tax Return. Acquired Company has not executed any power of attorney with respect to any Tax, other than powers of attorney that are no longer in force;

(g)     The Taxes of Acquired Company that have properly accrued on the Latest Balance Sheet but that have not yet been paid: (a) did not as of the date of the Latest Balance Sheet exceed the reserve for Taxes (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Latest Balance Sheet (rather than any notes thereto) and (b) will not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Company in filing its Tax Returns.

(h)     Acquired Company has properly classified each of its service providers as an independent contractor or employee, as applicable, for all applicable Tax purposes. Acquired Company has properly and timely withheld and collected all material amounts required to be withheld or collected, timely deposited such amounts with the appropriate Governmental Authority, and has properly reported all Taxes that it is required to withhold from amounts paid or owing to any employee, creditor, or other third party;

(i)     Acquired Company has collected and remitted all sales, use, value-added and similar Taxes with respect to sales or leases made or services provided to its customers, in each such case based upon the Knowledge of the Seller with respect to the location and operations of each such customer, and for all sales, leases or provisions of services that are exempt from sales, use, value-added and similar Taxes and that were made without charging or remitting sales, use, value-added or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale, lease or provision of services as exempt, in each case, in accordance with applicable Laws.  Acquired Company has complied in all material respects with all unclaimed property, escheat and similar Laws and has duly and properly turned over, to the extent required by such Laws, all material properties or credits or other assets to the appropriate Governmental Authorities.

(j)     all intercompany transactions have been conducted in accordance with an arm's-length result within the meaning of Treasury Regulation Section 1.482-1(b)(1) or similar non-United States law;

(k)     Acquired Company is not and has not been required to make any adjustment pursuant to Code Section 481(a) (or any predecessor provision) or any similar provision of state, local or foreign Tax Law by reason of any change in any accounting methods, and there is no application pending with any Governmental Authority requesting permission for any changes in any of its accounting methods for Tax purposes.   No Governmental Authority has proposed any such adjustment or change in accounting method.

(l)     Acquired Company (and, after the Closing, Purchaser as a result of its ownership of the Acquired Company) will not be required to include any amount in taxable income or exclude any item of deduction or loss from taxable income or pay any Tax for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (a) change in accounting method or the use of an improper accounting method, in each case, on or prior to the Closing Date, (b) "closing agreement" as described in Code Section 7121 (or any corresponding or similar provision of state, local or foreign Income Tax law) executed on or prior to the Closing Date, (c) intercompany transaction or excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding state, local or foreign Income Tax Legal Requirement) existing on the Closing Date, (d) installment sale or open transaction disposition made on or prior to the Closing Date, (e) prepaid amount received or

deferred revenue realized on or prior to the Closing Date (f) election pursuant to Code Section 108(i) (or any corresponding or similar provision of state, local or foreign Tax law), or (g) an election under Section 965(h) of the Code;

(m)     Acquired Company has not been party to any "reportable transaction," as defined in Section 1.6011-4(b) of the Treasury Regulations;

(n)     Acquired Company has not, within the last four (4) years, distributed the stock of any corporation or had its stock distributed by another person in a transaction satisfying or intending to satisfy the requirements of Section 355 or Section 361 of the Code;

(o)     Acquired Company has no Subsidiaries, and none of Acquired Company's assets consist of (and Acquired Company has no right in or to) any equity, stock, options, warrants or similar rights in any Person.

(p)     Acquired Company (i) has not been a member of an affiliated group of which Acquired Company is or was not the parent, (ii) has no Liability for Taxes of another Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign law) and (iii) is not subject to any private letter rulings from the IRS or any comparable pronouncements of any other taxing authorities (in each case) currently in effect;

(q)     No claim has been made by any Governmental Authority in a jurisdiction in which Acquired Company does not file Tax Returns that any such Person is or may be subject to taxation by that jurisdiction;

(r)     Acquired Company (A) is not a "passive foreign investment company" within the meaning of Code § 1297, and (B) does not have a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise have an office or fixed place of business in a country other than the country in which it is organized; and

(s)     None of Acquired Company's or (A) goodwill, (B) going concern value, or (C) other intangible assets (that would not be amortizable prior to the enactment of Section 197 of the Code) were held by Acquired Company or any "related person" (within the meaning of Section 197(f)(9)(C) of the Code) on or before November 1, 1993.

(t)     Acquired Company is not nor has been subject to any Tax imposed by Section 1374 of the Code (or any comparable provision of state or local Tax Laws) and will not be so subject as a result of the transactions contemplated by this Agreement.

(u)     (A) Since the date of the Contribution and until the Conversion, Acquired Company was classified as a Q-Sub, (B) since the date of the Conversion, Acquired Company has been (and will be immediately prior to the Closing) a Delaware limited liability company that is classified as an entity "disregarded" as separate from its owner, Seller, for all income Tax purposes (including under Treasury Regulations Section 301.7701-3) and (C) in each case, no Tax-related election or Tax Return has been or will be filed to the contrary. Prior to the Restructuring, Acquired Company has, at all times, since the date of its formation, been a validly electing "S corporation" within the meaning of Sections 1361 and 1362 of the Code (an "**S Corporation**") and all applicable state and local Tax laws where such treatment is allowed at all times since such date of formation and neither Shareholder nor has

17

Acquired Company taken any action that caused Acquired Company to lose its status as an S Corporation.

    **3.12**    <u>**Contracts**</u>.

    (a)    Except as set forth on the Leases Schedule, the Employee Benefits Schedule, or on the "**Contracts Schedule**" attached hereto as <u>Schedule 3.12(a)</u> (collectively, together with the Outbound Licenses and the Inbound Licenses, the "**Company Contracts**"), Acquired Company is not a party to nor is it bound by any of the following:

    (i)    bonus, pension, profit sharing, retirement or deferred compensation plan or stock purchase, stock Option, hospitalization insurance or similar plan or practice, whether formal or informal, or severance Contracts requiring Acquired Company to pay post-retirement medical benefits;

    (ii)    Contract with any labor union, works council, trade union or similar entity or organization or Contract for the employment of any officer, individual employee or other person on a full-time, part-time or consulting basis;

    (iii)    Contract relating to the borrowing of money or to placing a Lien on any of Acquired Company's Assets;

    (iv)    guarantee of any obligation for borrowed money or otherwise, other than endorsements made for collection in the Ordinary Course of Business;

    (v)    Contract with respect to the lending or investing of funds to or in other Persons;

    (vi)    license or royalty Contract relating to Proprietary Rights, any of which individually requires a payment of $25,000.00 or more by or to Acquired Company and any other license or Contract pursuant to which Acquired Company uses or is authorized to use any material Proprietary Rights or relating to the development, use (including restrictions on use) or ownership of any material Proprietary Rights;

    (vii)    lease or agreement under which it is lessee of or holds or operates any personal property owned by any other Person, which individually requires a payment of $25,000.00 or more by or to Acquired Company;

    (viii)    lease or agreement under which it is lessor of or permits any third Person to hold or operate any property, real or personal, owned or controlled by it, in each case which individually requires a payment of $25,000.00 or more by or to Acquired Company;

    (ix)    Contract or group of related Contracts with the same Person for the purchase or sale of products or services, which individually requires a payment of $25,000.00 or more by or to Acquired Company, other than customer orders and purchase orders entered into in the Ordinary Course of Business;

    (x)    Contract which prohibits it from freely engaging in business or which restrains its business activities anywhere in the world;

(xi)     Contract relating to the distribution of its products or services which individually requires a payment of $25,000.00 or more by or to Acquired Company;

(xii)     Contract with any officer, director or Seller, which individually requires a payment of $25,000.00 or more by or to Acquired Company;

(xiii)     Contracts for which Acquired Company has granted any third-party preferential pricing provision, such as "most favored nation" pricing terms;

(xiv)     Contracts with a Material Customer or Material Vendor;

(xv)     agency, distributor, sales representative or similar agreements which individually requires or may require payments of $25,000.00 or more annually by or to Acquired Company;

(xvi)     Contracts that contain a minimum annual purchase requirement or minimum annual supply obligations unless they can be canceled on less than ninety (90) days' notice without payment of any termination or cancellation fee;

(xvii)     Contracts for acquisitions or dispositions (in each case whether by merger, purchase or sale of assets or stock or otherwise) by Acquired Company of any company (or all or substantially all of its assets), business or line of business, as to which Acquired Company has any continuing indemnification or financial obligations or rights or any other material obligation or rights;

(xviii)     Contracts granting to any Person an option or a first-refusal, first-offer or similar preferential right to purchase or acquire any assets or properties of Acquired Company;

(xix)     Contracts that are a settlement or similar Contract arising from an Action under which Acquired Company has any ongoing obligations, limitations or restrictions or receives any ongoing benefits or rights;

(xx)     Contracts with respect to any partnership or joint venture/development;

(xxi)     any outstanding letters of credit or performance bonds or any Contract creating any liability as guarantor, surety, co-signer, endorser, or co-maker in respect of the obligations of any other Person;

(xxii)     Government Contracts, Government Bids or Contracts with any Governmental Authorities; or

(xxiii)     Contract, whether or not made in the Ordinary Course of Business, which individually requires a payment of $50,000.00 or more by or to Acquired Company (other than those agreements or Contracts required to be disclosed pursuant to clauses (i) through (xxii) above).

19

(b)     Except as specifically disclosed on the Contracts Schedule, (i) Acquired Company has performed in all material respects the obligations required to be performed by it under the applicable Company Contracts, (ii) no event has occurred which, with the passage of time or the giving of notice or both, would result in a material breach or material default under any Company Contract (including as a result of COVID-19 or COVID-19 Measures) and (iii) all such Company Contracts are valid, binding and enforceable against Acquired Company and, to Seller's Knowledge, the other Persons party thereto in accordance with their respective terms (except that such enforceability may be limited by (A) bankruptcy, insolvency, reorganization, moratorium or other similar laws, or by equitable principles, relating to or limiting the rights of creditors generally and (B) equitable principles upon the availability of specific performance, injunctive relief or other equitable remedies).  Complete and correct copies of each Company Contract (including all amendments, modifications and supplements thereto and waivers thereof) have been provided or made available to Purchaser.

### 3.13     Proprietary Rights.

(a)     Except for the Permitted Liens and as disclosed on the "**Proprietary Rights Schedule**" attached hereto as Schedule 3.13(a), (i) Acquired Company owns and possesses all right, title and interest in and to all of the Proprietary Rights of Acquired Company set forth on the Proprietary Rights Schedule and (ii) Acquired Company owns and possesses all right, title and interest in and to, or has a valid and enforceable written license to all other Proprietary Rights necessary for the operation of the business of Acquired Company as currently conducted or as conducted within the past four (4) years (collectively, the "**Company Proprietary Rights**").  All Proprietary Rights owned by Acquired Company that are patented, registered or the subject of a pending patent application or application for registration, and all other material Proprietary Rights, are set forth on the Proprietary Rights Schedule.  Except as set forth on the Proprietary Rights Schedule: (i) there are no claims (including oppositions or cancellation actions) against Acquired Company that were either made within the past four (4) years or are presently pending or, to Seller's Knowledge, threatened, contesting the validity, use, ownership, enforceability or registrability of any of the Company Proprietary Rights, and to Seller's Knowledge there is no basis for any such claim, (ii) Acquired Company has not infringed or misappropriated any Proprietary Rights of any third Person, and Acquired Company has not received any written threats or notices regarding any of the foregoing (including any demands or offers to license any Proprietary Rights from any other Person), and (iii) to Seller's Knowledge, Acquired Company's Proprietary Rights have not been infringed or misappropriated by any third Person.  Acquired Company has taken reasonably adequate measures to maintain, protect and enforce the Company Proprietary Rights, including to protect the confidentiality of all of its material trade secrets and confidential and proprietary information.  The Proprietary Rights Schedule sets forth a complete and accurate list of all Contracts pursuant to which, as of the Closing Date, (i) any other Person has the right to use or acquire any material Proprietary Rights owned by Acquired Company (collectively, the "**Outbound Licenses**") and (ii) any other Person has granted the Acquired Company the right to use or acquire any material Proprietary Rights owned by such Person (collectively, the "**Inbound Licenses**").

(b)     All present and past employees and independent contractors of, and consultants to, Acquired Company who received (or have had access to) to any Company Confidential Information have entered into enforceable written agreements pursuant to which such Person agrees to protect such Company Confidential Information. All present and past

20

employees and independent contractors of, and consultants to, the Acquired Company who materially contribute (or have materially contributed) to the development of any Company Proprietary Rights either (i) have entered into agreements pursuant to which such Person agrees to (and has) assigned to Acquired Company all Proprietary Rights authored, developed or otherwise created by such Person in the course of such Person's employment or engagement or (ii) such Proprietary Rights have vested in the Acquired Company automatically by operation of law, in each case without further consideration or any restrictions or obligations on the use or ownership of such Proprietary Rights. Acquired Company is not using any material Proprietary Rights owned by any present or past employee, independent contractor or consultant.

3.14    **Litigation; Proceedings**.  Except as set forth on the "**Litigation Schedule**" attached hereto as Schedule 3.14, (a) there are, and in the past four (4) years there have been, no formal or informal actions, suits, proceedings or Orders pending or, to the Seller's Knowledge, threatened, in any case, either by or against Acquired Company (or its business, Assets or properties), at law or in equity, or before or by any Governmental Authority, and (b) there is not in existence, and has not been in the past four (4) years, any Order, or judgment or decree of any court, tribunal, or agency enjoining or requiring Acquired Company to take any action with respect to its business, Assets, or properties.

3.15    **Brokerage**.  Except as set forth on the "**Brokers Schedule**" attached hereto as Schedule 3.15, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Acquired Company.

3.16    **Governmental Consent, etc**.  No permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Agreement or the Related Documents (to which Acquired Company, Seller or Shareholder, as applicable, is a party) by Acquired Company, Seller or Shareholder, or the consummation by Acquired Company, the Seller or Shareholder of any of the transactions contemplated hereby or thereby, except where the failure to obtain such permit, consent, approval, authorization, declaration, or filing  would not reasonably be expected to materially and adversely affect the Acquired Company.

3.17    **Employee Benefit Plans**

(a)    The "**Employee Benefits Schedule**" attached hereto as Schedule 3.17(a) contains a list of all Employee Benefit Plans maintained by Acquired Company in which any current or former employee, director, manager or consultant of Acquired Company or any beneficiary thereof, has a present or future right to benefits or to which Acquired Company is or was, obligated to contribute or otherwise with respect to which Acquired Company or any member of their Controlled Group, has any present or future Liability (collectively, the "**Company Plans**").  Acquired Company has furnished copies of (i) the Company Plans and any amendments, (ii) any related service or trust agreements or other funding instruments, (iii) the most recent IRS determination letter, if applicable, (iv) summary plan descriptions and any summary of material modifications, (v) the most recent three years financial statements, audited financials, Form 5500 annual report (including attached schedules) and nondiscrimination testing results and (vi) any communications with any Governmental Authority with respect to any Company Plan, to the Purchaser.

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 44 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

(b)    All Company Plans have been administered and maintained, in form and operation, in all material respects in compliance with their terms and all applicable Laws, including the requirements of ERISA and the Code.

(c)    No event has occurred with respect to the Company Plans and no condition exists that would subject Acquired Company or by reason of their affiliation with any member of their respective "**Controlled Group**" (defined as any organization which is a member of a controlled group of organizations within the meaning of Section 414(b), (c), (m) or (o) of the Code), to any Tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable Laws.

(d)    Each Company Plan that is intended to meet the requirements of a "qualified plan" under Code Section 401(a) has received a favorable determination letter or prototype opinion letter from the IRS to the effect that such Company Plan meets the requirements of Code Section 401(a) and no events have occurred, whether by action or failure to act, that could adversely affect such qualified status.

(e)    Neither Acquired Company nor any member of Acquired Company's Controlled Group, maintains, sponsors, contributes to or has any present or future Liability with respect to, (i) any Employee Benefit Plan that is or was subject to Section 412 of the Code or Title IV of ERISA, (ii) any "multiemployer plan" (as such term is defined under Section 3(37) of ERISA), (iii) a "multiple employer plan" (as defined in ERISA or the Code), (iv) a "funded welfare plan" within the meaning of Section 419 of the Code or (v) a "non-qualified deferred compensation plan" (as defined in Section 409A(d)(1) of the Code).

(f)    With respect to each Company Plan:  (i) there have been no prohibited transactions as defined in Section 406 of ERISA or Section 4975 of the Code that could reasonably be expected to cause Acquired Company from incurring a liability, (ii) there has been no breach of fiduciary duty (as determined under ERISA) that could reasonably be expected to cause Acquired Company from incurring a liability, and (iii) all contributions and premium payments which are due have been paid on a timely basis, and all contributions and premium payments which are not yet due for any period ending prior to or on the Closing Date have been made or accrued in accordance with GAAP.

(g)    No liability under Title IV of ERISA has been incurred and no condition presently exists, that is expected to cause such liability to be incurred, by Acquired Company or any member of Acquired Company's Controlled Group that has not been satisfied in full, and no condition exists that presents a risk to Acquired Company or any member of Acquired Company's Controlled Group of incurring a liability under such Title.

(h)    Each Company Plan is by its terms able to be unilaterally amended or terminated by Acquired Company.

(i)    No individual classified as a non-employee, including any independent contractor, leased employee or consultant, for purposes of receiving employee benefits, regardless of treatment for other purposes, is eligible to participate in, or receive benefits under, any Company Plan that does not specifically provide for his or her participation.

VP/#63856056.10

(j)      Acquired Company does not have any current or potential obligation to provide post-employment or post-termination health, life or other welfare benefits other than as required under Section 4980B of the Code or any similar applicable Law.

(k)      There do not exist any pending or, to the Seller's Knowledge, threatened claims (other than routine undisputed claims for benefits), suits, actions, disputes, audits or investigations with respect to any Company Plan.

(l)      Except as set forth on the **Employee Benefits Schedule** attached hereto as <u>Schedule 3.17(l)</u>, the consummation of the transactions contemplated by this Agreement will not (i) accelerate the time of the payment or result in the vesting of, or increase the amount of, or result in the forfeiture of compensation or benefits under any Employee Benefit Plan, (ii) result in severance pay or any increase in severance pay upon any termination of employment after the date hereof (or upon the Closing) pursuant to any Contract or Company Plan or (iii) cause Acquired Company to record additional compensation expense on its income statements with respect to any outstanding equity based award.

(m)      No payment or benefit with respect to any employee of Acquired Company is required to be characterized as a "parachute payment," within the meaning of Section 280G(b)(2) of the Code, and there is no Contract to which Acquired Company is a party, or by which Acquired Company is bound, to compensate any individual for excise taxes paid pursuant to Section 280G or Section 4999 of the Code.

(n)      With respect to each Company Plan that is maintained for service providers located outside of the United States (the "**Foreign Plans**"), no Foreign Plan has any unfunded or underfunded Liabilities, and each Foreign Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities. Each such Foreign Plan has been established, maintained and administered in compliance, in all material respects, with its terms and all applicable Laws and no material obligation or liability of Acquired Company exists with respect to such Foreign Plan.

(o)      With respect to each Company Plan that is subject to coverage, nondiscrimination and/or top-heavy testing, each such Company Plan has passed each such applicable test for each plan year for which the statute of limitations under the Code has not expired and/or has taken the appropriate actions to correct any failure of any such test within the applicable time limits.

3.18    <u>**Insurance**</u>.  The "**Insurance Schedule**" attached hereto as <u>Schedule 3.18</u> lists all fire, theft, casualty, general liability, workers' compensation, business interruption, product liability, automobile, and other insurance policies maintained by Acquired Company (the "**Insurance Policies**"), and specifies the type of coverage, the amount of coverage, the annual premiums, the carrier and the expiration date of each such policy, and all claims outstanding thereunder.  Acquired Company has furnished to the Purchaser copies of all such Insurance Policies, together with all riders and amendments thereto.  All such Insurance Policies are in full force and effect on the date of this Agreement, and Acquired Company is not in default, in any material respect, with respect to its obligations under any such Insurance Policy.  In the past four (4) years there has been no claim by Acquired Company under any insurance policy as to which coverage has been denied or disputed by the underwriters of any insurance policy. To the Seller's Knowledge, there is no threatened termination of, premium increase with respect to, or material alteration of coverage under, any of the Insurance

23

Policies. Acquired Company shall, immediately after the Closing, continue to have coverage under the Insurance Policies with respect to events occurring prior to the Closing.

**3.19    Affiliated Transactions**.  Except as set forth in the "**Affiliated Transactions Schedule**" attached hereto as Schedule 3.19, (a) no officer, director, manager, stockholder, member, employee or Affiliate of Acquired Company, the Seller, or Shareholder and (b) no immediate family member of any such officer, director, manager, stockholder, member, employee or Affiliate, or any Person in which any such Person owns any beneficial interest, (i) is a party to any Contract or owns any property or asset (tangible or intangible) used in the operation of the business of Acquired Company (other than, in the case of any employee, officer or director, any employment Contract in the Ordinary Course of Business) or (ii) has been involved in the past four (4) years in any business arrangements or transactions with Acquired Company.

**3.20    Compliance with Laws**.  During the past four (4) years, Acquired Company has complied in all respects with all applicable Laws of Governmental Authorities and COVID-19 Measures in effect on or prior to the Closing Date which apply to Acquired Company or to which Acquired Company is otherwise be subject, other than noncompliance that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Acquired Company, and Acquired Company has not received written notice of, and no claims have been filed (or, to Seller's Knowledge, have been threatened to be filed) against Acquired Company alleging, any violation by Acquired Company of any such Law or COVID-19 Measures, except in each case: (a) any immaterial violations that have been corrected; or (b) any such violations that are set forth on the "**Compliance Schedule**" attached hereto as Schedule 3.20.

**3.21    Environmental Matters**.

(a)    As used in this Section 3.21, the following terms shall have the following meanings:

(i)    "**Environmental Laws**" means all applicable Laws and Orders, in effect as of the Closing Date, (a) relating to pollution or contamination of the environment or the protection of natural resources, endangered or threatened species and human health or safety or (b) concerning exposure to or the presence, management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, reporting, disposal or remediation of Hazardous Materials.

(ii)    "**Hazardous Materials**" means (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is regulated, listed, limited or prohibited pursuant to any Environmental Law due to a potential for harm including any designated as toxic, hazardous, acutely hazardous or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, mold, urea formaldehyde foam insulation, per- and polyfluoroalkyl substances, and polychlorinated biphenyls.

(b)    Except as disclosed on the "**Environmental Matters Schedule**" attached hereto as Section 3.21, Acquired Company's operation of its business, including at or

from all real estate owned, leased or operated by any of them and their operation of Acquired Company's Assets, are currently and have been during the past four (4) years in compliance in all material respects with all applicable Environmental Laws.

        (c)     Neither Acquired Company nor, to the Knowledge of Seller, any of its predecessors, pre-petition owners nor any other previous owners of assets purchased by Acquired Company, has stored, managed, disposed of, released or exposed any Person to any Hazardous Materials in violation of Environmental Laws.

        (d)     Acquired Company possesses and is currently and has been during the past four (4) years in material compliance with all permits, authorizations, certificates, consents, licenses, orders and approvals necessary under applicable Environmental Laws for the lawful operation of Acquired Company's business as presently conducted (hereinafter referred to as "**Environmental Permit**"). Each such Environmental Permit is valid, binding, and in full force and effect and Acquired Company is not in default under any such Environmental Permit.

        (e)     Acquired Company has not received notice of, and there are no investigations, inquiries, administrative proceedings, actions, suits, claims, legal proceedings or other proceedings pending or threatened against Acquired Company under or relating to any Environmental Laws.

        (f)     Acquired Company has made available to the Purchaser copies of material reports, correspondence and memoranda in Acquired Company's possession relating to the environmental condition of the Leased Real Property.

### 3.22    <u>Customers and Suppliers</u>.

        (a)     The "**Material Customers Schedule**" attached hereto as <u>Schedule 3.22(a)</u> sets forth a list of the names of Acquired Company's customers to which Acquired Company has made aggregate gross sales in excess of Two Hundred Thousand Dollars ($200,000) for each of (x) the fiscal year ended December 31, 2022 and (y) the eleven (11) month period ended November 30, 2023 (the "**Material Customers**"), along with such dollar amounts paid to Acquired Company by each such Material Customer during such periods.  Except as set forth on the Material Customers Schedule, no Material Customer has (i) terminated,  indicated in writing or, , to Seller's Knowledge, threatened that it intends to terminate or not renew its customer relationship with Acquired Company, (ii) materially decreased the volume of goods or services it purchases from Acquired Company or materially decreased the price it pays for such goods or services, other than in the Ordinary Course of Business (e.g., due to the completion or wind-down of a customer project according to its specifications), or (iii) notified Acquired Company in writing of its intention to do any of the foregoing, during the preceding twelve (12) month period.

        (b)     The "**Material Vendors Schedule**" attached hereto as <u>Schedule 3.22(b)</u> sets forth a list of the names of Acquired Company's fifteen (15) largest vendors or suppliers, determined based on the total dollar amount of purchases from such vendors or suppliers for each of (x) the fiscal year ended December 31, 2022 and (y) the eleven (11) months ended November 30, 2023 (the "**Material Vendors**"), along with such dollar amounts of purchases paid by Acquired Company to each such Material Vendor during such

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 48 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

periods. Except as set forth on the Material Vendors Schedule, no Material Vendor has (i) terminated its vendor relationship with Acquired Company; (ii) materially increased the prices it charges or will charge Acquired Company for the goods or services it provides; or (iii) notified Acquired Company in writing of its intention to do so, during the preceding twelve (12) month period.

**3.23    Product Warranties; Product Liability.**

(a)    Copies of Acquired Company's customary product warranties that are included in their respective customary commercial customer Contracts are set forth on the "**Product Warranties Schedule**" attached hereto as <u>Schedule 3.23(a)</u>. Other than as set forth on the Product Warranties Schedule, Acquired Company has not made any express warranties or guarantees with respect to the products marketed or sold or services rendered by it. In the past four (4) years, each product sold or delivered that is an Acquired Company product (*i.e.*, not a product of a third Person) (each, an "**Acquired Company Product**" and collectively, the "**Acquired Company Products**") and each service rendered by Acquired Company has been in conformity with all applicable material Contracts terms and in all material respects with the product warranties set forth on the Product Warranties Schedule, and Acquired Company does not have any material Liability or obligation for replacement or repair thereof or other damages in connection therewith, subject only to the reserve for product and service warranty claims (if any) set forth on the Latest Balance Sheet.

(b)    There are currently no pending, and (i) in the past four (4) years, there has been no pending or, to the Seller's Knowledge, threatened, claim, action, suit, proceeding, arbitration or investigation and Acquired Company has not had any material liability with respect to (A) any Acquired Company Product first sold, directly or indirectly, or offered for sale by Acquired Company and having or alleged to have a defect in manufacture or design, (B) any other product liability or any similar claim with respect to any Acquired Company Product or (C) any claim for the breach of any express or implied product warranty or any similar claim with respect to any such Acquired Company Product other than standard warranty obligations set forth on the Product Warranties Schedule made by Acquired Company in the Ordinary Course of Business; (ii) in the past four (4) years, there has not been any accident or event caused or allegedly caused by any hazard, defect, alleged hazard or alleged defect in manufacture, design, materials or workmanship relating to Acquired Company Products; and (iii) there is currently no pending, and in the past four (4) years, there has been no pending or, to the Seller's Knowledge, threatened, voluntary or compulsory recall, market withdrawal, safety alert, investigation or any other similar notice or action relating to any alleged defect or violation, or lack of safety or efficacy of Acquired Company Products.

**3.24    Labor and Employment Matters.**

(a)    Except as set forth on the "**Labor and Employment Matters Schedule**" attached hereto as <u>Schedule 3.24(a)</u>, (a) there are no ongoing or threatened union organization activities relating to Acquired Company, and no such activities have occurred within the past four (4) years; (b) there are no pending or, to the Seller's Knowledge, threatened strikes, work stoppages, walkouts, lockouts, slowdowns, pickets or other material labor disputes involving Acquired Company, and no such disputes have occurred within the past four (4) years; (c) there are no administrative investigation, audit or other administrative proceedings by the Department of Labor, Equal Employment Opportunity Commission or

other similar Governmental Authority pending, or to the Seller's Knowledge, threatened; and (d) there do not exist any pending or, to the Seller's Knowledge, threatened claims, suits, actions or disputes with respect to any current or former employee, director, consultant or independent contractor of Acquired Company. With respect to the transactions contemplated by this Agreement, any notice to Acquired Company's employees or their representatives required under a collective bargaining agreement or applicable Law has been provided, and all bargaining, consultation or similar obligations to Acquired Company's employees or their representatives required under a collective bargaining agreement or applicable Law have been satisfied. Within the past four (4)years, Acquired Company has not implemented any employee layoffs, plant closures or other actions that did or could give rise to notice or payment obligations under WARN, and no such activities have been announced or are planned.

(b)     Acquired Company: (i) is in compliance with all applicable Laws with respect to employment, employment practices, immigration matters, terms and conditions of employment and wages and hours, in each case, with respect to Affected Employees; (ii) has withheld and reported all amounts required by applicable Law to be withheld and reported with respect to wages, salaries and other payments to employees of Acquired Company; (iii) is not liable for any arrears of wages or any Taxes or any penalty for failure to comply with any of the foregoing; (iv) is not liable for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees of Acquired Company (other than routine payments to be made in the Ordinary Course of Business and consistent with past practice); and (v) has properly classified all of its employees as exempt or non-exempt and is in compliance in all material respects with the Fair Labor Standards Act or any other applicable Law regarding payment of wages and overtime. Acquired Company has no direct or indirect liability with respect to any misclassification of any Person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(c)     The "**Employee Census Schedule**" attached hereto as Schedule 3.24(c), sets forth a complete and accurate list of all employees who are working for Acquired Company, including in each case, their name, employer, title, department, service date, full time/part time status, salaried/hourly status, active or leave status (if on leave, with type of leave indicated and projected return date), exempt/non-exempt status, work location, base salary/wage, and bonus entitlement. The **Employee Census Schedule** separately sets forth a complete and accurate list of all third party temporary employees, consultants, and independent contractors who are currently providing, or have provided in the past three (3) years, services to Acquired Company and includes their name, employer, work location, position description or service performed, date initially contracted, hours worked, term of assignment and fee structure.

**3.25     Inventory**. All inventory (including raw materials, work-in-process and finished goods) reflected on the Latest Balance Sheet is owned by Acquired Company free and clear of all Liens (except Permitted Liens) and no inventory is held on a consignment basis. The quantities of each item of inventory (whether raw materials, work-in-process or finished goods) are not excessive and are quantity held in the Ordinary Course of Business of Acquired Company.

3.26    **Bank Accounts; Directors and Officers**.

(a)    The "**Bank Accounts Schedule**" attached hereto as Schedule 3.26(a) lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) for Acquired Company. Except as set forth on the Bank Accounts Schedule, Acquired Company has not granted any powers of attorney to any third Person.

(b)    A list of the directors and officers (or the equivalent thereof) of Acquired Company is set forth on the "**Directors and Officers Schedule**" attached hereto as Schedule 3.26(b).

3.27    **Permits**. Acquired Company possesses all material approvals, authorizations, certificates, consents, licenses, orders and permits and other similar authorizations of all Governmental Authorities or non-governmental regulators, auditors, trade organizations and industry associations (hereinafter referred to as "**Permits**") necessary for the lawful operation of Acquired Company's business as presently conducted, or the lawful ownership of properties and assets of the business, as conducted on the date hereof. Each such Permit is valid, binding and in full force and effect and Acquired Company is not in default (nor with the giving of notice or lapse of time or both, would be in default) in any respect under any such Permit, other than default that would not, individually or in the aggregate, reasonably be expected to materially and adversely affect the Acquired Company. The "**Permits Schedule**" attached hereto as Schedule 3.27 sets forth a true, complete and correct list of all Permits.

3.28    **Customs & International Trade; Regulatory Filings**.

(a)    Acquired Company is, and at all times during the past four (4) years has been, in compliance with all applicable Customs & International Trade Laws, and neither Acquired Company nor, to Seller's Knowledge, any of its directors, officers, employees, agents or other Persons authorized to act or acting for or on behalf of Acquired Company, has committed any violation of, or incurred any fine or penalty under, any applicable Customs & International Trade Laws.

(b)    Except as specifically authorized by a permit, license exception, or other permit or applicable authorization of a Governmental Authority, or except as set forth on Schedule 3.28(b), Acquired Company has not:

(i)    exported, reexported, transferred, or brokered the sale of any goods, services, technology, or technical data to any destination to which, or individual for whom, a license or other authorization is required under the U.S. Export Administration Regulations (the "**EAR**", 15 C.F.R. § 730 et seq.), the International Traffic in Arms Regulations (the "**ITAR**", 22 C.F.R. § 120 et seq.), or the U.S. economic sanctions administered by OFAC (31 C.F.R. Part 500 et seq.);

(ii)    exported, reexported, or transferred any goods, services, technology, or technical data to, on behalf of, or for the benefit of any person or entity (i) designated as a Specially Designated National by OFAC, or (ii) on the Denied Persons, Entity, or Unverified Lists of Bureau of Industry and Security, or (iii) on the Debarred List of the DDTC (if applicable);

(iii)    exported any goods, services, technology, or technical data that have been or will be used for any purposes associated with nuclear activities, missiles, chemical or biological weapons, or terrorist activities, or that have been or will be used, transshipped or diverted contrary to applicable U.S. trade controls;

(iv)    exported, reexported, transferred, or imported any goods, services, technology, or technical data to or from Cuba, Iran, Libya, North Korea, Syria, or Sudan during a time at which such country and/or its government was subject to a U.S. trade embargoes under OFAC regulations, the EAR, or any other applicable statute or Executive Order;

(v)    manufactured any defense article as defined in the ITAR, including within the United States and without regard to whether such defense article was subsequently exported, without being registered and in good standing with the DDTC;

(vi)    imported any goods except in full compliance with the import and customs Laws of the United States, including but not limited to Title 19 of the United States Code, Title 19 of the Code of Federal Regulations, and all other regulations administered or enforced by the Bureau of Customs and Border Protection; or

(vii)    violated the antiboycott prohibitions, or failed to comply with the reporting requirements, of the EAR (15 C.F.R. § 760) and the Tax Reform Act of 1976 (26 U.S.C. § 999).

(c)    Acquired Company has obtained (A) all import and export licenses, license exceptions and other permits, notices, declarations and classifications required for the export, import and reexport of products, services, software and technology related to the Acquired Company's business and operations as presently conducted, and (B) all Export Control Authorizations.  Schedule 3.28(c) sets forth a true, correct and complete list of Export Control Authorizations held by Acquired Company, used in Acquired Company's business or to which Acquired Company is a party.

(d)    Acquired Company has not undergone and is not undergoing, any audit, review, inspection, investigation, survey or examination by a Governmental Authority relating to export, import, or other trade-related activity.  To the Knowledge of the Seller, there are no threatened claims, nor presently existing facts or circumstances that would constitute a reasonable basis for any future claims, with respect to exports, imports, or other trade-related activity by Acquired Company.  Acquired Company has not submitted any voluntary disclosures to any Governmental Authority, nor has Acquired Company received any notice from any Governmental Authority, regarding any actual, alleged or potential violation of Customs & International Trade Laws.

### 3.29    Anti-Corruption Laws.

(a)    Acquired Company has at all times conducted its business in compliance with all Applicable Anti-Corruption Laws.

VP/#63856056.10

(b)    Neither Acquired Company, nor, to Seller's Knowledge, any agent, representative, consultant, vendor, contractor, broker, finder, distributor, partner, or any other similar person associated with Acquired Company, whether directly or indirectly, (i) has offered, promised, paid, authorized, or taken any act in furtherance of any offer, promise, payment or authorization of payment of anything of value to any Governmental Authority or Person of concern for purpose of securing discretionary action or inaction or a decision of a Governmental Authority, influence over discretionary action of a Governmental Authority, or any improper advantage; or (ii) has taken any action otherwise prohibited by the substantive prohibitions or requirements of any Applicable Anti-Corruption Law in connection with or relating in any way to the business of Acquired Company.

(c)    Neither Acquired Company, nor, to Seller's Knowledge, any agent, representative, consultant, vendor, contractor, broker, finder, distributor, partner, or any other similar person associated with Acquired Company, (i) is or has been within the last four (4) years the subject of any investigation, inquiry, or enforcement proceedings by any Governmental Authority, administrative or regulatory body regarding any offense or alleged offense under Applicable Anti-Corruption Laws in connection with or relating to the business of Acquired Company in any way or seeking forfeiture of any assets or cancellation of any Contracts by virtue of alleged violations of any Applicable Anti-Corruption Laws; (ii) no such investigation, inquiry or proceedings have been threatened or are pending; (iii) Acquired Company has not received any whistleblower allegations of violations of Applicable Anti-Corruption Laws; and, (iv) there are no circumstances that would reasonably be expected to give rise to any such investigation, inquiry or proceeding of or against Acquired Company.

(d)    Acquired Company keeps and maintain books and records which accurately and fairly reflect the transactions and dispositions of the assets of Acquired Company.  Acquired Company does not keep or maintain any accounts or funds that are not reflected in its books and records.

**3.30    No Other Representations and Warranties**. Except for the representations and warranties contained in Article 2 and this Article 3 (including the related portions of the Schedules), none of Seller Parties, the Acquired Company, or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller Parties or the Acquired Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Acquired Company furnished or made available to Purchaser and its representatives (including any information, documents or material made available to Purchaser in the Data Room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Acquired Company, or any representation or warranty arising from statute or otherwise in law.

## 4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller Parties that:

**4.1    Organization and Power**.  The Purchaser is a limited liability company, duly organized and validly existing under the laws of the state of Delaware with full power and authority to enter into this Agreement and the Related Documents and to perform its obligations hereunder and thereunder. Purchaser has all requisite corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.

VP/#63856056.10

4.2     **Authorization**.  The execution, delivery and performance by the Purchaser of this Agreement and the Related Documents to which the Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action, and no other proceedings on the part of the Purchaser are necessary to authorize the execution, delivery or performance of this Agreement or any such other agreements.  This Agreement has been duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the Seller Parties) this Agreement constitutes and, upon execution and delivery by the Purchaser, the other agreements contemplated hereby to which the Purchaser is a party shall each constitute, the valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with their respective terms, except that such enforceability may be limited by (a) bankruptcy, insolvency, reorganization, moratorium or other similar laws, or by equitable principles, relating to or limiting the rights of creditors generally and (b) equitable principles regarding upon the availability of specific performance, injunctive relief or other equitable remedies.

4.3     **No Violation**.  The execution, delivery and performance of this Agreement and the Related Documents by the Purchaser and the consummation of the transactions contemplated hereby and thereby do not and shall not (a) result in any violation or breach of any of the provisions of, (b) constitute a default under, result in a violation of, or cause the acceleration or imposition of any obligation under, or (c) require any authorization, consent, approval, exemption or other action by or notice to any court or Governmental Authority under, the provisions of the Purchaser's Constituent Documents or any Contract to which the Purchaser is bound or any Law or Order to which the Purchaser is subject.

4.4     **Litigation**.  There are no actions, suits, proceedings, Orders or investigations pending or, to the Purchaser's knowledge, threatened against the Purchaser, at law or in equity, or before or by any Governmental Authority, which would materially and adversely affect the Purchaser's performance under this Agreement and the Related Documents or the consummation of the transactions contemplated hereby or thereby.

4.5     **Brokerage**.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Purchaser and for which the Seller Parties could be liable.

4.6     **Governmental Consent, etc**.  In reliance on the Seller Parties' representations and warranties in Section 3.16, no permit, consent, approval or authorization of, or declaration to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Agreement or the Related Documents (to which the Purchaser is a party) by the Purchaser, or the consummation by the Purchaser of any of the transactions contemplated hereby or thereby, except where the failure to obtain any such item would not have or would not reasonably be expected to have, individually or in the aggregate together with all other such failures, a Material Adverse Effect on the business, assets, condition (financial or otherwise), operating results or operations of the Purchaser, taken as a whole, or on the ability of the Purchaser to consummate timely the transactions contemplated hereby.

4.7     **Investment Representations**.

(a)     The Purchaser is acquiring the Company Interests purchased hereunder for its own account with the present intention of holding such securities for purposes of

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 54 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

investment, and the Purchaser has no present intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state securities Laws.

(b)    The Purchaser is sophisticated in financial matters and has the necessary knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of its participation in the transactions contemplated by this Agreement.

(c)    The Purchaser is an "accredited investor" as defined in Rule 501 of Regulation D promulgated by the Securities and Exchange Commission under the Securities Act.

(d)    The Purchaser further acknowledges that the Company Interests have not been registered under the Securities Act, or any state or foreign securities Laws, and that the Company Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the Securities Act and are registered under any applicable state or foreign securities Laws or pursuant to an exemption from registration under the Securities Act and any applicable state or foreign securities Laws.

**4.8**    **Independent Investigation**. Without limiting any representation or warranty set forth in Article 2 or Article 3, Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise), or assets of the Acquired Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller Parties and the Acquired Company for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of Seller Parties set forth in Article 2 and Article 3 of this Agreement (including the related portions of the Schedules); and (b) none of Seller Parties, the Acquired Company, or any other Person has made any representation or warranty as to Seller Parties, the Acquired Company, or this Agreement, except as expressly set forth in Article 2 and Article 3 of this Agreement (including the related portions of the Schedules).

## 5.    CLOSING TRANSACTIONS

**5.1**    **The Closing**.    Subject to the conditions contained in this Agreement, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by conference call and exchange of signature pages by e-mail, in each case effective at 10:00 am Eastern Standard Time on the date hereof, or such other time mutually agreed to by the parties (the "**Closing Date**").

**5.2**    **Actions to Be Taken at the Closing**.    The sale and delivery of the Purchased Interests and the payment of the Purchase Price pursuant to the terms of this Agreement shall take place at the Closing and, simultaneously, the other transactions contemplated by this Agreement shall take place by the delivery of all of the deliverables set forth in Section 5.3.

VP/#63856056.10

5.3    **Closing Deliveries**.

(a)    The Seller shall deliver, or cause to be delivered, to the Purchaser at the Closing the following documents, duly executed by the appropriate Person(s) where necessary to make them effective:

(i)    Membership Interest Assignment Agreement, in a form attached hereto as <u>Exhibit B</u> ("**Assignment Agreement**"), duly executed by Seller;

(ii)    a certificate of the secretary or assistant secretary, or equivalent officer, of Acquired Company certifying as to copies of Acquired Company's Constituent Documents;

(iii)    a certificate of the secretary or assistant secretary, or equivalent officer, of Seller certifying as to a copy of the board of director resolutions authorizing the execution, delivery and performance of this Agreement by Seller, and the incumbency and signatures of the officers executing this Agreement on behalf of Seller;

(iv)    a copy of the certificate of formation, as amended, of Acquired Company, certified by the Secretary of State of the State of Delaware;

(v)    certifications issued by the secretary or department of state, or another appropriate officer, of the State of Delaware and each jurisdiction in which Acquired Company is qualified to do business, as to the good standing of such Person under the laws of such jurisdiction;

(vi)    a properly completed and executed current IRS Form W-9 from Seller;

(vii)    the Escrow Agreement executed by the Escrow Agent and Seller;

(viii)    share books, share ledgers, minute books and corporate seals of Acquired Company as directed by the Purchaser;

(ix)    payoff letters, invoices and appropriate termination statements under the Uniform Commercial Code and other instruments evidencing the repayment of all Unpaid Transaction Expenses, extinguishment of all Payoff Indebtedness of the Acquired Company and all security interests related thereto as of the Closing, in form and substance reasonably satisfactory to the Purchaser;

(x)    evidence of all required consents and approvals of third parties set forth under the "Required Consents" heading of <u>Schedule 3.5</u>, duly executed by the counterparties thereto, in a form reasonably acceptable to the Purchaser;

(xi)    copies of complete and final invoices with respect to all Unpaid Transaction Expenses;

(xii)    evidence of the termination, effective as of the Closing and in form and substance reasonably satisfactory to the Purchaser, of each of each agreement set forth on Schedule 5.3(a)(xii);

(xiii)    employment agreements, each in form and substance satisfactory to the Purchaser, duly executed by each of Bruce Lach, Brandon Nohr, Jamie Wolbeck, Brent Morris and Tammie Coleman (each an "**Employment Agreement**" and collectively, the "**Employment Agreements**");

(xiv)    restrictive covenant agreements, in form and substance satisfactory to the Purchaser, duly executed by each Person set forth on Schedule 5.3(a)(xiv);

(xv)    the Rollover Agreement duly executed by Seller; and

(xvi)    such other documents or instruments as the Purchaser reasonably may request as are required to consummate the transactions contemplated hereby.

All of the foregoing documents in this Section 5.3(a) shall be reasonably satisfactory in form and substance to the Purchaser and shall be dated as of the Closing Date unless otherwise provided above.

(b)    The Purchaser shall deliver, or cause to be delivered, to the Seller at the Closing the following items, duly executed by the appropriate Person(s) where necessary to make them effective:

(i)    the Closing Amount;

(ii)    the Escrow Agreement;

(iii)    the Employment Agreements;

(iv)    the Rollover Agreement; and

(v)    such other documents or instruments as the Seller reasonably may request as are required to consummate the transactions contemplated hereby.

All of the foregoing documents in this Section 5.3(b) shall be reasonably satisfactory in form and substance to the Seller and shall be dated as of the Closing Date unless otherwise provided above.

(c)    The Purchaser shall make or cause to be made payment (on behalf of Acquired Company) the other payments as specified in Section 1.3(c)(i)-(iii).

## 6.    INDEMNIFICATION

**6.1    Indemnification by Seller Parties**.  Seller Parties, jointly and severally, agree to and shall indemnify the Purchaser and its officers, directors, managers, employees, stockholders, members, partners, agents and representatives (each, individually, a "**Purchaser Indemnified Party**"

and collectively, the "**Purchaser Indemnified Parties**") and defend and hold each Purchaser Indemnified Party harmless against any Losses that are incurred, suffered, sustained or required to be paid by or sought to be imposed upon such Purchaser Indemnified Party arising out of or relating to:

(a)    any breach of any of the representations or warranties contained in Article 2 or Article 3 of this Agreement;

(b)    any breach of, or failure to perform, any agreement or covenant of the Seller Parties contained in this Agreement;

(c)    any Closing Date Indebtedness and any Transaction Expenses, (for purposes of clarity, in each case subject to the limitations set forth in Section 6.6(e)), as applicable;

(d)    any Pre-Closing Taxes (taking into account Section 7.4(b) and Section 7.4(g) hereof); or

(e)    any item listed on the "**Special Indemnity Schedule**" attached hereto as Schedule 6.1(c) (Losses contemplated by this Section 6.1 are collectively referred to as "**Purchaser Losses**").

6.2    **Losses**.  Purchaser Losses shall be reduced by (a) the aggregate amount of any insurance proceeds actually received by the Purchaser or Acquired Company (in each case net of any costs of recovery and premium increases), with respect to such Purchaser Losses, and (b) the aggregate amount recovered under any indemnity agreement, contribution agreement or Contract (net of any costs of recovery) between the Purchaser or Acquired Company, on the one hand, and any third Person, on the other hand.  If an indemnification payment is received by any Purchaser Indemnified Party and such Purchaser Indemnified Party later receives insurance proceeds, other third-party recoveries in respect of the related Purchaser Losses that were not previously credited against such indemnification payment when made, such Purchaser Indemnified Party shall promptly pay to the Seller an amount equal to the lesser of (A) such insurance proceeds and other third-party recoveries with respect to such Purchaser Losses and (B) the indemnification payment previously paid by the Seller Parties with respect to such Purchaser Losses. Notwithstanding the forgoing, Purchaser and/or the Acquired Company shall use commercially reasonable efforts to mitigate any and all of Purchaser Losses and to use commercially reasonable efforts to recover under any insurance policies, indemnity agreement, contribution agreement or Contract with a third Person for any Purchaser Losses, provided that neither Purchaser, the Acquired Company nor any other Purchaser Indemnified Party shall be obligated to commence any Action against the relevant insurer, underwriter or counterparty under any such policy or agreement).

6.3    **Indemnification by the Purchaser**.  The Purchaser agrees to indemnify the Seller Parties and their respective officers, directors, managers, employees, agents, stockholders, members, partners, agents, trustees, beneficiaries, heirs and legal representatives, as the case may be (each individually, a "**Seller Indemnified Party**" and collectively, the "**Seller Indemnified Parties**") and hold each Seller Indemnified Party harmless against, any Losses such Seller Indemnified Party may suffer, sustain or become subject to as a result of, arising out of or relating to:

(a)    any breach of any of the representations or warranties of the Purchaser contained in Article 4 of this Agreement, or

(b)      any breach of, or failure to perform, any agreement or covenant of the Purchaser contained in this Agreement (Losses contemplated by this <u>Section 6.3</u> are collectively referred to as "**Seller Losses**").

      **6.4**    **Method of Asserting Claims**.  As used herein, an "Indemnified Party" shall refer to a Purchaser Indemnified Party or Seller Indemnified Party, as applicable; provided, that, with respect to any actions to be taken by an Indemnified Party under this <u>Section 6.4</u>, "**Indemnified Party**" shall mean the Purchaser or Seller, as applicable, and the "**Indemnifying Party**" shall refer to the party hereto obligated to indemnify such Indemnified Party; provided, further, that, with respect to any actions to be taken by Seller as an "Indemnifying Party" under this <u>Section 6.4</u>, "**Indemnifying Party**" shall mean the Seller.

      (a)      <u>Third-Party Claims</u>.  In the event that any Indemnified Party is made a defendant in or party to any action or proceeding, judicial or administrative, instituted by any third party for the Liability or the costs or expenses of which are Seller Losses or Purchaser Losses, as the case may be (any such third-party action or proceeding being referred to herein as a "**Third Party Claim**"), the Indemnified Party shall give the Indemnifying Party prompt notice thereof.  The failure to give such notice shall not affect the Indemnified Party's ability to seek reimbursement except to the extent such failure has actually prejudiced the affected the Indemnifying Party's ability to successfully defend such Third Party Claim.  The Indemnifying Party shall have the right to assume sole control and contest and defend a Third Party Claim, upon the delivery of written notice to the Indemnified Party of the intention so to contest and defend within twenty (20) Business Days after the Indemnified Party gives the Indemnifying Party written notice of such Third Party Claim (but, in all events, at least ten (10) Business Days prior to the date that an answer to such Third Party Claim is due to be filed), which notice shall describe the Third Party Claim in reasonable detail, including a reasonable estimate of the amount of Losses; <u>provided</u>, <u>however</u>, that the Indemnifying Party acknowledges liability therefor hereunder.  Notwithstanding the forgoing, the Indemnifying Party shall not have the right to assume the defense of a Third Party Claim if (i) such Third Party Claim involves criminal allegations, (ii) such Third Party Claim demands injunctive or other equitable relief, (iii) an actual conflict exists between the Indemnifying Party and the Indemnified Party as mutually agreed between the Indemnifying Party and the Indemnified Party, or if the Indemnifying Party and the Indemnified Party cannot agree within five (5) days, then the Indemnifying Party and the Indemnified Party shall engage an independent conflict counsel from an AmLaw 200 firm to determine if an actual conflict exists, which such conflict counsel fees shall be split equally among the parties and the conflict counsel shall be directed to render a decision within ten (10) days of engagement, or (iv) if a Purchaser Indemnified Party is the Indemnified Party, with a customer, supplier or other business relation of Acquired Company or with respect to which the Indemnified Party has determined, in good faith, that there is a reasonable possibility that such claim will adversely affect it, its business relationships or any of its Affiliates in any material respect, other than as a result of monetary damages for which it would be entitled to indemnification hereunder and (v) if the amount of the Third Party Claim exceeds (or may exceed in the good faith judgement of Purchaser) the amount in the Indemnity Escrow Fund, taking into account such amount for all other Third Party Claims.  Such contest and defense shall be conducted by attorneys engaged by the Indemnifying Party.  Such contest and defense shall be conducted by attorneys engaged by the Indemnifying Party and the Indemnifying Party shall have the right to take such action as it deems reasonably necessary to avoid, dispute, defend, appeal, or make counterclaims pertaining to any such Third Party Claim.  The Indemnified Party shall be entitled at any time, at its own cost and expense (which

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 59 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

expense shall not constitute a Loss unless such expense is incurred at the request of the Indemnifying Party), to participate in such contest and defense and to be represented by attorneys of its own choosing, subject to the Indemnifying Party's right to control the defense thereof.  The Indemnified Party shall cooperate with the Indemnifying Party in the conduct of such defense of such Third Party Claim.  Neither the Indemnified Party nor the Indemnifying Party may concede, settle or compromise any Third Party Claim without the consent of the other party, which consent shall not be unreasonably withheld or delayed; provided, however, the Indemnifying Party or Indemnified Party shall be entitled to settle such Third Party Claim only if such settlement (i) includes an unconditional release of the Indemnified Party from all Liabilities that are the subject matter of such Third Party Claim, (ii) does not contain any admission of wrongdoing or any ongoing obligation other than confidentiality and a covenant not to sue and (iii) includes the payment of monetary damages only in an amount that is equal to or less than the amount then remaining under the Cap, taking into account any other unresolved Third Party Claims  Notwithstanding the foregoing, in the event the Indemnifying Party fails to contest and defend a Third Party Claim, or fails to do so diligently,  the Indemnified Party shall be entitled to contest, settle and defend such Third Party Claim and to pursue its indemnification rights hereunder and whatever other legal remedies may be available to enforce its rights under this Article 6.

(b)    Direct Claims.  In the event any Indemnified Party should have a bona fide claim against any Indemnifying Party that does not involve a Third Party Claim (a "**Direct Claim**" and, together with Third Party Claims, "**Claims**"), the Indemnified Party shall promptly deliver written notice of such Direct Claim to the Indemnifying Party, which notice shall specify in reasonable detail to the extent known the amount or an estimate of the amount of the Liability arising therefrom and the basis therefor.  The failure to give such notice shall not affect the Indemnified Party's ability to seek indemnification except to the extent such failure has actually prejudiced the Indemnifying Party.  If the Indemnifying Party notifies the Indemnified Party in writing that it does not dispute the Direct Claim described in such notice or fails to respond in writing, describing its objections within thirty (30) days of its receipt of such notice, the Losses in the amount specified in the Indemnified Party's notice shall be deemed a liability of the Indemnifying Party, and the Indemnifying Party shall pay the amount of such Losses to the Indemnified Party on demand in accordance with the terms herein.  If the Indemnifying Party gives notice to the Indemnified Party that it disputes the Direct Claim within thirty (30) days of its receipt of such notice, the Indemnified Party may pursue its indemnification rights hereunder and whatever other legal remedies may be available to enforce its rights under this Article 6.

6.5    **Adjustments**.  Any indemnification payment paid under this Article 6 and any payment under Section 7.4 will be considered an adjustment to the Purchase Price, to the maximum extent permitted by applicable Law, for Tax, and all other purposes.

6.6    **Limitation**.  The rights to indemnification under this Article 6 shall be subject to the following limitations:

(a)    any Claim for indemnification under this Article 6 shall be made by giving written notice under Section 6.4 to the Purchaser, Seller or Shareholder, as applicable.  The representations, warranties, covenants and agreements set forth in this Agreement shall survive the Closing as follows:

(i)    any Claims pursuant to Section 6.1(b) or Section 6.3(b) shall survive until the earlier of the expiration of such agreement or covenant or the full performance of such agreement or covenant;

(ii)    (x) any representation or warranty contained in Sections 2.1 (Authorization), 2.3 (Capitalization), 2.5 (Brokerage), 3.1 (Restructuring), 3.2 (Organization and Power), 3.3 (Subsidiaries), 3.4 (Company Interests), 3.5(a) (Authorization),    3.15 (Brokerage), 3.19 (Affiliated Transactions), 4.1 (Organization and Power), 4.2 (Authorization) and 4.5 (Brokerage) (the representations and warranties described in this clause (x) collectively, the "**Fundamental Representations**") and (y) any representation or warranty contained in Section 3.21 (Environmental Matters) (the representations and warranties described in this clause (y) the "**Environmental Representations**") shall survive until the fifth (5th) anniversary of the Closing Date;

(iii)    any representation or warranty contained in Sections 3.11 (Taxes) and    3.17 (Employee Benefit Plans) (collectively, the "**Statutory Representations**") shall survive until the sixth (6th) anniversary of the Closing Date;

(iv)    any representation or warranty contained in this Agreement (other than the Fundamental Representations, Environmental Representations, and the Statutory Representations) shall survive until the first (1st) anniversary of the Closing Date (the "**Indemnification Escrow Release Date**"); and

(v)    any Claims pursuant to Sections 6.1(c) and 6.1(d) shall survive until the sixth (6th) anniversary of the Closing Date.

Any Claim for indemnification for which notice is not given to the Indemnifying Party on or before the expiration of the survival period specified in this Section 6.6(a) will have no effect; provided, however, that in the event a good faith Claim with reasonable specificity (to the extent known at such time) has been made by the giving of timely written notice, and such Claim is unresolved as of the conclusion of such time limitation, if any, then the right to indemnification with respect to such Claim shall remain in effect until such matter shall have been finally resolved (provided, that the applicable Indemnified Party shall have commenced litigation within twelve (12) month following the expiration of the applicable survival period).

(b)    No Seller Party shall be required to indemnify the Purchaser Indemnified Parties under Section 6.1(a) (other than in respect of any breach of a Fundamental Representation or a Statutory Representation) unless and until (i) such Claim (or series of Claims) involves Purchaser Losses in excess of Ten Thousand and 0/100 Dollars ($10,000.00) and (ii) the aggregate amount of Purchaser Losses as to which the Purchaser Indemnified Parties would otherwise be entitled under Section 6.1(a) (other than in respect of a breach of any Fundamental Representation, any Statutory Representation) exceed One Hundred Thousand and 0/100 Dollars ($100,000.00) (the "**Basket**"), at which point each Seller Party shall be jointly and severally liable to pay the Purchaser for all Purchaser Losses in excess of the Basket, subject to Section 6.6(c).

38

(c)      The aggregate amount of Purchaser Losses for which the Seller Parties shall be liable under <u>Section 6.1(a)</u> (other than in respect of a breach of any Fundamental Representation or any Statutory Representation) shall not exceed Three Million Eight Hundred Thousand Dollars ($3,800,000) (the "**Cap**").      Except as otherwise provided under Section 7.4(g), the aggregate amount of Purchaser Losses for which Seller Parties shall be liable for a breach of any Fundamental Representation and any Statutory Representation shall not exceed the Purchase Price. The aggregate amount of Seller Losses for which Purchaser shall be liable with respect to this Agreement shall not exceed the Purchase Price.

(d)      The parties acknowledge and agree that the limitations set forth in <u>Sections 6.6(b)</u> and <u>6.6(c)</u> and the survival periods set forth in <u>Section 6.6(a)</u> shall not apply with respect to any Losses arising out of, resulting from or relating to Fraud.

(e)      The Seller Parties shall not be obligated to indemnify the Purchaser Indemnified Parties with respect to any matter or item to the extent that such matter or item was reflected on the face of the Company Statements or in the Adjustment Amount as finally agreed to pursuant to <u>Section 1.4</u>, as applicable.

(f)      For purposes of this <u>Article 6</u>, any inaccuracy in or breach of any representation or warranty, and the amount of indemnifiable Losses arising therefrom or related thereto, shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty

### 6.7    <u>Manner of Payment</u>.

(a)      Upon a final determination of an indemnification Claim made by the Indemnified Party, whether such final determination is by reason of (a) a failure of the Indemnifying Party to timely object to a notice of a Claim, (b) the mutual agreement of the Indemnifying Party and the Indemnified Party or (c) a final judgment of a court of competent jurisdiction which is either not subject to any further appeals or the time for giving notice to take such appeals has lapsed and no such notice was filed (each a "**Final Determination**"), then, provided that Escrow Agent is given sufficient advance notice of such Final Determination to enable Indemnifying Party to satisfy such payment deadline,  the amount of the Losses stated in such claim or otherwise agreed upon or awarded, and due and payable by the Indemnifying Party, shall be paid by the Indemnifying Party within ten (10) Business Days after the date of such Final Determination.

(b)      Subject to the limitations set forth in <u>Section 6.6(b)</u> and <u>Section 6.6(c)</u>, any amounts owing to the Purchaser Indemnified Parties by the Seller Parties shall be recoverable in the following order of priority: (i) *first*, from the Indemnity Escrow Fund to the extent available; then (ii) *second*, from any Seller Party; <u>provided</u>, <u>however</u>, that in the event that, as a result of amounts payable pursuant to (x) <u>Section 6.1(a)</u> solely due to any breach of any Special Representation or (y) <u>Sections 6.1(b)</u> through <u>6.1(e)</u>, the balance of the Indemnity Escrow Account falls below $1,500,000, Seller shall, within ten (10) Business Days thereafter, replenish the Indemnity Escrow Account so that the balance of the Indemnity Escrow Account shall be no less than the Indemnity Escrow Amount.

(c)      [Intentionally Omitted].

(d)    Within five (5) Business Days after the Indemnification Escrow Release Date, the Seller and the Purchaser shall deliver to the Escrow Agent joint written instructions instructing the Escrow Agent to pay by wire transfer of immediately available funds to the Seller, the then remaining balance of the Indemnity Escrow Fund, except that the Escrow Agent shall retain an amount equal to  the aggregate amount of all Losses under each unresolved Claim asserted by the Purchaser in good faith in accordance with <u>Section 6.4</u> of this Agreement prior to the Indemnification Escrow Release Date, but that remains outstanding and unresolved as of the Indemnification Escrow Release Date ("**Unresolved Claims**"). The portion of the Indemnity Escrow Fund retained for the Unresolved Claims shall be released by the Escrow Agent to the Seller (to the extent not utilized to pay for any Unresolved Claims resolved in favor of the Purchaser) upon the resolution of such Unresolved Claims.

**6.8    Remedies**.  The foregoing indemnification provisions shall be the sole and exclusive remedy for the matters set forth in this Agreement, or any of the transactions contemplated hereby or thereby, and no party hereto shall have any cause of action or remedy at law or in equity for breach of contract, rescission, tort or otherwise against any other party arising under or in connection with this Agreement, except with respect to (a) claims related to <u>Sections 1.4</u>, or in the event of Fraud or (b) remedies that cannot be waived as a matter of Law, in each of which case each of the parties shall have and retain all other rights and remedies existing in their favor at law or in equity, including any actions for specific performance and/or injunctive or other equitable relief under Section 9.11. Without limiting the generality of the preceding sentence, no legal action, rights, claims, or causes of action sounding in contribution, tort or strict liability (in each case, other than claims made or contemplated by this <u>Article 6</u>) may be maintained by any Purchaser Indemnified Party, or any of its officers, directors, managers, employees, stockholders, members, owners, affiliates, representatives, agents, successors or assigns, against Acquired Company, Seller or Shareholder, except in the event of Fraud, and the Purchaser, for itself and the other Purchaser Indemnified Parties and each of their respective officers, managers, directors, employees, stockholders, members, owners, affiliates, representatives, agents, successors and assigns, hereby waives any and all other rights, claims, causes of action, statutory rights of contribution or indemnification that any of them might otherwise be entitled to under any federal, state or local Law.

**6.9**    [Intentionally Omitted].

**7.    ADDITIONAL AGREEMENTS**

**7.1    Survival**.  The representations, warranties, covenants and agreements set forth in this Agreement or in any writing specifically required to be delivered to the Purchaser, Seller or Shareholder in connection with this Agreement shall survive the Closing Date and the consummation of the transactions contemplated hereby for the periods set forth in <u>Section 6.6(a)</u>.

**7.2    Press Release and Announcements**.  Following the Closing, Purchaser may issue any press release or make any other public announcement with respect to the execution of this Agreement or the transactions contemplated hereby; <u>provided</u>, that any such press release or public announcement shall be subject to the prior written approval of the Seller which such written approval shall not be unreasonably withheld or delayed.  No other public announcement related to this Agreement or the transactions contemplated hereby shall be made by any Seller Party or their respective Affiliates, except as required by Law, in which event the applicable Seller Party shall consult with Purchaser as to the form and substance of any such announcement required by Law. Notwithstanding anything otherwise contained herein, after the Closing, the Purchaser and its Affiliates

may, without the consent of or notice to any Person, issue one or more press releases or public announcements related to the Acquired Company, and its business, including the Purchaser's control of the Acquired Company, so long as such press releases or other public announcements do not contain any information regarding the economic terms of this Agreement. Seller Parties may reference or reiterate all or any portion of the contents of any such announcement made by the Purchaser or its Affiliates without notice or consent of Purchaser or its Affiliates.

7.3    **Expenses**. Subject to Sections 1.4, 1.5, 7.4 and 7.5, each party shall pay all of its fees, costs and expenses in connection with the negotiation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated by this Agreement and the Related Documents.

7.4    **Tax Matters**.

(a)    The Seller shall prepare (or cause to be prepared) and file (at the expense of the Seller) all Income Tax Returns for Acquired Company that (i) are for a tax period ending on or prior to the Closing Date and (ii) are required to be filed with the IRS or a taxing authority of a state or local jurisdiction within the United States (each such Tax Return being a "**Seller Return**"). The Seller shall provide each Seller Return to the Purchaser for review and approval at least fifteen (15) Business Days prior to the filing thereof. The Purchaser shall cause Acquired Companies to provide the Seller (or its designee) with all necessary authorizations and documents to permit the Seller (or its designee) to execute all such Seller Returns on behalf of the Acquired Company. The Purchaser shall duly prepare all (or cause to be prepared) and file (or cause to be filed) all Tax Returns (other than any Seller Return) of Acquired Company that are due (taking into account any extensions of time to file) after the Closing Date (each such Tax Return being a "**Purchaser Return**"). The Purchaser shall provide each material Purchaser Return that relates to a Pre-Closing Tax Period (including any Straddle Period) to Seller for review as soon as practicable prior to the due date thereof; provided, that this sentence shall not apply to any Purchaser Return that is a consolidated, affiliated or combined return and that includes Persons other than the Acquired Company. Purchaser shall consider Seller's comments to any Purchaser Return in good faith and to the extent they are not inconsistent with the parties' agreements on Tax-related matters as set forth in this Agreement. With respect to any Seller Return, the Seller shall timely pay or cause to be paid all Taxes reported on such Seller Return but only to the extent such Taxes are Pre-Closing Taxes, and, with respect to any Purchaser Return, the Seller shall, no less than five (5) days prior to the due date (including extensions) of such Purchaser Return, pay or cause to be paid to the Purchaser the amount of any Taxes reported on such Purchaser Return to the extent such Taxes are Pre-Closing Taxes.

(b)    If Acquired Company is permitted but not required under applicable Law to treat the Closing Date as the last day of a taxable period, then the parties hereto shall cause Acquired Company to elect to (or otherwise) treat the Closing Date as the last day of such taxable period. In the case of any Straddle Period, the amount of any Taxes based on or measured by income, gross or net sales, payroll, payments or receipts of Acquired Company for the Pre-Closing Tax Period shall be determined based on an interim closing of the books as of the close of business on the Closing Date, and the amount of other Taxes of Acquired Company for a Straddle Period which relate to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator

41

of which is the number of days in the taxable period ending on and including the Closing Date and the denominator of which is the number of days in such Straddle Period.

(c)    The Purchaser, Acquired Company, the Seller shall use reasonable efforts to cooperate fully and in a timely manner, as and to the extent reasonably requested by another party, in connection with the filing of Tax Returns pursuant to this Section 7.4 and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon another party's request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding, making employees available on a mutually convenient basis to provide additional information and explanation of any materials provided hereunder and providing or executing the appropriate power(s) of attorney as necessary to permit the appropriate party to settle, resolve, control or participate, in accordance with the terms of this Agreement, in any Tax-related dispute, claim, audit, examination or proceeding.

(d)    The Purchaser further agrees, upon request of the Seller, to use its commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

(e)    Notwithstanding anything to the contrary herein, all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement ("**Transfer Taxes**") shall be paid by Seller when due, and Seller will file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other such Taxes and fees, and, if required by applicable Law and requested by the Seller, Purchaser and the Acquired Company will join in the execution of any such Tax Returns and other documentation so long as any such Tax Returns and other documents are provided to Purchaser for review and comment at least twenty (20) Business Days prior to the filing thereof.

(f)    This Section 7.4(f) (and not Section 6.4) shall control any inquiry, assessment, proceeding or other similar event relating to Taxes of Acquired Company. Purchaser shall have the right to represent the interests of Acquired Company before the relevant Governmental Authority with respect to any inquiry, assessment, proceeding or other similar event (a "**Tax Matter**") and control the defense, compromise or other resolution of any such Tax Matter, including responding to inquiries, preparing Tax Returns and contesting, defending against and resolving any assessment for additional Taxes or notice of Tax deficiency or other adjustment of Taxes of, or relating to, such Tax Matter; provided, however, that with respect to any Tax Matter that relates to a tax period ending prior to or on the Closing Date, Purchaser shall provide prompt written notice of such Tax Matter to Seller and Seller may upon written notice to Purchaser (such written notice to be provided within thirty (30) days after notice of the Tax Matter has been given to Seller), assume and control the defense of such Tax Matter at Seller's cost and expense, through counsel of Seller's choosing and reasonably acceptable to Purchaser. If Seller elects to assume the defense of any such Tax Matter, Purchaser shall have the right, at its own cost and expense, to participate in the defense of such Tax Matter and Seller shall not enter into any settlement with respect to any such Tax Matter without Purchaser's prior written consent, which consent shall not be unreasonably withheld,

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 65 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

conditioned or delayed. In connection with any Tax Matter that relates to a Straddle Period, such Tax Matter shall be controlled by Purchaser and Seller agrees to reasonably cooperate with Purchaser in pursuing such Tax Matter; provided, however, that Seller shall have the right, at its own cost and expense, to participate in the defense of such Tax Matter. Purchaser shall promptly provide Seller with any notices and other documents received in connection with any Tax Matter described in the preceding sentence. Notwithstanding anything herein to the contrary, Purchaser shall not settle, compromise or abandon any Tax Matter if such settlement or other resolution is reasonably expected to be subject to an indemnification obligation of the Seller Parties hereunder without the prior written consent of the Seller Parties, which consent shall not be unreasonably withheld, conditioned or delayed.

(g)     Except for the obligations of the Shareholder to consummate the Restructuring as provided in <u>Section 3.1</u>, the aggregate amount of Purchaser Losses for which the Seller Parties shall be liable directly relating to, arising out of, or resulting from the Restructuring shall not exceed Five Million Dollars ($5,000,000).

7.5     <u>Directors' and Officers' Liability</u>.

(a)     Prior to the Closing, the Acquired Company shall obtain an irrevocable "tail" insurance policy (the "**D&O Tail Policy**") naming each manager and officer of Acquired Company, who as of immediately prior to the Closing was a manager or officer of Acquired Company (each, a "**Covered Person**"), as direct beneficiaries, on terms no less favorable (including in amount and scope) as maintained by the Acquired Company immediately prior to the Closing, and for the benefit of such individuals for an aggregate period of not less than four (4) years with respect to claims arising from acts, events or omissions that occurred at or prior to the Closing, including with respect to the transactions contemplated by this Agreement. The Purchaser will not, and will cause the Acquired Company not to, cancel or change the D&O Tail Policy. The amount of the premium and other costs incurred to obtain the D&O Tail Policy shall be included in the Unpaid Transaction Expenses to be paid at Closing. To the extent available, the coverage under the D&O Tail Policy shall be the first monetary recourse of any Covered Person with respect to any matter for which the Covered Person is otherwise entitled to indemnification or advancement of expenses from the Acquired Company with respect to such matters arising prior to the Closing. Notwithstanding anything to the contrary in this Agreement (including this <u>Section 7.5</u>), no Seller Indemnified Party shall make any claim for indemnification against the Purchaser or Acquired Company by reason of the fact that such Seller Indemnified Party was a controlling person, director, officer, employee or representative of Acquired Company with respect to any claim brought by a Purchaser Indemnified Party against such Seller under this Agreement or any other agreement entered into in connection with the transactions contemplated by this Agreement.

(b)     This <u>Section 7.5</u>, which shall survive the Closing and shall continue for the periods specified herein, is intended to benefit any Person or entity referenced in this <u>Section 7.5</u> or indemnified hereunder, each of whom may enforce the provisions of this <u>Section 7.5</u> (whether or not parties to this Agreement).

7.6     **WARN**. The Purchaser does not plan or contemplate, and will not for a period of ninety (90) days subsequent to the Closing cause or effectuate, directly or indirectly, any reductions in force or terminations of employees of Acquired Company that, in the aggregate, would trigger any liability under the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101, et

seq., as amended, or any similar foreign, state or local Law, regulation or ordinance (collectively, "**WARN**"); provided, that, prior to the Closing, the Acquired Company provides the Purchaser with a list of employees (by date and location) whose employment was terminated by Acquired Company during the ninety (90) day period immediately prior to the Closing Date.

**7.7** **Release and Waiver**.

(a)     Effective as of the Closing, each Seller Party, on behalf of himself, herself or itself and each of his, her or its heirs, legal representatives, beneficiaries, assigns, successors in interest, past and present officers, directors, employees, shareholders and Affiliates, as applicable (collectively, the "**Releasing Persons**"), hereby knowingly, voluntarily, unconditionally and irrevocably releases, waives, remises and forever discharges Acquired Company and its successors, assigns, former, current or future members, equityholders, partners, insurers, officers, managers, employees, agents, attorneys, representatives and Affiliates, whether in their individual or official capacities (the "**Released Parties**"), from any and all Liabilities of any kind and nature whatsoever (whether known or unknown, fixed or contingent, suspected or claimed, liquidated or unliquidated) that such Seller Party ever had, now has or hereafter can, shall or may have with respect to any act or omission of Acquired Company or Acquired Company's predecessors, successors and assigns or any of its officers, directors, employees, agents, representatives, Affiliates or any other person acting on their behalf that occurred prior to the Closing, (collectively, the "**Released Claims**"); provided, that the foregoing release shall not cover any claims arising from rights of the Seller Parties under: (i) this Agreement or any of the transactions contemplated hereby; (ii) any Related Document; (iii) benefits payable under Employee Benefit Plans in the Ordinary Course of Business; or (iv) any employee compensation earned or accrued as of the Closing(collectively (i)-(iv) the "**Preserved Rights**").  Except with respect to the Preserved Rights, each Seller Party further agrees to waive all rights with respect to the Released Claims, not to file or bring any litigation before any court or other Governmental Authority on the basis of or respecting any Released Claim against any Released Party, to not seek or recover any amounts in connection with or under the Released Claims, and to indemnify, defend and hold harmless each of the Released Parties from and against any and all costs, losses, Liabilities or damages (including, without limitation, costs of investigation and defense and reasonable attorneys' fees and expenses) such Released Party may incur as the result of any future claim made by such Seller Party against any of them with respect to a Released Claim.  Each Seller Party understands that this is a full and final release of all claims, demands, causes of action and Liabilities of any nature whatsoever, whether or not known, suspected or claimed, that could have been asserted in any legal or equitable proceeding against either Acquired Company, except with respect to the Preserved Rights.  For the avoidance of doubt, the release set forth in this Section 7.7 is an integral part of the transactions contemplated by this Agreement, and without such release, none of the parties would have entered into this Agreement. Notwithstanding any term to the contrary herein, nothing in this Section 7.7 shall be deemed to have altered the scope of coverage of the D&O Tail Policy.

(b)     The foregoing release is intended to be complete, global and all-encompassing and specifically includes claims that are known, unknown, fixed, contingent or conditional with respect to the matters described herein.  With respect to the Released Claims, each Releasing Person hereby expressly waives any and all rights conferred upon him, her or it by any statute or rule of law that provides that a release does not extend to claims that the claimant does not know or suspect to exist in his, her or its favor at the time of executing the

release, which if known by him, her or it must have materially affected his, her or its settlement with the released party, including the following provisions of California Civil Code Section 1542:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

7.8    **Confidentiality**.  Each Seller Party shall, and shall cause its respective Affiliates to, treat and hold as confidential and not disclose to any third party Company Confidential Information, refrain from using any of the Company Confidential Information except in connection with this Agreement, and deliver promptly to the Purchaser or destroy, at the request and option of the Purchaser, all tangible embodiments (and all copies) of the Company Confidential Information which are in its possession or control.  In the event that any Seller Party (or any of its Affiliates) is requested or required (by oral question or request for information or documents in any proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Company Confidential Information, such party will notify the Purchaser promptly in writing of the request or requirement so that the Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 7.8.  If, in the absence of a protective order or the receipt of a waiver hereunder, such Seller Party (or any of its Affiliates) is, on the advice of counsel, compelled to disclose any Company Confidential Information to any tribunal or else stand liable for contempt, such Seller Party (or any of their Affiliates, as applicable) may disclose the Company Confidential Information to the tribunal; provided, however, that such Seller Party (or any of their Affiliates, as applicable) shall use their respective commercially reasonable efforts to obtain, at the reasonable request of the Purchaser and at the Purchaser's expense, a protective order or other assurance that confidential treatment will be accorded to such portion of the Company Confidential Information required to be disclosed as the Purchaser shall designate and shall disclose only that portion of the Company Confidential Information as is strictly required.

7.9    **Data Room**.  As soon as reasonably practicable, and in any event within five (5) Business Days, after the Closing Date, the Seller shall deliver, or cause to be delivered, to the Purchaser a USB drive (or such other storage medium as the Purchaser may reasonably request) containing a true, correct and complete copy of the Data Room.

8.    **DEFINITIONS**

"**Action**" means any suit, action, cause of action (whether at Law or in equity), arbitration, audit, hearing, investigation, litigation, claim, complaint, administrative or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or before, or otherwise involving, any Governmental Authority.

"**Affected Employees**" means all individuals who are employees of Acquired Company (including employees who are not actively at work on account of illness, disability or leave of absence) on the Closing Date.

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"**Applicable Anti-Corruption Laws**" means any Law (a) concerning anti-bribery or anti-corruption applicable to the Purchaser, the Seller Parties or Acquired Company, or any of their respective Affiliates to the extent relating to any of their respective actions or omissions on behalf of Acquired Company, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, which prohibits bribery or some other form of corruption, kickbacks or other improper inducements, including fraud, tax evasion, insider dealing and market manipulation, or (b) concerning anti-money laundering applicable to the Purchaser, the Seller Parties or Acquired Company, or any of their respective Affiliates, including the Money Laundering Control Act of 1986, as amended, and the USA PATRIOT Act of 2001, as amended, which prohibit money laundering and terrorist financing, including conspiring to conceal or disguise the identity, location or nature of illicitly obtained or unlawful proceeds.

"**Assets**" of any Person means all assets and properties of every kind (whether real, personal or mixed, whether tangible or intangible and wherever situated), including the goodwill related thereto, owned or leased by such Person.

"**Business Day**" means any day other than a Saturday, Sunday or day when banks are closed or authorized to be closed in the State of Minnesota.

"**Cash**" means, as determined in accordance with GAAP, (a) cash in the bank less outstanding checks, (b) deposits in transit (which, for the avoidance of doubt, shall include any third-party checks deposited or held in Acquired Company's accounts that have not yet cleared) and (c) petty cash; provided, however, that Cash shall not include any restricted cash and trapped cash.

"**Cash Equivalents**" means, without duplication of any amount that constitutes Cash (a) marketable direct obligations or securities issued by, or guaranteed by, the United States government (or any agency thereof), (b) any amounts on deposit in unrestricted accounts with any commercial bank and (c) any amounts on deposit in money market accounts and money market mutual funds, the investments of which are substantially as described in the foregoing clauses (a) and (b), in each case as determined in accordance with GAAP.]

"**COVID-19**" means SARS-CoV-2 or COVID-19.

"**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, directive, guideline or recommendation by any Governmental Authority in connection with or in response to COVID-19, including, but not limited to, the Coronavirus Aid, Relief, and Economic Security Act (CARES).

"**Closing Date Cash**" means the aggregate amount of Cash and Cash Equivalents of Acquired Company as of immediately prior to the Closing.

"**Closing Date Indebtedness**" means, with respect to Acquired Company, as of immediately prior to the Closing: (a) all indebtedness of Acquired Company with respect to (i) obligations for borrowed money and notes payable and capital leases or otherwise secured by a Lien, (ii) obligations to pay the deferred purchase price of property or services, conditional sales obligations and obligations under any title retention agreement, (iii) contingent amounts owing with respect to purchases of

businesses or companies or other capital assets, (iv) in respect of capitalized leases, (v) evidenced by notes, bonds, debentures or similar contracts or agreements, (vi) in respect of letters of credit and bankers' acceptances, in each case, to the extent drawn or funded, (vii) all break fees or other breakage costs for contracts or agreements relating to interest rate protection, swap agreements and collar agreements, (viii) obligations that are not characterized as current liabilities under GAAP, (ix) all obligations in respect of deferred revenue and down payments (for purposes of clarity, to the extent excluded from the calculation of Closing Date Working Capital Amount), (x) all technical debts and remediation costs, (xi) obligations under any employee pension benefit plans, including any underfunding and any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA; (xii) liabilities with respect to any current or former employee, officer or director of Acquired Company that arise before or on the Closing Date with respect to deferred compensation, severance payments, accrued but unpaid bonuses, unused vacation and personal holiday pay obligations, accrued paid time off, workers' compensation claims, deferred payroll Taxes, and any employment Taxes payable by Acquired Company with respect to the foregoing, and, (xiii) Closing Taxes; (b) all indebtedness in the nature of guarantees of the obligations of other Persons described in the immediately preceding clauses (a)(i) through (a)(x); and (c) including, with respect to clauses (a) and (b), any interest accrued thereon and prepayment, premium or similar penalties and fees and expenses which would be payable if such indebtedness were paid in full as of the Closing Date. "Closing Date Indebtedness" shall not include (i) any accounts payable or other accrued current liabilities to the extent included in the Closing Date Working Capital Amount or (ii) any indebtedness or Liabilities that the Purchaser causes Acquired Company to incur at the Closing.

"**Closing Date Statement Date**" means the date on which Purchaser delivers the Closing Date Statement to Seller in accordance with Section 1.4(b), provided, that if there is any Excluded A/R that remains outstanding, then the Closing Statement Date shall be no earlier than sixty (60) days following the Closing Date.

"**Closing Date Working Capital Amount**" means the net consolidated amount of Acquired Company's Working Capital Assets minus Acquired Company's Working Capital Liabilities, calculated strictly in accordance with (i) the Net Working Capital Schedule; and (ii) except to the extent expressly provided in this Agreement, applied consistently with GAAP.

"**Closing Taxes**" means any unpaid Taxes of Acquired Company incurred or accruing for Pre-Closing Tax Periods (provided, for the avoidance of doubt, that such amounts shall include reasonable estimates thereof for any taxable periods (or portions thereof, as determined in accordance with Section 7.4(b) that end on or include the Closing Date)).

"**Code**" means the Internal Revenue Code of 1986, as amended or now in effect or as hereafter amended, including but not limited to, any successor or substitute federal Tax codes or legislation.

"**Company Confidential Information**" means all confidential or proprietary information (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to the business, products, services or research or development of Acquired Company, or any of Acquired Company's vendors, suppliers, distributors, clients, customers, employees, independent contractors or other business relations. Company Confidential Information includes the following: (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, business, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and accounting and business

47

methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and other confidential or proprietary information about, Acquired Company's vendors, suppliers, distributors, clients, customers, employees, independent contractors or other business relations and their confidential or proprietary information; (iii) trade secrets, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto; and (iv) inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information (whether or not patentable).

"**Constituent Documents**" means the certificate or articles of incorporation and by-laws of any corporate Person, the certificate of formation, articles of organization and limited liability company agreement of any Person that is a limited liability company and the certificate of limited partnership and partnership agreement of any Person that is a partnership, and any other similar governing or constituent document, as applicable.

"**Contract**" means any written or oral and express or implied note, bond, mortgage, indenture, loan, contract, factoring arrangement, license, agreement, lease (including the Leases) or other instrument or obligation to which the party in question is a party or by which such party or any of its Assets may be bound.

"**Customs & International Trade Laws**" means any customs, export control, sanctions, import, trade or antiboycott Law or other binding decisions of a Governmental Authority applicable to any Seller Party, Acquired Company, or any of their respective Affiliates to the extent relating to any of their respective actions or omissions on behalf of Acquired Company, including the Tariff Act of 1930, as amended, and other Laws and programs administered or enforced by the U.S. Department of Commerce, U.S. Department of State, U.S. Department of the Treasury, U.S. Census Bureau, U.S. Department of Homeland Security, including Customs and Border Protection and Immigration and Customs Enforcement, and their predecessor agencies; the Export Administration Act of 1979, as amended or otherwise in force; the Export Administration Regulations, including related restrictions with regard to transactions involving Persons on BIS' Denied Persons List, Unverified List or Entity List; the Arms Export Control Act, as amended; the International Traffic in Arms Regulations, including related restrictions with regard to the transactions involving Persons on DDTC's Debarred Persons List; the antiboycott Laws administered by the Office of Antiboycott Compliance; the antiboycott Laws administered by the U.S. Department of the Treasury's IRS; the Foreign Assets Control Regulations, including restrictions with regard to transactions, transfers or dealings involving sanctioned jurisdictions or Governmental Authorities and Persons on OFAC's Specially Designated Nationals and Blocked Persons List, the Sectoral Sanctions Identification List, and Non-SDN List. This definition does not include the import Laws of the countries to which Acquired Company's products and services are exported.

"**Data Room**" means the electronic documentation site established by Firmex on behalf of Acquired Company in connection with the transactions contemplated by this Agreement.

"**DDTC**" means the U.S. Department of State Directorate of Defense Trade Controls.

"**Employee Benefit Plan**" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3)), pension, retirement, profit sharing, defined contribution, equity-based, stock purchase, stock option, incentive compensation, employment, severance, change in control, retention, health and welfare (including any retiree medical or retiree life) fringe benefit, bonus, deferred

compensation plan, program, arrangement or agreement and any other employee benefit plan, program, agreement or arrangement of any kind, whether or not subject to ERISA, whether formal or informal, oral or in writing, or legally binding or not.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" shall mean Citibank, N.A., as escrow agent under the Escrow Agreement, or any successor Person appointed in accordance with the terms of the Escrow Agreement.

"**Fraud**" means fraud under Delaware law, which shall not include any claim for constructive fraud.

"**GAAP**" means United States generally accepted accounting principles as in effect from time to time.

"**Government Bid**" means a bid, proposal, quotation, offer, or similar submission submitted by a contractor that, if accepted or awarded, would result in a Government Contract.

"**Government Contract**" means a prime contract, subcontract at any tier, teaming agreement or arrangement, joint venture, basic ordering agreement, pricing agreement, letter contract or other similar arrangement of any kind, between Acquired Company and (i) any Governmental Authority, (ii) any prime contractor of a Governmental Authority in its capacity as a prime contractor, or (iii) any subcontractor (or lower-tier subcontractor) with respect to any contract of a type described in (i) or (ii) above.

"**Governmental Authority**" means any foreign, domestic or local court, administrative agency, bureau, board, commission, office, authority, department or other governmental entity.

"**Income Tax**" means any Tax measured by or imposed on net income, including any interest, penalty or addition thereto, whether disputed or not.

"**Income Tax Return**" means any Tax Return relating to Income Taxes, including any schedule or attachment thereto and any amendment thereof.

"**IRS**" means the United States Internal Revenue Service and any successor thereto.

"**Knowledge of the Seller**," "**Known to the Seller**," "**Seller's Knowledge**" or each "**Seller's Knowledge**" means the actual knowledge, after due inquiry, of Erik Thorsell, Jamie Wolbeck, Bruce Lach, Tammie Coleman, Brandon Nohr and Brent Morris.

"**Laws**" means all applicable laws, statutes, rules, regulations, ordinances, judgments and Orders of any Governmental Authority.

"**Liabilities**" means any indebtedness liability, debt, obligation, deficiency, interest, Tax penalty, fine, claim, demand, judgment, cause of action, or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of whether or when accrued.

"**Lien**" means any mortgage, pledge, lien, encumbrance, charge or other security interest or ownership interest or claim of another person.

"**Loss**" or "**Losses**" means all damages, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses; provided, however, that "**Losses**" shall exclude punitive damages, except for any punitive damages paid to any third Person in connection with a Third Party Claim.

"**Material Adverse Effect**" or "**Material Adverse Change**" means, with respect to Acquired Company, any event, development, state of facts, development, effect or change that, individually or in the aggregate, is materially adverse to the business, Assets, financial condition, operating results or prospects of Acquired Company, taken as a whole; provided, that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect or Material Adverse Change: any adverse change, event, development or effect arising from or relating to (i) general business or economic conditions, (ii) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (iv) changes in GAAP, (v) the public announcement of the intent of the Seller to sell, or of the Purchaser's agreement to acquire, Acquired Company, (vi) any act or omission (x) of Purchaser or any of its Affiliates or (y) expressly contemplated by this Agreement or any Related Document, or (vii) any failure by Acquired Company to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); provided that, in the case of clauses (i), (ii), (iii) and (iv) above, if such change, effect, event, occurrence, state of facts or development disproportionately affects Acquired Company as compared to other Persons or businesses that operate in the industry in which Acquired Company operates, then the disproportionate aspect of such change, effect, event, occurrence, state of facts or development may be taken into account in determining whether a Material Adverse Effect has or will occur.

"**Net Working Capital Target**" means negative Three Hundred Fifty Thousand Dollars (-$350,000).

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**Option**" with respect to any Person means any security, right, subscription, warrant, option, "phantom" stock right or other Contract that gives any Person the right to purchase or otherwise be issued any shares of capital stock of or membership or partnership interests in such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock of or membership or partnership interests in such Person.

"**Order**" means any writ, judgment, award, decree, injunction or similar order of any Governmental Authority or arbitrator.

"**Ordinary Course of Business**" means the ordinary course of business of Acquired Company, consistent with Acquired Company's past custom and practice.

"**Payoff Indebtedness**" means the Closing Date Indebtedness listed on <u>EXHIBIT C</u>.

"**Permitted Liens**" means, with respect to any Asset:  (a) Taxes, assessments and other governmental levies, fees or charges imposed with respect to such Asset that are (i) not due and payable as of the Closing Date or (ii) being contested in good faith; (b) mechanics' liens and similar liens for labor, materials or supplies provided with respect to such Asset incurred in the Ordinary Course of Business for amounts for which adequate reserves have been established that are (i) not due and payable as of the Closing Date or (ii) being contested in good faith which would not, individually or in the aggregate, materially impair the use or occupancy of such Asset or the operation of the business of Acquired Company as currently conducted using such Asset; (c) zoning Laws, building codes and other land use Laws regulating the use or occupancy of such Asset that constitutes the Leased Real Property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such real property and are not violated by the current use or occupancy of such real property or the operation of the business of Acquired Company as currently conducted thereon; and (d) easements, covenants, conditions, restrictions and other similar matters of record affecting, as of the date of this Agreement, the Leased Real Property which do not or would not materially impair the use or occupancy of such real property or the operation of the business of Acquired Company as currently conducted thereon; and (e) those items set forth on Permitted Liens disclosure schedule.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity or a Governmental Authority or governmental entity (or any department, agency or political subdivision thereof).

"**Post-Closing Receivables**" means all amounts of Excluded A/R actually received by Purchaser or the Acquired Company during the Receivables Period.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date.

"**Pre-Closing Taxes**" means:  (i) all Taxes (including the nonpayment thereof) of Acquired Company for all Pre-Closing Tax Periods, (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which Acquired Company is or was a member on or prior to the Closing Date, including Taxes imposed on or payable by Acquired Company pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar state, local or other Law or regulation, (iii) any and all Taxes of Seller and/or Shareholder for any taxable period or portion thereof (including any which may be imposed on, or required to be collected or paid by Acquired Company, such as Taxes relating to composite Tax Return filings or obligations), (iv) any and all Taxes of any Person imposed on Acquired Company as a transferee or successor, by Contract or pursuant to any Law, rule or regulation as the result of transactions or events occurring prior to the Closing Date, (v) any and all payroll and employment Taxes with respect to any compensatory payments made pursuant to or in accordance with this Agreement, (vi) all Taxes resulting from the Restructuring; and (vii) Transfer Taxes; provided, however, Pre-Closing Taxes shall not include Taxes to the extent that such Taxes were included as liabilities in calculating Closing Date Indebtedness.

"**Proprietary Rights**" means any and all intangible assets and intellectual property, including: registered and unregistered patents, trademarks, service marks and trade names, trade dress and other names, marks and slogans, all publishing and distribution rights and technical manuals, and all

associated goodwill; all statutory, common-law, unregistered and registered copyrights; computer software and databases; all inventions, shop rights, know-how, trade secrets and confidential information; and all registration applications for any of the foregoing; all Internet domain names; together with all rights to use all of the foregoing forever and all other rights in, to, and under the foregoing in all countries.

"**Related Documents**" means any and all other instruments, agreements or documents executed or delivered in connection with this Agreement.

"**Rollover Amount**" means $2,500,000.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Securities Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Straddle Period**" means any taxable period that includes (but does not end on) the Closing Date.

"**Subsidiary**" means, with respect to Acquired Company, any corporation, limited liability company, partnership, association, or other business entity of which:  (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by Acquired Company or one (1) or more of the other Subsidiaries of Acquired Company or a combination thereof; or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by Acquired Company or one (1) or more Subsidiaries of Acquired Company or a combination thereof and for this purpose, Acquired Company owns a majority ownership interest in such a business entity (other than a corporation) if Acquired Company shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).

"**Tax**" means:   (a) any federal, state, local or foreign income, gross receipts, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, unclaimed property, escheat, license, registration, anti-abuse, workers' compensation, real property, personal property, sales, use, transfer, value added, alternative or add-on minimum or estimated tax, including any interest, penalty or addition thereto; (b) any liability for any amount described in clause (a) above whether as a result of transferee liability, of being a member of an affiliated, consolidated, combined or unitary group for any period, or otherwise through operation of applicable Law; and (c) any liability for any amount described in clauses (a) or (b) as a result of any tax sharing, tax indemnity or tax allocation agreement.

"**Tax Return**" means any return, claim for refund or information return or statement required to be filed in respect of any Taxes, including any schedule or attachment thereto and including any amendment thereof.

"**Transaction Expenses**" means any legal, accounting, financial advisory or other third party advisory, or consulting or any other fees or payments by Acquired Company (or on behalf of Acquired

Company) to: (a) any Person in connection with the negotiation, execution and delivery of this Agreement or under the Related Documents; or (b) any current or former directors, officers, employees, consultants, holders of equity (including Options) or independent contractors of Acquired Company with respect to any change of control, commission, bonus, retention (including those retention bonuses payable to technicians of Acquired Company), severance or other similar payments payable as a result of the Closing of the transactions contemplated hereunder, including the employer's portion of any employment Taxes associated therewith.  For the avoidance of doubt, "**Transaction Expenses**" shall include the payment or obligations to employees of Acquired Company set forth on the "**Transaction Expenses Schedule**" attached hereto as EXHIBIT D.

"**Treasury Regulations**" means the regulations issued or proposed under the Code.

"**Working Capital Adjustment**" means an amount, which may be negative, equal to (a) if the Working Capital Difference is a negative number the absolute value of which is greater than $25,000, the result of (i) the Working Capital Difference plus (ii) $25,000, or (b) if the Working Capital Difference is a positive number greater than $25,000, the result of (i) the Working Capital Difference minus (ii) $25,000.  If the Working Capital Difference is greater than or equal to negative $25,000 and less than or equal to $25,000, the Working Capital Adjustment shall equal zero ($0).

"**Working Capital Assets**" means, with respect to Acquired Company, the current assets of Acquired Company set forth in the Net Working Capital Schedule of Acquired Company as of the 12:01 a.m. Eastern Standard Time on the Closing Date; provided, however, that Working Capital Assets shall (x) exclude any accounts receivable that are more than sixty (60) days past due as of the Closing Date (the "**Excluded A/R**"); and (y) include any Excluded A/R that is collected prior to the Closing Date Statement Date pursuant to Section 1.7.

"**Working Capital Difference**" means the Closing Date Working Capital Amount minus the Net Working Capital Target.

"**Working Capital Liabilities**" means, with respect to Acquired Company, the current liabilities of Acquired Company set forth in the Net Working Capital Schedule of Acquired Company as of 12:01 a.m. Eastern Standard Time on the Closing Date.

**8.1    Cross-Reference of Other Definitions**.  Each capitalized term listed below is defined in the corresponding section of this Agreement.

| Term | Section No. |
| --- | --- |
| Acquired Company | Preamble |
| Adjustment Amount | 1.4(a) |
| Adjustment Escrow Amount | 1.3(b) |
| Adjustment Escrow Fund | 1.3(c) |
| Adjustment Escrow Shortfall | 1.4(f)(i) |
| Agreement | Preamble |
| Allocation Dispute Period | 1.6 |
| Allocation Disputes | 1.6 |
| Approval Notice | 1.4(d) |
| Assignment Agreement | 5.3(a)(i) |
| Basket | 6.6(b) |
| Cap | 6.6(c) |

| Term | Section No. |
| --- | --- |
| Claims | 6.4(b) |
| Closing Amount | 1.3(b) |
| Closing Date | 5.1 |
| Closing Date Payment Schedule | 1.3(b) |
| Closing Date Statement | 1.4(b) |
| Company Closing Date Schedule | 1.3(a) |
| Company Contracts | 3.12(a) |
| Company Interests | Recitals |
| Company Plans | 3.17(a) |
| Company Proprietary Rights | 3.13(a) |
| Company Statements | 3.6(a)(ii) |
| Contribution | 3.1(a) |
| Controlled Group | 3.17(c) |
| Covered Person | 7.5(a) |
| Conversion | 3.1(c) |
| Counsel | 9.12 |
| D&O Tail Policy | 7.5(a) |
| Direct Claim | 6.4(b) |
| Dispute Notice | 1.4(d) |
| Dispute Period | 1.4(d) |
| EAR | 3.28(b)(i) |
| Employment Agreement | 5.3(a)(xiii) |
| Environmental Laws | 3.21(a)(i) |
| Environmental Permit | 3.21(d) |
| Environmental Representations | 6.6(a)(ii) |
| Escrow Agreement | 1.3(c)(iii) |
| Estimated Closing Date Cash | 1.3(a) |
| Estimated Closing Date Indebtedness | 1.3(a) |
| Estimated Closing Net Working Capital | 1.3(a) |
| Estimated Unpaid Transaction Expenses | 1.3(a) |
| Estimated Working Capital Adjustment | 1.3(a) |
| Final Determination | 6.7(a) |
| Foreign Plans | 3.17(n) |
| Fundamental Representations | 6.6(a)(i) |
| Hazardous Materials | 3.21(a)(ii) |
| Inbound Licenses | 3.13(a) |
| Indemnification Escrow Release Date | 6.6(a)(iv) |
| Indemnified Party | 6.4(a) |
| Indemnifying Party | 6.4(a) |
| Indemnity Escrow Account | 1.3(c)(iii) |
| Indemnity Escrow Amount | 1.3(b) |
| Indemnity Escrow Fund | 1.3(c) |
| Independent Accountant | 1.4(d) |
| Independent Accountant Allocation | 1.6 |
| Independent Accountant Determination | 1.4(d) |
| Insurance Policies | 3.18 |

VP/#63856056.10

27-CV-25-8808

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

| Term | Section No. |
| --- | --- |
| ITAR | 3.28(b)(i) |
| Latest Balance Sheet | 3.6(a)(ii) |
| Lease | 3.10(b) |
| Leased Real Property | 3.10(b) |
| Material Customers | 3.22(a) |
| Material Vendors | 3.22(b) |
| Outbound Licenses | 3.13(a) |
| Parent LP | Preamble |
| Parent LP Equity | Preamble |
| Permits | 3.27 |
| Post-Closing Deliveries | 1.4(b) |
| Predecessor Company | Preamble |
| Privileged Communications | 9.11 |
| Purchased Interests | Preamble |
| Purchase Price | 1.2 |
| Purchase Price Allocation | 1.6 |
| Purchaser | Preamble |
| Purchaser Indemnified Party (Parties) | 6.1 |
| Purchaser Losses | 6.1 |
| Purchaser Return | 7.4(a) |
| Purchaser Tax Group | 1.1 |
| Q-Sub | 3.1(a) |
| Q-Sub Election | 3.1(b) |
| Receivables Period | 1.7 |
| Released Claims | 7.7 |
| Released Parties | 7.7 |
| Releasing Persons | 7.7 |
| Remaining Disputes | 1.4(d) |
| Resolution Period | 1.4(d) |
| Restructuring | Recitals |
| Reviewed Financial Statements | 3.6(a)(i) |
| Rollover Agreement | Preamble |
| Rollover Interests | Preamble |
| S Corporation | 3.11(u) |
| Seller | Preamble |
| Seller Indemnified Party (Parties) | 6.3 |
| Seller Party | Preamble |
| Seller Losses | 6.3 |
| Seller Return | 7.4(a) |
| Statutory Representations | 6.6(a)(iii) |
| Shareholder | Preamble |
| Third Party Claim | 6.4(a) |
| Transfer Taxes | 7.4(e) |
| Unpaid Transaction Expenses | 1.2 |
| Unresolved Claims | 6.7(d) |
| WARN | 7.6 |

VP/#63856056.10

## 9.    MISCELLANEOUS

**9.1    Amendment and Waiver**.  This Agreement may be amended, and any provision of this Agreement may be waived; provided, however, that any such amendment or waiver shall be binding on Seller only if such amendment or waiver is set forth in a writing executed by Seller, and that any such amendment or waiver shall be binding upon the Purchaser only if such amendment or waiver is set forth in a writing executed by the Purchaser.  No course of dealing between or among any Persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Person under or by reason of this Agreement.

**9.2    Notices**.  All notices and other communications required or permitted under this Agreement must be in writing and will be deemed to have been duly given and delivered (a) when delivered in person, (b) one (1) Business Day after being sent to the recipient by electronic mail of a PDF document (with confirmation of transmission), (provide, however, any notice pursuant to Article VI delivered in accordance this Section 9.2(b) requires the delivery, on the same day, of a confirming copy of such notice by a recognized overnight delivery service (charges prepaid)) (c) one (1) Business Day after having been dispatched by a nationally recognized overnight courier service or (d) five (5) Business Days after being sent by registered or certified mail, return receipt requested, postage prepaid, to the appropriate party at the address specified below:

| | |
|---|---|
| Notices to the Seller or the Shareholder: | 3805 Inglewood Avenue South<br>St. Louis Park, MN   55416 |
| | Attention:  Erik A. Thorsell<br>E-mail: erikthorsell@outlook.com |
| *with, in each case, a required copy to (which shall not constitute notice):* | Spencer Fane LLP<br>100 South Fifth Street, Suite 2500<br>Minneapolis, MN 55402<br>Attention: Jon Farnsworth<br>E-mail: jfarnsworth@spencerfane.com |
| Notices to the Purchaser: | L Squared Capital Partners LLC<br>Attn:   Sean Barrette, Brian Scott,<br>         Jack Foley and Adam Mokhtarzadeh<br>3434 Via Lido, Suite 300<br>Newport Beach, California 92663<br>Email:  sbarrette@lsquaredcap.com,<br>         bscott@lsquaredcap.com<br>         jfoley@lsquaredcap.com<br>         amokhtarzadeh@lsquaredcap.com |

VP/#63856056.10

|  |  |
|---|---|
| *with, in each case, required copies to (which shall not constitute notice):* | Vedder Price P.C.<br>222 North LaSalle Street, Suite 2400<br>Chicago, Illinois 60601<br>Attention: Michael A. Nemeroff, Esq. and<br>Jason W. Reese, Esq.<br>E-mail: mnemeroff@vedderprice.com and<br>jreese@vedderprice.com |

Any party may change its address for the purposes of this <u>Section 9.2</u> by giving notice as provided in this Agreement.

      **9.3**    **No Third Party Beneficiaries**.  Except as provided in <u>Section 7.5</u> (Directors' and Officers' Liability), and with respect to indemnification of the Purchaser Indemnified Parties and Seller Indemnified Parties under <u>Article 6</u>, nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any other Person other than the parties hereto and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third Person to any party, nor shall any provision give any third Person any right of subrogation or action over or against any party.  Except as provided in this <u>Section 9.3</u>, this Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

      **9.4**    **No Strict Construction**.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

      **9.5**    **Captions**.  The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no captions had been used in this Agreement.

      **9.6**    **Complete Agreement**.  This document and the documents referred to herein contain the complete agreement between the parties and supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter herein in any way.

      **9.7**    **Counterparts**.  This Agreement may be executed in counterparts (including by e-mail), all of which when taken together shall constitute one and the same instrument.

      **9.8**    **Governing Law; Consent to Forum**.  The internal law, not the law of conflicts, of the State of Delaware shall govern all questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement. The parties hereby consent and agree that the state court or federal court located in Hennepin County in the State of Minnesota, shall have exclusive jurisdiction to hear and determine any claims or disputes among the parties pertaining to this Agreement or to any matter arising out of or related to this Agreement.  The parties expressly submit and consent in advance to such jurisdiction in any action or suit commenced in any such court, hereby waive any objection which any of them may have based upon lack of personal jurisdiction, improper venue or forum non conveniens and hereby consent to the granting of such legal or equitable relief as is deemed appropriate by such court.  EACH OF THE PURCHASER AND EACH SELLER PARTY WAIVES PERSONAL SERVICE OF THE

SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED AS PROVIDED IN <u>SECTION 9.2</u> FOR THE GIVING OF NOTICES TO THE PURCHASER AND THE SELLER PARTIES, AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE ACTUAL DELIVERY THEREOF AT SUCH ADDRESS.

   **9.9**  **Binding Effect; Assignment**. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, assigns, heirs, legatees and personal representatives, as the case may be. None of the Seller Parties shall assign any of its rights or obligations hereunder without the prior written consent of the Purchaser, and the Purchaser shall not assign any of its rights or obligations hereunder without the prior written consent of the Seller and any attempted assignment without the required consents shall be void; <u>provided</u> that notwithstanding the foregoing, the Purchaser may, without the consent of any other party, in its sole discretion, assign its rights, interests or obligations hereunder (a) for collateral security purposes to any lender providing financing to the Purchaser, (b) to any of its Affiliates or (c) to any successor in interest to all or substantially all of the Purchaser or its business, provided that in any or all of the forgoing cases, Purchaser shall remain liable for the performance of all its obligations hereunder.

   **9.10** **Rules of Construction**. The following provisions shall be applied where appropriate herein: (a) "herein," "hereby," "hereunder," "hereof" and other equivalent words shall refer to this Agreement as an entirety and not solely to the particular portion of this Agreement in which any such word is used; (b) all definitions set forth herein shall be deemed applicable whether the words defined are used herein in the singular or the plural; (c) wherever used herein, any pronoun or pronouns shall be deemed to include both the singular and plural and to cover all genders; (d) all accounting terms not specifically defined herein shall be construed in accordance with GAAP; (e) neither this Agreement nor any other agreement, document or instrument referred to herein or executed and delivered in connection herewith shall be construed against any party as the principal draftsperson hereof or thereof; (f) all references or citations in this Agreement to statutes or regulations or statutory or regulatory provisions shall generally be considered citations to such statutes, regulations or provisions as in effect on the date hereof, except that when the context otherwise requires, such references shall be considered citations to such statutes, regulations or provisions as in effect from time to time, including any successor statutes, regulations or provisions directly or indirectly superseding such statutes, regulations or provisions; (g) any references herein to a particular section, article, exhibit or schedule means a section or article of, or an exhibit or schedule to, this Agreement unless another agreement is specified; (h) the exhibits and schedules attached hereto are incorporated herein by reference and shall be considered part of this Agreement; (i) the words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation" and shall not be limited by any enumeration or otherwise; (j) the word "or" shall not be deemed to be exclusive; (k) the symbol "$" and word "Dollars" shall mean dollars of the United States of America; and (l) all references to "Acquired Company" shall be deemed to include references to Acquired Company's predecessor entity prior to its conversion as part of the Restructuring.

   **9.11** **Specific Performance**. The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Purchaser or the Seller Parties. Notwithstanding any provision in this Agreement to the contrary, the parties hereto hereby further acknowledge and agree that: (a) each party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement by any other party and to enforce specifically the terms and provisions herein against any other party, this being in addition to any other

remedy to which the party is entitled at law or in equity; and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither the Seller, the Shareholder, Acquired Company, nor the Purchaser would have entered into this Agreement.

      **9.12**    **Attorney-Client Privilege**. All privileged communications between the Seller Parties or the Acquired Company, on the one hand, and Spencer Fane LLP and any other law firm or attorney ("**Counsel**"), on the other hand, relating to the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (the "**Privileged Communications**") shall be deemed to be attorney-client privileged and the expectation of client confidence relating thereto shall belong solely to the Seller Parties and shall not pass to or be claimed by Purchaser. Accordingly, Purchaser and its Affiliates shall not have access to, and shall not attempt to obtain access to, any Privileged Communications or to the files of Counsel relating to such engagement from and after Closing and may not use or rely on any Privileged Communications in any claim, dispute, action, suit or proceeding against or involving any of the Seller Parties. Without limiting the generality of the foregoing, from and after the Closing, (i) the Seller Parties (and not Purchaser or the Acquired Company) shall be the sole holders of the attorney-client privilege with respect to such engagement, and Purchaser and Acquired Company shall not be a holder thereof, (ii) to the extent that files of Counsel in respect of such engagement constitute property of the client, only the Seller Parties (and not Purchaser or the Acquired Company) shall hold such property rights and (iii) Counsel shall have no duty whatsoever to reveal or disclose any such attorney-client communications or files to Purchaser or Acquired Company by reason of any attorney-client relationship between Counsel and the Acquired Company or otherwise. Notwithstanding the foregoing, in the event that a dispute arises between Purchaser or its Affiliates (including the Acquired Company), on the one hand, and a third party other than the Seller Parties, on the other hand, Purchaser and its Affiliates (including the Acquired Company) may assert the attorney-client privilege to prevent disclosure of confidential communications to such third party; provided, however, that neither Purchaser nor any of its Affiliates (including the Acquired Company) may waive such privilege without the prior written consent of the Seller, which consent shall not be unreasonably withheld, conditioned or delayed. In the event that Purchaser or any of its Affiliates (including the Acquired Company) is legally required by Order or otherwise legally required to access or obtain a copy of all or a portion of the Privileged Communications, to the extent (x) permitted by applicable Law, and (y) advisable in the opinion of Purchaser's counsel, then Purchaser shall immediately (and, in any event, within five (5) days) notify the Seller in writing so that the Seller can seek a protective order (at Seller's cost and expense).

**[Signature Page Follows]**



*(Signature Page to Equity Purchase Agreement)*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

<u>**SELLER**</u>:

**TWN HOLDINGS, INC.**

*Erik A Thorsell*

By: _____
Name:  Erik A. Thorsell
Its:      President

<u>**SHAREHOLDER**</u>:

*Erik A Thorsell*

_____
Erik A. Thorsell

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

*(Signature Page to Equity Purchase Agreement)*

**ACQUIRED COMPANY**:

**SUCCESS COMPUTER CONSULTING, LLC**



By: _Erik A Thorsell_
Name: Erik A. Thorsell
Its:     President

DocuSign Envelope ID: 550D09AB-94E2-4AC1-A55F-A4011EC14855

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD     Doc. 1-1     Filed 05/22/25     Page 84 of 128

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

*(Signature Page to Equity Purchase Agreement)*

**PURCHASER:**

**SS MSP HOLDINGS, INC.**

By: Sean Barrette

Name:   Sean Barrette

Its:       President

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

# EXHIBIT 2

to Plaintiff's Complaint dated April 22, 2025

*TWN Holdings, Inc. v. SS MSP Holdings, Inc. & L Squared Capital Partners LLC*
Minnesota State Court – Hennepin County District Court

*EXECUTION VERSION*

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is entered into as of January 22, 2024, by and among (i) SS MSP Holdings, Inc., a Delaware corporation ("Purchaser"), (ii) TWN Holdings, Inc., a Minnesota corporation ("Seller" and, together with Purchaser, sometimes referred to individually as "Party" and collectively as the "Parties"), and (iii) Citibank, N.A., as the escrow agent ("Escrow Agent").

WHEREAS, pursuant to the terms of that certain Equity Purchase Agreement, dated as of 22, 2024 (the "Purchase Agreement"), by among Seller, Purchaser and the other parties thereto, the Parties have agreed to establish an escrow arrangement for the purposes set forth therein;

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement; provided, however, the Escrow Agent will not be responsible to determine or to make any inquiry into any term, capitalized or otherwise, not defined herein;

WHEREAS, the Purchase Agreement contemplates that at the Closing, Purchaser will deposit, or cause to be deposited, by wire transfer of immediately available funds, an amount in cash equal to $400,000 (the "Adjustment Escrow Amount", and together with all products and proceeds of the Adjustment Escrow Amount, including all interest, dividends, gains and other income earned with respect to the Adjustment Escrow Amount, the "Adjustment Escrow Funds") into the Adjustment Escrow Account (as defined below) and an amount of cash equal to $2,500,000.00 (the "Indemnity Escrow Amount" (collectively with the Adjustment Escrow Amount, "Escrow Amount"), and together with all products and proceeds of the Indemnity Escrow Amount, including all interest, dividends, gains and other income earned with respect to the Indemnity Escrow Amount, the "Indemnity Escrow Funds", and collectively with the Adjustment Escrow Funds, the "Escrow Funds") into the Indemnity Escrow Account (as defined below), in each case to be held in accordance with the terms and subject to the conditions of the Purchase Agreement and this Agreement for the purpose of establishing sources of funds to secure and satisfy (i) with respect to the Adjustment Escrow Amount, any potential adjustments to the Purchase Price following the Closing pursuant to Section 1.4 of the Purchase Agreement and (ii) with respect to the Indemnity Escrow Amount, certain indemnification obligations of the Seller Parties following the Closing pursuant to Article VI of the Purchase Agreement; and

WHEREAS, the Parties desire that Escrow Agent agree to hold and distribute the Adjustment Escrow Funds and the Indemnity Escrow Funds in accordance with the terms and conditions of this Agreement, until the Adjustment Escrow Funds and the Indemnity Escrow Funds held hereunder has been released in full in accordance with the terms and conditions of this Agreement and, as between Purchaser and Seller, the Purchase Agreement.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, each of Purchaser, Seller and Escrow Agent hereby agrees as follows:

1.     Appointment. The Parties hereby appoint and designate Escrow Agent to act as their escrow agent for the purposes set forth herein, and Escrow Agent hereby accepts such

appointment under, and agrees to assume and perform its duties and obligations as escrow agent pursuant to, the terms and conditions set forth herein. Escrow Agent shall hold the Adjustment Escrow Funds and the Indemnity Escrow Funds in accordance with, and shall not disburse or release any of the Adjustment Escrow Funds or the Indemnity Escrow Funds except in accordance with, the terms and conditions set forth in this Agreement.

2.    <u>Funds</u>. Upon the Closing, in accordance with the terms of the Purchase Agreement, Purchaser shall deposit, or cause to be deposited, with Escrow Agent, to be held by Escrow Agent in separated and distinct escrow accounts established by Escrow Agent, the Adjustment Escrow Amount (such account, the "<u>Adjustment Escrow Account</u>") and the Indemnity Escrow Amount (such account, the "<u>Indemnity Escrow Account</u>" and collectively with the Adjustment Escrow Account, each an "<u>Escrow Account</u>" and collectively "<u>Escrow Accounts</u>"). Escrow Agent agrees to keep each Escrow Account separate from all other property held by Escrow Agent and each Escrow Account shall be identified as being held in connection with this Agreement. Escrow Agent shall acknowledge in a courtesy electronic mail ("<u>e-mail</u>") to Purchaser and Seller its receipt of the Escrow Amounts from Purchaser upon the date of receipt. As agreed by the Parties, the Escrow Amounts shall (i) not be subject to set off by Escrow Agent or any of its affiliates, (ii) not be subject to any lien, attachment, trustee process or any other judicial process of any, creditor of any party hereto and (iii) be held and disbursed solely for the purposes and in accordance with the terms and conditions of this Agreement, except as otherwise provided in <u>Section 10</u> below.

3.    <u>Investment of Escrow Amounts</u>.

(a)    Escrow Agent shall invest the Escrow Funds in an interest-bearing deposit obligation of Citibank, N.A., with an initial interest rate of 200bps (2.00%), insured up to the applicable limits by the Federal Deposit Insurance Corporation ("<u>FDIC</u>"). The Parties acknowledge that any applicable interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties. Escrow Agent shall not have any liability for any loss sustained as a result of any investment decision made pursuant to the terms of this Agreement. Except as expressly provided herein, the Escrow Amounts shall not, in any manner, directly or indirectly, be assigned, hypothecated, pledged, alienated, or released from escrow (or otherwise dealt with in any manner that has the economic effect of any of the foregoing acts, on a current or prospective basis). Notwithstanding anything to the contrary herein, the Escrow Amounts shall, at all times, remain available for distribution in accordance with <u>Section 4</u> below.

(b)    Seller shall be the responsible taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Amounts for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Amounts to the Internal Revenue Service ("<u>IRS</u>") or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request. The Escrow Agent shall be responsible only for income reporting to the IRS with respect to income earned on the Escrow Amounts. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities. The Parties agree that Escrow Agent shall not have any other

2

contractual obligation to file or prepare any tax returns or to prepare any other reports for any taxing authorities concerning the matters covered by this Agreement.

(c)     Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the Escrow Amounts in accordance with the terms, and subject to the conditions of this Agreement. Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

(d)     Escrow Agent will send account statements to the Parties on a monthly basis reflecting activity with respect to the Escrow Amounts in the Escrow Accounts for the preceding month. The Parties agree to notify Escrow Agent of any errors, delays or other problems within thirty (30) days after receiving written notification from Escrow Agent that a transaction has been completed; <u>provided,</u> that the failure to so notify Escrow Agent will not constitute waiver by the Parties of any such error, delay or other problem.

(e)     This Agreement (except for the provisions of <u>Section 8</u> hereto), the duties of Escrow Agent and the Escrow Accounts shall automatically terminate and shall have no further force or effect upon the first to occur of (i) the distribution in full by Escrow Agent of all of the Escrow Amounts in accordance with this Agreement, or (ii) the delivery to Escrow Agent of a written notice of termination executed jointly by an Authorized Representative (as defined below) of Purchaser and Seller and the release by Escrow Agent of all of the Escrow Amounts.

4.     <u>Disposition</u>. Purchaser and Seller shall act in accordance with, and Escrow Agent shall hold and release the Adjustment Escrow Funds and the Indemnity Escrow Funds as provided in, this <u>Section 4</u> as follows:

(a)     <u>Joint Direction or Release Order</u>. As promptly as practicable, and in any event within two (2) Business Days following the date on which Escrow Agent receives (i) a Joint Direction (as defined below), or (ii) a Release Order (as defined below), in each case, with respect to (x) disbursement from the Adjustment Escrow Account, which shall be in accordance with Section 1.4 of the Purchase Agreement, or (y) disbursement from the Indemnity Escrow Account, which shall be in accordance with <u>Section 4(d)</u> of this Agreement, Escrow Agent shall, to the extent directed by such Joint Direction or Release Order, disburse the applicable amount(s) of the Adjustment Escrow Funds or the Indemnity Escrow Funds, as applicable, in accordance with such Joint Direction or Release Order (as applicable) to the Persons (as defined below) and accounts specified in the Joint Direction or Release Order (as applicable), by wire transfer of immediately available funds.

(b)     <u>Method of Payment</u>. All payments of any part of the Adjustment Escrow Funds or the Indemnity Escrow Funds shall be made by wire transfer of immediately available funds to one or more accounts as designated in advance by Purchaser or Seller, as applicable, or as set forth in the Joint Direction or a Release Order, as applicable.

(c)     <u>Security Procedures for Fund Transfers</u>. Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in the Adjustment Escrow Account or the Indemnity Escrow Account under the terms

of this Agreement must be in writing, executed by an Authorized Representative of the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on <u>Schedule 1-A</u> and <u>Schedule 1-B</u> and delivered to the Escrow Agent as set forth in <u>Section 11</u> below. Escrow Agent shall confirm each funds transfer instruction received by means of a call back to an Authorized Representative for either Party and communicated to Escrow Agent through a signed certificate in the form of <u>Schedule 1-A</u> or <u>Schedule 1-B</u> attached hereto, which upon receipt by Escrow Agent shall become a part of this Agreement. Once delivered to Escrow Agent, <u>Schedule 1-A</u>, or <u>Schedule 1-B</u>, may be revised or rescinded only by a writing signed by one of the Authorized Representatives of the applicable Party. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford Escrow Agent a reasonable opportunity to act on it. If a revised <u>Schedule 1-A</u> or <u>Schedule 1-B</u>, or a rescission of an existing <u>Schedule l-A</u> or <u>Schedule 1-B</u> is delivered to Escrow Agent by an entity that is a successor-in-interest to such Party, such document shall be accompanied by additional documentation satisfactory to Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the Party under this Agreement. The Parties understand that Escrow Agent's inability to receive or confirm funds transfer instructions by means of a call back to such Party may result in a delay in accomplishing such funds transfer, and agree that Escrow Agent shall not be liable for any loss caused by any such delay. To ensure accuracy of the instructions it receives, the Escrow Agent may record such call backs. Escrow Agent shall not be liable to any Party or other person for refraining from acting upon any instruction for or related to the transfer or distribution of the Adjustment Escrow Funds or the Indemnity Escrow Funds if delivered to any other fax number or e-mail address, including but not limited to a valid e-mail address of any employee of Escrow Agent.

      (d)    <u>Indemnity Escrow Funds</u>.

      (i)    Within five (5) Business Days following the twelve (12) month anniversary of the date hereof (the "<u>Indemnity Escrow Release Date</u>"), Purchaser and Seller shall deliver to the Escrow Agent a Joint Direction instructing the Escrow Agent to deliver to Seller from the Indemnity Escrow Account an amount equal to the amounts then remaining in the Indemnity Escrow Funds less the amount of any Unsatisfied Claims, and the Escrow Agent shall promptly, but in any event within two (2) Business Days, disburse such amount in accordance with such Joint Direction.

      (ii)    Promptly following final resolution of all Unsatisfied Claims, including (without limitation) the payment(s) with respect thereto having been made to the Party or Parties entitled thereto in accordance with this Agreement and the Purchase Agreement, Purchaser and Seller shall deliver to the Escrow Agent from the Indemnity Escrow Account a Joint Direction directing the Escrow Agent to disburse all of the remaining Indemnity Escrow Funds to the account or accounts designated by Seller in such Joint Direction. The Escrow Agent shall disburse the applicable portion of the Indemnity Escrow Funds within two (2) Business Days following the Escrow Agent's receipt of a Joint Direction.

      (e)    <u>Certain Definitions</u>. As used herein, the following terms shall have the following definitions:

VP/#64009056

"Authorized Representative" means, with respect to Purchaser, a representative of Purchaser listed on Schedule 1-A attached hereto and, with respect to Seller, a representative of Seller listed on Schedule 1-B attached hereto.

"Business Day" means any day on which banks are open for business in New York, New York (excluding Saturdays, Sundays, and public holidays).

"Joint Direction" means a joint written instruction made by Purchaser and Seller, substantially in the form attached hereto as Exhibit A and signed by an Authorized Representative of each of Purchaser and Seller, to the Escrow Agent.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental authority or any department, agency or political subdivision thereof.

"Release Order" means a final and non-appealable order of any court or arbitrator of competent jurisdiction that may be issued ordering Escrow Agent to distribute all or any portion of the Adjustment Escrow Funds or the Indemnity Escrow Funds or determining the rights of the Parties with respect to the Adjustment Escrow Funds or the Indemnity Escrow Funds, together with (i) a certificate, substantially in the form attached hereto as Exhibit B signed by an Authorized Representative of the prevailing Party (as between Purchaser and Seller) to the effect that such judgment is final and non-appealable and from a court or arbitrator of competent jurisdiction having proper authority and (ii) the written payment instructions of the prevailing Party to effectuate such order.

"Unsatisfied Claim" means any unsatisfied or outstanding claim for indemnity stated to be pursuant to and in accordance with Article VI of the Purchase Agreement, of which the Escrow Agent and Seller shall have been given written notice by Purchaser in accordance with the terms hereof and the Purchase Agreement on or prior to the twelve (12) month anniversary of the date hereof.

5.    Escrow Agent. Escrow Agent hereby agrees and covenants with Purchaser and Seller that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Adjustment Escrow Funds or the Indemnity Escrow Funds to anyone, except pursuant to the express terms of this Agreement or as otherwise required by applicable law. Escrow Agent hereby undertakes to perform only those duties as are specifically and expressly provided herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied, other than the implied duty of good faith and fair dealing. Escrow Agent has no knowledge of, nor any requirement to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, if any, including without limitation the Purchase Agreement, nor shall Escrow Agent be required to determine if any Party has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of Escrow Agent; provided, that as between the Parties, the Purchase

5

Agreement shall control the actions of the Parties. Escrow Agent may rely upon, and shall not be liable for acting in accordance with, any Joint Direction or Release Order delivered to it by any Party in accordance with <u>Section 9</u> and believed by Escrow Agent in good faith to be genuine and to have been signed by an Authorized Representative(s), as applicable; <u>provided</u> that Escrow Agent has fulfilled its obligations under <u>Section 4(c)</u> to confirm any funds transfer instruction received. Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through any of its affiliates or agents; <u>provided</u>, <u>however</u>, that no such delegation of powers or duties will release Escrow Agent from any of its obligations under this Agreement. In the event that Escrow Agent is uncertain as to its duties or rights hereunder or receives instructions, claims or demands from any Party that conflict with the provisions of this Agreement or conflicting instructions from the Parties, Escrow Agent shall promptly notify the Parties of such uncertainty or apparent conflict and, following delivery of such notice and until such time as the Parties deliver revised instructions to Escrow Agent, Escrow Agent shall be entitled to refrain from taking any action and shall not be liable for refraining to take any action, and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Direction or Release Order. Escrow Agent shall have no duty to solicit any payments that may be due to it or the Escrow Accounts including, without limitation, the Escrow Amounts, nor shall Escrow Agent have any duty or obligation to confirm or verify the accuracy or correctness of any amounts deposited with it hereunder. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving Escrow Agent) without making Escrow Agent a party to the same. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, IN NO EVENT SHALL ESCROW AGENT BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSS OR DAMAGE OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF ESCROW AGENT HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION. Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. Escrow Agent shall not be responsible for or under, or chargeable with knowledge of, the terms and conditions of any other agreement, instrument or document executed between/among the parties hereto. This Agreement sets forth all of the obligations of Escrow Agent, and no additional obligations shall be implied from the terms of this Agreement or any other agreement, instrument or document.

      6.    <u>Resignation and Removal: Succession</u>. The Parties, acting jointly, may remove Escrow Agent at any time, with or without cause, by giving to Escrow Agent fifteen (15) calendar days' advance notice in writing of such removal signed by an Authorized Representative of each Party. Escrow Agent may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days' advance notice in writing of such resignation to the Parties. Escrow Agent's sole responsibility after such fifteen (15)- or thirty (30)-day notice period (as applicable) expires, in the case of either removal or resignation, shall be to hold and safeguard the Adjustment Escrow Funds and the Indemnity Escrow Funds (without any obligation to reinvest

the same) and to deliver the same (i) to a designated substitute escrow agent, if any, appointed jointly by the Parties, as set forth in a Joint Direction, (ii) to such other Person jointly designated in writing by the Parties, or (iii) in accordance with the directions of a final court order, at which time of delivery, Escrow Agent's obligations hereunder shall cease and terminate, except for any liability of the Escrow Agent as set forth within Section 5. If prior to the expiration of the fifteen (15)- or thirty (30)-day notice period (as applicable), the Parties have failed to appoint a successor escrow agent, or to instruct Escrow Agent in writing to deliver the Adjustment Escrow Funds and the Indemnity Escrow Funds to another Person as provided above, at any time on or after the expiration of the fifteen (15)- or thirty (30)-day notice period (as applicable), Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto. Escrow Agent shall deliver the Adjustment Escrow Funds and the Indemnity Escrow Funds to any appointed successor escrow agent, at which time Escrow Agent's obligations under this Agreement shall cease and terminate, except for any liability incurred prior to delivery of the Adjustment Escrow Funds and the Indemnity Escrow Funds. Any entity into which Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of Escrow Agent may be transferred, shall be Escrow Agent under this Agreement and subject to all obligations hereunder without further act; provided, that Escrow Agent shall use commercially reasonable efforts to provide the Parties with notice in writing of any such merger, conversion or consolidation within a reasonable period of time either prior to or following the consummation thereof.

7.    Compensation. The Escrow Agent acknowledges and agrees that the fees and expenses described in Schedule 2 attached hereto are intended as full compensation for the Escrow Agent's services as contemplated by this Agreement and the Parties agree to pay to Escrow Agent such fees and expenses fifty percent (50%) by Seller and fifty percent (50%) by Purchaser, upon execution of this Agreement.

8.    Indemnification and Reimbursement. The Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from against any and all losses, damages, liabilities and reasonable and documented out-of-pocket costs or expenses (including, without limitation, the reasonable and documented out-of-pocket fees and reasonable and documented out-of-pocket expenses of one outside counsel) (collectively, "Losses"), arising out of or in connection with (i) Escrow Agent's performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Losses are determined by a court of competent jurisdiction through a final order to have been caused by the fraud, gross negligence, or willful misconduct, of the Escrow Agent and (ii) Escrow Agent's following any instructions or other directions from Purchaser or Seller, except to the extent that following any such instruction or direction is expressly prohibited by the terms of this Agreement. It is understood and agreed that the Escrow Agent does not have a contractual right of set-off or a contractual security interest under this Agreement; provided, however, that nothing herein shall be construed as a waiver of any statutory or common law rights to which the Escrow Agent may otherwise be entitled with respect thereto. Notwithstanding anything to the contrary herein, each of Purchaser and Seller hereby agree between themselves that any obligation for indemnification under this Section 8 shall be borne by

7

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 93 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

Purchaser or Seller as determined by a court of competent jurisdiction to be responsible for causing the Losses, fees or expenses against which Escrow Agent is entitled to indemnification or payment or, if no such determination is made, then to each pay fifty percent (50%) of any such indemnification claims or payments. The provisions set forth in this Section 8 shall survive the resignation, replacement or removal of Escrow Agent or the termination of this Agreement.

9.    Notices. All communications hereunder shall be in writing or set forth in a PDF attached to an e-mail, and all instructions from a Party or the Parties to Escrow Agent shall be executed by an Authorized Representative of such Party or Parties, and shall be deemed to have been delivered in accordance with the terms of this Agreement (i) on the day of delivery by e-mail, if delivered by e-mail prior to 5:00 p.m. New York City time on a Business Day (and otherwise on the first Business Day thereafter) or (ii) when actually delivered, if delivered by hand, by certified mail return receipt requested, or by courier or express delivery service (with receipt showing signature or similar confirmation) to the appropriate fax number, e-mail address, or notice address set forth for each party hereto as follows:

If to Purchaser,

SS MSP Holdings, Inc.
L Squared Capital Partners LLC
Attn:    Sean Barrette, Brian Scott,
Jack Foley and Adam Mokhtarzadeh
3434 Via Lido, Suite 300
Newport Beach, California 92663
Email:    sbarrette@lsquaredcap.com,
bscott@lsquaredcap.com
jfoley@lsquaredcap.com
amokhtarzadeh@lsquaredcap.com

with a copy (which shall not constitute notice) to:

Vedder Price P.C.
1925 Century Park East, Suite 1900
Los Angeles, California, 90067
Attention:  Michael A. Nemeroff, Esq. and Jason W. Reese, Esq.
Email:  mnemeroff@vedderprice.com and jreese@vedderprice.com

If to Seller,

TWN Holdings, Inc.
3805 Inglewood Avenue South
St. Louis Park, MN   55416

Attention:  Erik A. Thorsell
E-mail: erikthorsell@outlook.com

VP/#64009056

with a copy to (which shall not constitute notice):

Spencer Fane LLP
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Attention: Jon Farnsworth
E-mail:     jfarnsworth@spencerfane.com

If to Escrow Agent,        Citibank, N.A.
Citi Private Bank
One Market Street, 42nd Floor
San Francisco, CA 94105
Attn: Hamyd Mazrae
Telephone No.: (415) 627-6044
E-mail: hamyd.mazrae@citi.com

Any party hereto may provide notice in accordance with this <u>Section 9</u> of any change of the notice information in this <u>Section 9</u>.

10.    <u>Compliance with Court Orders</u>. In the event that any of the Adjustment Escrow Funds and the Indemnity Escrow Funds shall be attached, garnished, levied upon, or otherwise be subject to any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any judgment or decree shall be made or entered by any court affecting the property deposited under this Agreement, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, which it is advised in writing by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, <u>provided</u>, that Escrow Agent shall provide a written notice thereof to the Parties as soon as reasonably practicable and to the extent legally permissible, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to any of the Parties or to any other Person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

11.    <u>Miscellaneous</u>.

(a)    The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by Escrow Agent and each of the Parties. No waiver of any provision of this Agreement will be valid unless the waiver is in writing and signed by the waiving parties. The failure of a party hereto at any time to require performance of any provision of this Agreement will not affected such party's rights at a later time to enforce such provision. No waiver by any party hereto of any breach of this Agreement will be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other breach.

(b)    No party to this Agreement will assign its or their rights or delegate its or their obligations under this Agreement without the express prior written consent of each of the other parties to this Agreement; <u>provided</u>, <u>however</u>, upon prior written notice to the Escrow Agent, no such consent will be required for (i) Purchaser to assign its rights (but not its obligations)

hereunder, in whole or in part, to any of their lenders for collateral security purposes (including any grant of encumbrances in respect of such person's rights and interests hereunder to its lenders (and/or any agent for its lenders)) or (ii) Purchaser or Seller to assign such party's rights and obligations to such party's affiliates or any person that acquires, directly or indirectly, such party or a majority of its consolidated assets; provided, further, in each case, that no such assignment or transfer will relieve the assigning party of its obligations or agreements hereunder or require the other parties to resort to any such assignee or transferee prior to seeking any remedies against the assigning or transferring party permitted under or pursuant to this Agreement. To comply with Federal law including USA Patriot Act requirements, assignees shall provide to Escrow Agent the appropriate form W-9 or W-8 (as applicable) and such other forms and documentation that Escrow Agent may request to verify identification and authorization to act. In no event shall the Escrow Agent be obligated hereunder to (x) make any payments from the Escrow Accounts directly to any assignee of any rights under this Agreement, or (y) obey any written instructions delivered pursuant hereto from any assignee of any rights under this Agreement, unless, in the case of clauses (x) and (y), such assignee has provided the Escrow Agent with any and all Patriot Act documentation reasonably required by the Escrow Agent and become a Party to this Agreement.

(c)      This Agreement, all questions concerning the construction, interpretation and validity of this Agreement, the rights and obligations of the parties hereto, all claims or causes of action (whether in contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in this Agreement or as an inducement to enter this Agreement) shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, including its statutes of limitations, without giving effect to any choice or conflict of law provision or rule (whether in the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware and without regard to any borrowing statute that would result in the application of the statute of limitations of any other jurisdiction. In furtherance of the foregoing, the laws of the State of Delaware will control even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily or necessarily apply.

(d)      The parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware sitting in Wilmington, Delaware (or, if such court lacks jurisdiction, any federal or state court sitting in the State of Delaware in Wilmington, Delaware) over all claims or causes of action (whether in contract, tort, statute or otherwise) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in this Agreement or as an inducement to enter into this Agreement) and each Party hereby irrevocably agrees that all claims in respect of any such action related thereto may be heard and determined in such courts. The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

VP/#64009056

(e)    No Party nor Escrow Agent shall be liable to any other party hereto for losses due to, or for any delay in performance of its obligations under the terms of this Agreement because of, acts of God, fire, war, terrorism, floods, pandemic, epidemic, government closures, electrical outages or unavailability of Federal Reserve Bank wire services, or other causes reasonably beyond its control; it being understood that Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

(f)    This Agreement and any Joint Direction or Release Order from the Parties may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument or instruction, as applicable. All signatures of the parties to this Agreement and in any Joint Direction, Release Order or other instruction, instrument or notice delivered hereunder may be transmitted by facsimile (including PDF) or email, and such transmission will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

(g)    If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be revised as mutually agreed by the parties so as to as nearly as possible reflect the intent of the parties without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.

(h)    Nothing in this Agreement, whether express or implied, shall be construed to give to any Person or entity other than Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of the Adjustment Escrow Funds and the Indemnity Escrow Funds or this Agreement.

(i)    The Parties acknowledge that the Adjustment Escrow Funds and the Indemnity Escrow Funds are not and shall not be subject to any lien, security interest or encumbrance of any kind.

(j)    EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE RESPECTING ANY MATTER ARISING UNDER THIS AGREEMENT.

(k)    No publicly distributed printed or other material in any language related to this Agreement or the transactions contemplated by the Purchase Agreement, including prospectuses, notices, reports, and promotional material, to the extent any such material mentions "Citibank" by name, or the rights, powers, or duties of Escrow Agent under this Agreement, shall

11

be issued by the Parties, or on their behalf, without the prior written consent of Escrow Agent, except to the extent such disclosure is required by applicable law.

(l)    This Agreement, the Purchase Agreement, and any Joint Direction and Release Order, taken together shall constitute the entire agreement among the Parties with respect to the subject matter of this Agreement and supersede all prior agreements (whether written or oral and whether express or implied) by or among the Parties to the extent related to the subject matter of this Agreement. The terms and conditions of this Agreement will control the actions, duties, and obligations of Escrow Agent. To the extent there is a conflict between the terms and provisions of this Agreement and the Purchase Agreement, (i) as between the Parties, the terms and provisions of the Purchase Agreement will control and (ii) to the extent governing the actions of Escrow Agent, the terms and conditions of this Agreement shall control.

(m)    Know Your Client Requirements. The Parties hereby acknowledge that, in order to help fight the funding of terrorism and money laundering activities, federal law may require certain financial institutions to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship. The Parties hereby agree that they shall provide the Escrow Agent with such information as the Escrow Agent may reasonably request in order to comply with applicable anti-money laundering rules and regulations, including each Party's name, physical address, tax identification number and other information that is reasonably required to assist the Escrow Agent in identifying and verifying each Party's identity in order to comply with applicable anti-money launder rules and regulations, such as organizational documents, certificates of good standing, licenses to do business or other pertinent identifying information.

(n)    Patriot Act Disclosure. Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") requires Escrow Agent to implement reasonable procedures to verify the identity of any Person that opens a new account with it. Accordingly, the Parties acknowledge that Section 326 of the USA PATRIOT Act and Escrow Agent's internal policies require Escrow Agent to follow reasonable procedures to verify the identity including without limitation name, address and organizational documents ("Identifying Information"). The Parties agree to provide Escrow Agent with and consent to Escrow Agent obtaining from third parties any such Identifying Information required as a condition of opening an account with or using any service provided by Escrow Agent in connection with the transactions contemplated hereby.

12.    Use of Electronic Records and Signatures. As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by Escrow Agent in Escrow Agent's sole discretion, and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, Escrow Agent shall be indemnified and held harmless from any Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it deems to be genuine. Any electronically signed agreement,

instruction or other document shall be an "electronic record" established in the ordinary course of business and any copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 USC § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

13.    <u>Return of Funds</u>. If Escrow Agent releases any funds, including but not limited to the Escrow Funds or any portion of it, to a Party and subsequently determines, in its sole discretion, that the payment or any portion of it was made in error, the Party shall, upon notice, promptly refund the erroneous payment. Any such erroneous payment by Escrow Agent, and the Party's return thereof to Escrow Agent, shall not affect any obligation or right of either Escrow Agent or the Parties. Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to Escrow Agent's recovery of any erroneous payment.

*[Signature Pages Follow]*

DocuSign Envelope ID: AE3AFBC0-9828-4439-A7C0-2DF9DFA5823C

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 99 of 128

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

*(Signature Page to Escrow Agreement)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**PURCHASER**:

SS MSP HOLDINGS, INC.

By: *Sean Barrette*
Name: Sean Barrette
Title: President

**SELLER:**

TWN HOLDINGS, INC.

By: _____
Name:
Title:

**ESCROW AGENT**:

CITIBANK, N.A.

By: _____
Name:
Title:

VP/#64009056

*(Signature Page to Escrow Agreement)*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**PURCHASER**:

[_____]

By: _____
Name:
Title:

**SELLER:**

TWN HOLDINGS, INC.

*Erik A Thorsell*

By: _____
Name: Erik A. Thorsell
Title: President

**ESCROW AGENT**:

CITIBANK, N.A.

By: _____
Name:
Title:

ESCROW AGENT:

**CITIBANK, N.A.**

By: _____
Name:
Title:

Hamyd-Mazrae
Senior Vice President
CPB Law Firm Group
415-627-6044
1010953856

*Signature Page to Escrow Agreement*

DocuSign Envelope ID: AE3AEBC0-8028-4439-A7C6-2D50DFA5933C

27-CV-25-8808
CASE 0:25-CV-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 102 of 128

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

## SCHEDULE 1-A
## SCHEDULE OF PURCHASER'S AUTHORIZED REPRESENTATIVES

**Telephone Numbers and Authorized Signatures for
Person(s) Designated to Give and Confirm Funds Transfer Instructions**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as Authorized Representatives of Purchaser, and are authorized to initiate and approve transactions for the Escrow Accounts established under this Agreement on behalf of Purchaser. The below listed Persons have also been designated as contacts for confirmation of funds transfer instructions as provided for in Section 4(c) to this Agreement, and will be notified by Escrow Agent upon the release of any Adjustment Escrow Funds from the Adjustment Escrow Account or any Indemnity Escrow Funds from the Indemnity Escrow Account.

| Name | Business/Cellphone Telephone Numbers | Signature |
|---|---|---|
| Sean Barrette | (949) 398-0178 | *Sean Barrette* 392AE0C0B3D84C5... |
| | | |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of at least one Authorized Representative authorizing said funds transfer on behalf of each Party.

VP/#64009056

## SCHEDULE 1-B

### SCHEDULE OF SELLER'S
### AUTHORIZED REPRESENTATIVES

**Telephone Numbers and Authorized Signatures for
Person(s) Designated to Give and Confirm Funds Transfer Instructions**

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as Authorized Representatives of Seller, and are authorized to initiate and approve transactions for the Escrow Accounts established under this Agreement on behalf of Seller. The below listed Persons have also been designated as contacts for confirmation of funds transfer instructions as provided for in Section 4(c) to this Agreement, and will be notified by Escrow Agent upon the release of any Adjustment Escrow Funds from the Adjustment Escrow Account or any Indemnity Escrow Funds from the Indemnity Escrow Account.

| Name | Business/Cellphone Telephone Numbers | Signature |
|------|--------------------------------------|-----------|
| Erik A. Thorsell | 612-802-4669 (cell) <br> 612-268-7018 |  *Erik A Thorsell* |

All instructions, including but not limited to funds transfer instructions, whether transmitted by facsimile or set forth in a PDF attached to an email, must include the signature of at least one Authorized Representative authorizing said funds transfer on behalf of each Party.

MN 902893.2

## SCHEDULE 2
## SCHEDULE OF ESCROW AGENT FEES

**Acceptance Fee**

To cover the acceptance of the Escrow Agent's appointment, the study of the Escrow Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

Fee: WAIVED

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Accounts including safekeeping of assets in the Escrow Accounts, normal administrative functions of Escrow Agent, including maintenance of Escrow Agent's records, follow-up of the Escrow Agreement's provisions, and any other safekeeping duties required by Escrow Agent under the terms of the Escrow Agreement. Fee is based on Escrow Amounts being invested in an interest-bearing deposit obligation of Citibank, N.A., FDIC insured to the applicable limits:

Fee: WAIVED

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

Fee: WAIVED

**Transaction Fees**

To oversee all required disbursements or release of property from the Escrow Accounts to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by Escrow Agent as required under the terms and conditions of the Escrow Agreement:

Fee: WAIVED

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

VP/#64009056

**EXHIBIT A**
**JOINT DIRECTION**

TO:    Citibank, N.A.
       Citi Private Bank
       One Market Street, 42nd Floor
       San Francisco, CA 94105
       Attn: Hamyd Mazrae
       Telephone No.: 415 627 6044
       E-mail: hamyd.mazrae@citi.com

This certificate is issued as of the [•] day of [•], [•], pursuant to Section 4 of that certain Escrow Agreement, dated as of January 22, 2024 (the "Escrow Agreement"), by and among SS MSP Holdings, Inc., a Delaware corporation ("Purchaser"), TWN Holdings, Inc., a Minnesota corporation ("Seller"), and Citibank, N.A., as Escrow Agent ("Escrow Agent"). Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Escrow Agreement.

The undersigned, as Authorized Representatives of Purchaser and Seller, hereby jointly instruct Escrow Agent to pay to *[RECIPIENT]* an amount equal to $[•] out of the [Adjustment Escrow Account/Indemnity Escrow Account], by wire transfer to:

*[INSERT WIRE INSTRUCTIONS]*

Each of the undersigned hereby represents and warrants that it has been authorized to execute this certificate. This certificate may be signed in counterparts.

PURCHASER:

SS MSP HOLDINGS, INC.


By:    _____
Name:
Title:


SELLER:

TWN HOLDINGS, INC.


By:    _____
Name:
Title:

VP/#64009056.4

## <u>EXHIBIT B</u>
## CERTIFICATE OF RELEASE ORDER

TO:    Citibank, N.A.
          Citi Private Bank
          One Market Street, 42nd Floor
          San Francisco, CA 94105
          Attn:  Hamyd Mazrae
          Telephone No.: 415 627 6044
          E-mail: hamyd.mazrae@citi.com

Pursuant to, and in accordance with, Section 4 of that certain Escrow Agreement, dated as of January 22, 2024 (the "<u>Escrow Agreement</u>"), by and among SS MSP Holdings, Inc., a Delaware corporation ("<u>Purchaser</u>"), TWN Holdings, Inc., a Minnesota corporation ("<u>Seller</u>"), and Citibank, N.A., as Escrow Agent ("<u>Escrow Agent</u>"), the undersigned hereby certifies to Escrow Agent and [Purchaser]/[Seller] that:

1.      attached is a Release Order pursuant to which Escrow Agent is authorized to promptly disburse $[•] from the [Adjustment Escrow Account/Indemnity Escrow Account] to *[name of applicable recipient]* to *[insert wire instructions]* and Escrow Agent is instructed to comply with such Release Order;

2.      the Release Order is final, non-appealable and from a [court/arbitrator] of competent jurisdiction;

3.      Escrow Agent shall be entitled to conclusively rely on the attached Release Order without further investigation; and

4.      [Purchaser]/[Seller] [are/is] delivering a copy of this Certificate of Release Order simultaneously to [Purchaser]/[Seller].

Capitalized terms not defined herein shall have the meanings ascribed to them in the Escrow Agreement.

Dated: [•]

[Prevailing party]:

[_____]

By:      _____
Name:
Title:

VP/#64009056.4

# EXHIBIT 3

to Plaintiff's Complaint dated April 22, 2025

*TWN Holdings, Inc. v. SS MSP Holdings, Inc. & L Squared Capital Partners LLC*
Minnesota State Court – Hennepin County District Court

MINNESOTA
JUDICIAL
BRANCH

SS MSP Holdings, Inc.
c/o L Squared Capital Partners LLC
3434 Via Lido, Suite 300
Newport Beach, California 92663

January 18, 2025

**VIA FEDERAL EXPRESS AND E-MAIL**

TWN Holdings, Inc.
3805 Inglewood Avenue South
St. Louis Park, Minnesota 55416
Attention: Erik A. Thorsell, President
E-mail: erikthorsell@outlook.com

Re:     **Indemnification Notice—Direct Claim**

Mr. Thorsell:

Reference is made to that certain:  (i) Equity Purchase Agreement (the "EPA") made as of January 22, 2024, by and among Success Computer Consulting, LLC (the "Acquired Company"), and Erik A. Thorsell (the "Shareholder"), TWN Holdings, Inc., (the "Seller," and together with Shareholder, each a "Seller Party" and together, "Seller Parties"), and SS MSP Holdings, Inc. (the "Purchaser") and (ii) Escrow Agreement entered into as of January 22, 2024 (the "Escrow Agreement") between Seller, Purchaser and Citibank N.A. as escrow agent (the "Escrow Agreement").  All capitalized terms used but not defined herein shall be given the same meaning ascribed to them in the EPA and the Escrow Agreement.

Pursuant to Section 6.1 of the EPA, from and after the Closing, each of the Seller Parties, jointly and severally, agreed to and shall indemnify the Purchaser Indemnified Partes and defend and hold each Purchaser Indemnified Party harmless against any Losses that are incurred, suffered, sustained or required to be paid by or sought to be imposed upon such Purchaser Indemnified Party arising out of or relating to, among other things, any breach of any of the representations or warranties contained in Articles 2 or 3 of the EPA.  "Loss" or "Losses" means all damages, penalties, fines, costs, amounts paid in settlement, Liabilities, obligations, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.  "Liabilities" means any indebtedness liability, debt, obligation, deficiency, interest, Tax penalty, fine, claim, demand, judgment, cause of action, or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of whether or when accrued.

In Section 3.9(s) (Absence of Certain Developments) of the EPA, Seller Parties represented and warranted that, "[e]xcept as set forth on the 'Absence of Certain Developments Schedule' attached [to the EPA] as Schedule 3.9, since December 31, 2022, Acquired Company has not ... amended or modified, renewed, extended, replaced, or granted any release or waiver under or terminated any Company Contract."  In Section 3.22(a) (Customers and Suppliers) of the EPA, Seller Parties represented and warranted that, "[e]xcept as set forth on the Material Customers Schedule, no Material Customer has (i) terminated, indicated in writing or, to Seller's Knowledge, threatened that it intends to terminate or not renew its customer relationship with Acquired Company, (ii) materially decreased the volume of goods or services it purchases from Acquired Company or materially decreased the price it pays for such goods or services, other than in the Ordinary Course of Business (e.g., due to the completion or wind-down of

Erik A. Thorsell
January 18, 2025
Page 2

a customer project according to its specifications), or (iii) notified Acquired Company in writing of its intention to do any of the foregoing, during the preceding twelve (12) month period." In Section 3.6(b) (Financial Statements) of the EPA, Seller Parties represented and warranted that, "[e]ach of the Company Statements has been based upon the information contained in the Acquired Company's books and records and fairly presents, in all material respects, the financial condition and results of operations of Acquired Company as of the times and for the periods referred to therein, and has been prepared in accordance with GAAP, except, in the case of the Latest Balance Sheet, for (i) changes resulting from normal year-end adjustments none of which are expected to reflect a Material Adverse Effect to Acquired Company and (ii) the absence of footnote disclosures."

Seller Parties failed to disclose that, prior to Closing, that Form-A-Feed Inc. notified Acquired Company, in writing, that it was materially decreasing the volume of services it purchased and the price it paid for such services. Other customers similarly notified Acquired Company and at least one customer terminated its relationship with Acquired Company. Furthermore, Seller Parties failed to correctly disclose expenses associated with Watchguard in the Company Statements. Seller Parties' failure to disclose these facts breached the warranties and representations in Sections 3.9(s), 3.22 and 3.6. Seller Parties' failure to disclose these facts may also give rise to a breach of the representations and warranties in 3.8 (No Material Adverse Change).[1] Purchaser's investigation continues.

As a result of Seller Parties' failure to disclose, Purchaser currently calculates Losses at not less than $3,524,937 based upon the 12.0x multiple used to calculate the Purchase Price and the impact of Seller Parties' failure to disclose on the value of Acquired Company. Details for such calculations, together with supporting information, are attached hereto as Attachment A. This calculation does not include fees, costs, and expenses, each of which are recoverable by Purchaser as Losses and will continue to be incurred by Purchaser.

Pursuant to Section 6.7(b) of the EPA, Purchaser's Losses are to be satisfied first from the Indemnity Escrow Account. Notice is hereby given to the Escrow Agent under Section 6.6(a) of the EPA and Section 9 of the Escrow Agreement that the amount of Purchaser's Losses shall be retained in the Escrow Accounts as an Unresolved Claim until a Final Determination has been made.

This notice is sent by Purchaser pursuant to Section 6.4(b) (Direct Claim) of the EPA ("Indemnification Notice"). Purchaser reserves all of its rights and remedies under the EPA, the Escrow Agreement, at law and in equity. This includes, without limitation, any rights or remedies in connection with this Direct Claim and the right to supplement this Indemnification Notice if and when additional information becomes available to Purchaser.

*[Signature Page Follows]*

---

[1] For purposes of Article 6 of the EPA, any inaccuracy in or breach of any representation or warranty, and the amount of indemnifiable Losses arising therefrom or related thereto, shall be determined without regard to any materiality, Material Adverse Effect or other similar qualification contained in or otherwise applicable to such representation or warranty. (EPA § 6.6(f.).)

Docusign Envelope ID: 8652B6FB-1547-468E-8D66-1914A6F5D372

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 110 of 128

Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

Very truly yours,

SS MSP Holdings, Inc.



By:_____
Sean Barrette, President

cc:    Spencer Fane LLP
       100 South Fifth Street, Suite 2500
       Minneapolis, MN 55402
       Attention: Jon Farnsworth
       E-mail: jfarnsworth@spencerfane.com

       Citibank, N.A.
       Citi Private Bank
       One Market Street, 42nd Floor
       San Francisco, CA 94105
       Attn: Hamyd Mazrae
       Telephone No.: (415) 627-6044
       E-mail: hamyd.mazrae@citi.com

       L Squared Capital Partners LLC
       Attn: Brian Scott, Jack Foley
       and Adam Mokhtarzadeh
       3434 Via Lido, Suite 300
       Newport Beach, California 92663
       Email: bscott@lsquaredcap.com
       jfoley@lsquaredcap.com
       amokhtarzadeh@lsquaredcap.com

       Vedder Price P.C.
       222 North LaSalle Street, Suite 2400
       Chicago, Illinois 60601
       Attention: Michael A. Nemeroff, Esq. and
       Jason W. Reese, Esq.
       E-mail: mnemeroff@vedderprice.com and
       jreese@vedderprice.com

[Signature Page to Indemnification Notice]

**Attachment A**

Indemnity Claim Support

See attached.



## SUCCESS
*Indemnity Claim*

| | |
|---|---:|
| SUCCESS Purchase Price | $38,000,000 |
| Purchase Price Multiple | 12.0x |
| **Dec-23 TTM EBITDA** | **$3,162,560** |
| | |
| Churned Clients Not Identified Prior to Close | ($177,570) |
| Downsell Clients Not Identified Prior to Close | ($90,794) |
| Financials Overstatement | ($25,000) |
| **Total EBITDA Overstatement** | **($293,364)** |
| | |
| Purchase Price Multiple | 12.0x |
| **Indemnity Claim Amount** | **($3,524,937)** |

**Supporting Detail**

**Churned Clients Not Identified Prior to Close**

| | ARR | Notice Given |
|---|---:|---:|
| Oppidian | ($69,911) | 1/12/2024 |
| GlobalBiz Services | ($16,166) | 2/9/2024 |
| East Side Neighborhood Services | ($91,494) | |
| **Total Churned Clients** | **($177,570)** | |

*Brent notes that they had provided detail on January 12th. This was not diclosed until post close on 2/20*
*Globalbiz was an at-risk customer which was not flagged during diligence and not provided in the dataroom*
*Management claimed that this a a good customer that they would collect from. After transaction closed, Brent noted that SUCCESS decided to walk away from this client as "they simply couldn't afford our service and I was not confident that they could pay us"*

**Downsell Clients Not Identified Prior to Close**

| | ARR | Notice Given |
|---|---:|---:|
| Form-A-Feed Inc | ($46,305) | 1/3/2024 |
| Open Arms of Minnesota | ($44,489) | 12/21/2023 |
| **Total Downsell Clients** | **($90,794)** | |

*Form-A-Feed agreed to a decrease in hours on 1/3/2024 which was not disclosed*
*Open Arms of Minnesota executed a decrease in service on 12/21/2023 which was not disclosed. Was included in Judd Moore's sales plan as an expected downsell in January but also not provided in the dataroom*

**Financials Overstatement**

| | $ |
|---|---:|
| Q4 2023 Understatement of Watchguard Expenses | ($25,000) |
| **Total Financials Overstatement** | **($25,000)** |

*Watchguard expenses weren't included in Q4 2023 EBITDA and Q4 2023 EBITDA was overstated.*



# EXHIBIT 4

to Plaintiff's Complaint dated April 22, 2025

*TWN Holdings, Inc. v. SS MSP Holdings, Inc. & L Squared Capital Partners LLC*
Minnesota State Court – Hennepin County District Court



Randi Winter
Direct Dial: 612-268-7007
rwinter@spencerfane.com

File No. 5031939.20

February 14, 2025

**Via E-mail and FedEx Overnight Mail**

L Squared Capital Partners LLC
Attn:   Sean Barrette, Brian Scott,
        Jack Foley and Adam Mokhtarzadeh
3434 Via Lido, Suite 300
Newport Beach, California 92663
Email: sbarrette@lsquaredcap.com
        bscott@lsquaredcap.com
        jfoley@lsquaredcap.com
        amokhtarzadeh@lsquaredcap.com

Vedder Price P.C.
Attn:   Michael A. Nemeroff, Esq. and
        Jason W. Reece, Esq.
222 North LaSalle Street, Suite 2400
Chicago, Illinois 60601
Email: mnemeroff@vedderprice.com
        jreese@vedderprice.com

**RE:    Indemnity claim by L Squared Capital Partners LLC against TWN Holdings, Inc.**

Dear Attorneys Nemeroff and Reece:

On behalf of our clients, TWN Holdings, Inc. and Erik Thorsell (together, "TWN"), our office is in receipt of the Indemnification Notice—Direct Claim (the "Notice"), dated January 18, 2025, from your client SS MSP Holdings, Inc. c/o L Squared Capital Partners LLC ("L2"), seeking indemnification for alleged breaches of representations and warranties ("R&Ws") set forth in Sections 3.9(s), 3.22, and 3.6(b) of the Equity Purchase Agreement ("EPA") between the parties. Pursuant to Section 6.4(b) of EPA, this correspondence serves as TWN's responsive notice that it disputes the Direct Claim. This response is not intended to set forth an exhaustive explanation of all of TWN's arguments and defenses, but rather, to provide a high-level overview of its present, primary objections to the Direct Claim.

At the outset, TWN was surprised to receive L2's Notice given: (i) Brian Scott orally represented to Brent Morris last summer that "everything was going great," and there "were no indemnity claims or concerns that would risk any escrow amounts," and (ii) all of L2's allegations relate to



Michael A. Nemeroff, Esq.
  and Jason W. Reece, Esq.
February 14, 2025
Page 2

matters that occurred approximately one year prior to L2's Notice and at least six months before Mr. Scott's representations and assurances to Mr. Morris that everything was okay.

To be clear, TWN disputes L2's Notice and demands release of the full amount of the escrowed funds. Should the funds not be promptly released, TWN is prepared to vigorously litigate this matter.

**Prejudicial Delay in the Indemnity Notice**. As an initial matter, it is unclear why L2 delayed so long in providing its Notice—sent on the eve of the contractual limitations period's expiration—particularly when L2 plainly had knowledge of all relevant information upon which its Direct Claim is premised for many months. Section 6.4(b) of the EPA expressly mandates the need for "prompt notice" of any indemnity claim. In this situation, L2 failed to provide prompt notice, and in some instances, waited over 12 months after the alleged indemnifiable events took place. Had prompt notice been provided, it would have afforded TWN the ability to mitigate any alleged damages by, among other things, enabling TWN to investigate and potentially redress L2's concerns, as well as seeking to upsell clients, and/or reduce downsells. Failure by L2 to provide prompt notice prejudiced TWN from being able to take ameliorative steps to reduce or eliminate any claimed damages.

**Oppidian, GlobalBiz Services, East Side Neighborhood Services and Open Arms of Minnesota Were Neither Company Contracts Nor Material Customers**. Notwithstanding its delayed notice, L2 alleges TWN breached R&Ws set forth in Section 3.9(s) and 3.22(a) of the EPA with respect to the foregoing customers, which L2 characterizes as "churned clients" and "downsell clients." Under the plain language of these sections of the EPA, however, these R&Ws do not apply to the customers at issue.

Section 3.9(s) relates to Company Contracts, defined as those contracts listed on Schedule 3.12(a) of the EPA, together with Outbound and Inbound Licenses. Oppidian, GlobalBiz Services, East Side Neighborhood Services, and Open Arms of Minnesota are *not* identified on Schedule 3.12(a). Likewise, these relationships do not satisfy the EPA's definition of Outbound License or Inbound License. Because these customer relationships and their corresponding agreements do not constitute "Company Contracts," Section 3.9(s) does not apply to them, and L2 cannot assert a Direct Claim based on an alleged breach of a R&W set forth in Section 3.9(s) for these client accounts.

With respect to Section 3.22(a) of the EPA, a similar result exists. The representation in Section 3.22(a) only related to "Material Customers." That section also excepted out situations where a decrease in business occurred due to the Ordinary Course of Business. A "Material Customer" was defined as a customer which "the Acquired Company has made aggregate gross sales in excess of Two Hundred Thousand Dollars ($200,000) for each of (x) the fiscal year ended December 31, 2022 and (y) the eleven (11) month period ended November 30, 2023, … along with such dollar amounts paid to Acquired Company by each such Material Customer during such periods" All Material Customers are identified on Schedule 3.22(a) to the EPA. Oppidian, GlobalBiz Services,



Michael A. Nemeroff, Esq.
     and Jason W. Reece, Esq.
February 14, 2025
Page 3

East Side Neighborhood Services, and Open Arms of Minnesota are not among them. Therefore, the R&W reflected in Section 3.22(a) does not apply to those customers.

In sum, in its Direct Claim Notice, L2 failed to identify any relevant R&W applicable to customers Oppidian, GlobalBiz Services, East Side Neighborhood Services, or Open Arms of Minnesota, much less describe facts suggesting TWN breached any such applicable R&W with respect to such customers. L2 cannot, therefore, pursue an indemnification claim against TWN as to these customers.

**Form-A-Feed Business Actually Increased**. L2's attempt to assert an indemnification claim based on changes in the Form-A-Feed customer relationship fares no better. According to L2's Notice, this purported claim is premised on notice by the customer, Form-A-Feed, that it was "materially decreasing the volume of services it purchased and the price it paid for such services." However, the R&W in Section 3.9(s) specifically relates to actions taken by Success Computer Consulting, Inc., the Acquired Company. Section 3.9(s) does not cover situations resulting from actions taken by the Acquired Company's customers. Notably, there is no evidence that the Acquired Company granted Form-A-Feed any amendment, modification, renewal, replacement, or granted any release or waiver or termination to Form-A-Feed prior to the Closing Date. Again, L2's Notice alleges that the breach was caused by termination related to an action that Form-A-Feed took, not TWN or the Acquired Company. Therefore, there is no valid assertion of a breach of Section 3.9(s) based on actions of a customer outside TWN's control.

The evolution of the Form-A-Feed customer relationship does not support a claim of breach of the R&W in Section 3.22(a), either. After the Closing Date, the business from Form-A-Feed reduced consistent with the Ordinary Course of Business. A natural winddown occurred at the completion of certain security work, and in conjunction with Form-A-Feed making an internal hire to perform services that had been outsourced to the Acquired Company.

More importantly, however, is that L2 fails to acknowledge the historical fluctuations in Form-A-Feed's business. The original contract between the Acquired Company and Form-a-Feed was valued at a lesser amount than the amount reflected as of the Closing Date, which is the amount that L2 uses as the basis for its claim. It is clear, however, that Form-A-Feed actually *increased* its volume of work from the original contract price, and although Form-A-Feed made a reduction thereafter, such reduction still resulted in a net volume of work in excess of the original contracted amount. In other words, Form-A-Feed's business remains at an elevated level. Furthermore, Form-A-Feed's eventual decrease in hours—while remaining still above its contracted service level relevant to any pre-sale valuation—occurred in the ordinary course of business, and consistent with past norms of hour fluctuations. Since any decrease in revenue from Form-A-Feed related to the ordinary course of business, and Form-A-Feed's overall business actually increased over its original contract that was shared with L2 prior to the Closing Date, TWN's representation in Section 3.22(a) remains accurate.



Michael A. Nemeroff, Esq.
    and Jason W. Reece, Esq.
February 14, 2025
Page 4

**L2's Assertion of Breach of Section 3.6(b) based on the Watchguard Expense is Not Supported.** With respect to disclosed financials, L2 asserts that TWN breached the R&W in Section 3.6(b) by failing "to correctly disclose expenses associated with Watchguard in the Company Statements." Not so.

The EPA defines "Company Statements" as including the Reviewed Financial Statements for 2020, 2021, and 2022, as well as the "Latest Balance Sheet," which is defined as "the balance sheet and related statement of income, retained earnings and cash flow of Acquired Company or the elven-month period *ended on November 30, 2023*" (emphasis added).

The $25,000 Watchguard expense at issue was not incurred until December 2023. Moreover, notwithstanding the foregoing, a $25,000 expense is immaterial to the overall condition of the Acquired Company. Section 6.6(b) of the EPA specifically provided for a $100,000 basket before any claims would be indemnifiable. The $25,000 Watchguard expense is significantly below that threshold amount.

**No Material Adverse Change Occurred**. L2 next makes a vague and non-committal suggestion that the customer and expense concerns raised in its Notice "may" give rise to a breach of the R&Ws in Section 3.8, "No Material Adverse Change," and that is "investigation continues."

TWN does not construe this vague suggestion as actual notice of a Direct Claim arising from a breach of Section 3.8, and TWN will vigorously object to any untimely attempt by L2 to pursue such a claim in the future.

Nevertheless, even if such a claim is made, L2 is again mistaken. The EPA defined a Material Adverse Change ("MAC") as "any event, development, state of facts, development, effect or change that, individually or in the aggregate, is materially adverse to the business, Assets, financial condition, operating results or prospects of Acquired Company, taken as a whole." The EPA is governed under Delaware law, which has established the high threshold for proving a MAC. The most important consideration in determining whether a MAC has occurred is "whether there has been an adverse change in the target's business that is consequential to the company's long-term earnings power over a commercially reasonable period, which one would expect to be measured in years rather than months." *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008). Delaware courts particularly focus on the historical financials compared to the current financials to determine if the earnings would result in a MAC. *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 66–70 (Del. Ch. June 18, 2001) (holding the court found that a decrease in year-to-year first quarter earnings was not an MAC when there was proof of strong earnings that signaled a strong quarter ahead).

In the case of the Acquired Company, it is clear that no MAC occurred. Even if it is assumed that all of the assertions made in L2's Notice, including those related to Oppidian, GlobalBiz Services, East Side Neighborhood Services, Form-A-Feed Inc., Open Arms of Minnesota and the WatchGuard expenses are taken to be true and identified as negatively affecting the Acquired



Michael A. Nemeroff, Esq.
 and Jason W. Reece, Esq.
February 14, 2025
Page 5

Company's earnings, such an overall small decrease in alleged earnings before income tax, depreciation and amortization ("EBITDA") is immaterial. *See Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 742 (Del. Ch. 2008) (no materially adverse event where 2008 EBITDA would be only 11% below 2007 EBITDA); *see also Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-KSJM, 2021 WL 1714202, at *34 (Del. Ch. Apr. 30, 2021) (no materially adverse event where party "experienced a precipitous drop but then rebounded in the two weeks immediately prior to termination and was projected to continue recovering through the following year").

Further, L2 ignores the Acquired Company's positive business developments that more than offset any of these alleged negative items that occurred prior to the Closing. The Acquired Company had an upsell client for $12,798 per month (PeopleLink), plus three new clients acquired shortly before the Closing (Secured Retirement Associates for $3,245 per month, SwageLok Minnesota for $5,982 per month, and Construction Thermal Services for $2,804 per month). There may also have been other upsells and/or added clients, and we would need to see additional documentation from L2 to verify. Nevertheless, the amount from these four customers alone amounts to $25,829 in additional monthly revenue, or $309,948 per year in ARR. L2's Notice only claimed churned clients of $177,570 and downsell clients of $90,794, totaling $268,364 ARR. This means that the Acquired Business actually had at least $41,584 in *positive* additional ARR ($309,948 - $268,364) than what L2 expected. Accordingly, if anything, there was a *positive change* and, thus, no MAC occurred.

**GlobalBiz Provided Notice *After* The Closing.** L2's Notice alleges that TWN failed to flag GlobalBiz as an "at risk" account in the due diligence process or Data Room. However, the supporting exhibit to L2's Notice confirms that GlobalBiz provided such notice of any anticipated reduced or terminated business on February 9, 2024, which was *after* the Closing Date. Therefore, TWN could not have disclosed GlobalBiz because TWN did not even have notice yet of GlobalBiz's decision. To be clear, TWN provided the information that was available as the Closing Date. Even if we assume that GlobalBiz was an at-risk account, GlobalBiz was not a Material Customer listed in Schedule 3.22(a), and therefore, was immaterial to the overall financial condition of the Acquired Company and not required to be disclosed.

**L2 Miscalculates Alleged Damages**. Even if L2 could credibly establishes breaches of the R&Ws at issue based on the alleged churned and downsold clients and Watchguard expense, L2 wildly overestimates its purported damages. First, annualized recurring revenue ("ARR") is *not* equivalent to EBITDA. A sophisticated private equity company like L2 clearly knows this. Among other things, the cost of goods sold along with other operating costs, and customer churn rates must be considered when converting ARR to EBITDA. In reality, only a fraction of ARR equates to EBITDA.

Second, while L2 may insist on using a multiple of EBITDA as a methodology for calculating alleged damages because that math works in L2's favor, such approach incorrectly assumes that the actual value L2 received created a diminution of the company's earnings into perpetuity. Not



Michael A. Nemeroff, Esq.
   and Jason W. Reece, Esq.
February 14, 2025
Page 6

so. As demonstrated by the new clients and one upsell client, there was no permanent diminution of value. In this circumstance, courts applying Delaware law will not utilize an EBITDA multiple as a proper methodology for calculating damages. *See, e.g.*, *Zayo Grp., LLC v. Latisys Holdings, LLC*, No. CV 12874-VCS, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018).

Third, and arguably most importantly, L2 ignores that the alleged churned or downsell customers all had contracts that expired shortly after the Closing Date. The contract terms of both Open Arms of Minnesota and Oppidian expired on March 31, 2024. The contract terms for East Side and Form-A-Feed expired within 2024, as well. L2 cannot reasonably expect revenue in perpetuity from any customer, and particularly so with respect to these customers because their contracts were expiring in the near future.

Regardless, even if the claims related to these clients were valid, at worst, the damages would equate to the profit margin on such clients during the remainder of their specific contracts. As seen on the table below, such calculation is well under the $100,000 basket threshold as stated in Section 6.6(b) of the EPA.

| Client | L2's Alleged Reduced ARR | Monthly Revenue (ARR / 12 months) | Months remaining on Client Contract as of Closing Date | Total Revenue Remaining on Contract | Lost Profits (using 50% profit margin assumption) |
|---|---|---|---|---|---|
| Oppidian | $69,911 | $5,825.92 | 2 | $11,651.83 | $5,825.92 |
| GlobalBiz | $16,166 | $1,347.17 | 10 | $13,471.67 | $6,735.83 |
| East Side | $91,494 | $7,624.50 | 6 | $45,747.00 | $22,873.50 |
| Form-A-Feed | $46,305 | $3,858.75 | 10 | $38,587.50 | $19,293.75 |
| Open Arms | $44,489 | $3,707.42 | 2 | $7,414.83 | $3,707.42 |
| **Total maximum damages*** | | | | | **$58,436.42** |

*TWN reserves all right to challenge all damages calculations by L2 and assumptions (including but not limited to the profit margin assumption). The above table is merely an assumed example of the potential worst-case scenario of damages.



Michael A. Nemeroff, Esq.
   and Jason W. Reece, Esq.
February 14, 2025
Page 7

Based on the table above, even if all of the complained-about customer accounts constituted damages, and even coupled with the $25,000 Watchguard expense, the total alleged damages still remain under the $100,000 basket.

Fourth, any renewal or extension of customer contract terms was beneficial to L2, even if the total revenue from the customer may have been less than it was previously. In short, it's better to retain a client, even with a reduction in business, than to permanently lose that client altogether.

**No New Claims Are Allowed**. L2's Notice attempts to reserve a right to supplement its Notice. To the extent this would enlarge any claim or make novel arguments, such reservation runs contrary to the plain language in Section 6.6(a) of the EPA, which states "Any Claim for indemnification for which notice is not given to the Indemnifying Party on or before the expiration of the survival period specified in this <u>Section 6.6(a)</u> will have no effect." Furthermore, Delaware courts have consistently held that indemnification claims made past the contractual deadline and retroactive amendments to claims made prior to the contractual deadline are prohibited and would effectively constitute a unilateral rewriting of the parties' contractual scheme. *See, e.g.*, *LPPAS Representative, LLC v. ATH Holding Company, LLC*, Del. Ch. 2020 WL 7706937; *Winshall v. Viacom International, Inc.*, 2012 WL 6200271, at *3 (Del. Ch. Dec. 12, 2012), aff'd, 76 A.3d 808 (Del. 2013). Accordingly, TWN will not accept any additional or modified indemnity claims.

**TWN Demands Release of All Escrowed Funds**. As stated at the outset of this responsive notice, based on the foregoing, it is clear that all escrowed funds should be immediately released. TWN requests L2 respond within ten (10) days confirming that it consents to have the funds released by the escrow agent. To the extent that L2 does not agree to release all of the escrowed funds to TWN, then TWN demands that L2 promptly provide the following information and documents, which are relevant to L2's allegations:

1. All documents and communications that support L2's claim that Oppidian provided details of reduced business on January 12, 2024.

2. All documents and communications that support L2's claim that TWN knew GlobalBiz was an at-risk customer and failed to disclose it prior to the Closing.

3. All documents and communications that support L2's claim that Open Arms decreased services on December 21, 2023.

4. All documents and communications that support L2's claim that the $25,000 Watchguard expense should have been included in the Latest Balance Sheet for the period ending November 30, 2023.

5. Copies of all customer notices and communications received related to the allegations in L2's Notice, including but not limited to any customer notices or communications to support L2's claim that TWN knew of such churned customers and/or downsell customers prior to the Closing Date.




Michael A. Nemeroff, Esq.
 and Jason W. Reece, Esq.
February 14, 2025
Page 8

6.  All other evidence that supports L2's contentions that the TWN executive team was aware of customer churn or downsells as you allege in the supporting exhibit to the Notice.

7.  All documents that support L2's contention that Form-A-Feed was a downsell client.

8.  All contract documents (including any amendments and renewals) with the Acquired Company clients identified in L2's Notice.

9.  All invoices for all alleged churned customers and downsell clients.

10. Provide invoices for all new clients and upsell clients, including but not limited to referenced herein.

11. All contracts for all new clients and upsell clients entered from September 1, 2023 to January 31, 2025, including but not limited to the contracts with those new clients and upsell clients referenced herein.

12. All documents showing when L2 had notice of its potential claims associated with the Notice.

13. All documents that evidence communications with any of the Acquired Company's executive relating in any way to any of the allegations supporting L2's Direct Claim.

TWN reserves all of its rights, and nothing herein shall be construed as an admission or agreement related to any allegations or claims made by L2. To the contrary, TWN disputes the allegations made by L2, and demands the prompt release of the escrowed funds.

If L2 refuses to release all of the escrowed funds, this notice further puts your client(s) on notice that they must preserve all data, documents, and evidence potentially relevant to these matters, including but limited to any communications with and between Brian Scott and Sean Barrette. This obligation extends to all of L2's executives, employees, and representatives with potentially relevant information, documents, and communications, whether in electronic or in paper form.

Very truly yours,

Randi Winter

Randi Winter

cc:    L Squared Capital Partners LLC (*via hand-delivery*)
       TWN Holdings, Inc.
       Jon Farnsworth
       Jordan Reimschisel

# State of Minnesota                                    District Court

| County of | Judicial District: | Fourth |
|---|---|---|
| **Hennepin** | Court File Number: | |
| | Case Type: | Other Civil |

TWN Holdings, Inc.,
_____
Plaintiff (first, middle, last)

vs.

SS MSP Holdings, Inc. & L Squared Capital Partners
_____
Defendant (first, middle, last)

Date Case Filed: 05/07/2025

### Civil Cover Sheet
### (Non-Family Case Type)
Minn. Gen. R. Prac. 104

This civil cover sheet must be filed by the initial filing lawyer or party, if unrepresented by legal counsel, unless the court orders all parties or their legal counsel to complete this form. Once the initial civil cover sheet is filed, opposing lawyers or unrepresented parties who have not already been ordered to complete this form may submit their own cover sheet within 7 days after being served with the initial cover sheet. See Rule 104 of the General Rules of Practice for the District Courts.

**If information is not known to the filing party at the time of filing, it shall be provided to the Court Administrator in writing by the filing party within 7 days of learning the information.** Any party impleading additional parties shall provide the same information to the Court Administrator. The Court Administrator shall, upon receipt of the completed certificate, notify all parties or their lawyers, if represented by counsel, of the date of filing the action and the file number assigned.

| ATTORNEY FOR PLAINTIFF | ATTORNEY FOR DEFENDANT |
|---|---|
| Randi J. Winter | Chad A. Schiefelbein |
| Attorney Name (not firm name) | Attorney Name (not firm name) |
| 100 South Fifth Street, Suite 2500 | 222 North LaSalle Street, Suite 2400 |
| Postal Address | Postal Address |
| Minneapolis      MN      55402 | Chicago      IL      60601 |
| City      State      Zip Code | City      State      Zip Code |
| (612) 268-7007 | 312609 4180 |
| Telephone Number | Telephone Number |
| rwinter@spencerfane.com | cschiefelbein@vedderprice.com |
| E-mail Address | E-mail Address |
| 0391354 | |
| Minnesota Attorney ID Number | Minnesota Attorney ID Number |

PLAINTIFF, Self-represented                    DEFENDANT, Self-represented

_____          _____
Name                                              Name

_____          _____
Postal Address                                    Postal Address

_____  _____  _____      _____  _____  _____
City                State  Zip Code       City              State  Zip Code

_____          _____
Telephone Number                                  Telephone Number

_____          _____
E-mail Address                                    E-mail Address

(Attach additional sheets for additional attorneys / parties)

Note: If either Plaintiff or Defendant gets an attorney, the attorney's name, address, telephone number and attorney ID number must be given in writing to the Court Administrator immediately.

1.    Provide a concise statement of the case including facts and legal basis:

Plaintiff is pursuing claims for declaratory judgment, breach of contract, and tortious interference with contract arising from Defendants' wrongful retention of $2.5 million in escrowed funds following Defendants' purchase of equity shares of a computer consulting business from Plaintiff.

2.    Date Complaint was served: ___04/22/2025_____

3.    For Expedited Litigation Track (ETLT) Pilot Courts only:

a.  ☐ The parties jointly and voluntarily agree that this case shall be governed by the Special Rules of ELT Pilot. Date of agreement: _____

b.  ☐ The court is requested to consider excluding this case from ELT for the following reasons:

_____
_____
_____

Note: ELT is mandatory in certain cases, and where mandatory, exclusion may also be sought by timely motion under the Special Rules for ELT Pilot.

c.  ☐ Anticipated number of trial witnesses: _____

d.  ☐ Amount of medical expenses to date: _____

e.  ☐ Amount of lost wages to date: _____

f.  ☐ Identify any known subrogation interests: _____

4.  For Complex Cases (See Minn. Gen. R. Prac. 146):

    a.  Is this case a "complex case" as defined in Rule 146? ☐ Yes  ☐ No

    b.  State briefly the reasons for complex case treatment for this case:

        _____
        _____
        _____
        _____

    c.  Have the parties filed a "CCP Election" for this case as provided in Rule 146(d)?
        ☐ Yes   ☐ No

5.  Estimated discovery completion within __8__ months from the date of this form.

6.  Disclosure/discovery of electronically stored information discussed with other party?

    ☒ No   ☐ Yes   Date of discussion: _____

    If yes, list agreements, plans and disputes:

    _____
    _____
    _____

7.  Proposed trial start date: 04/01/2026 _____

8.  Estimated trial time: __5__ days _____ hours (estimates less than a day must be stated in hours).

9.  Jury trial is:

    ○ waived by consent of _____ pursuant to Minn. R. Civ. P. 38.02.
                  (specify party)

    ◉ requested by  Plaintiff _____ (NOTE: Applicable fee must be enclosed)
               (specify party)

10.  Physical/mental/blood examination pursuant to Minn. R. Civ. P. 35 is requested.

    ☐ Yes   ☐ No

11.  Identify any party or witness who will require interpreter services, and describe the services needed (specifying language, and if known, particular dialect):

    _____
    _____



12.    Issues in dispute:

   1) Whether Plaintiff is entitled to a declaratory order that Defendants' Direct Claim is resolved in Plaintiff's favor; 2) Whether Plaintiff is entitled to a declaratory order for release of the escrowed funds to Plaintiff; 3) Whether Defendant SS MSP Holdings, Inc. is liable to Plaintiff for damages arising from SS MSP Holding's breach of contract; and 4) Whether Defendant L Squared is liable to Plaintiff for damages arising from L Squared's tortious interference with contract.

13.    Case Type/Category:  Civil Other/Miscellaneou (NOTE: select case types from the Civil

   Case Type Index found at http://www.mncourts.gov/mncourtsgov/media/scao_library/documents/eFile%20Support/Handout-Case-Type-Index.pdf.)

14.    Recommended Alternative Dispute Resolution (ADR) mechanism:  Mediation

   (See list of ADR processes set forth in Minn. Gen. R. Prac. 114.02(a))

   Recommended ADR provider (known as a "neutral") Senior or Retired Judge

   Recommended ADR completion date:  10/31/2025

   If applicable, reasons why ADR not appropriate for this case:

By signing below, the attorney or party submitting this form certifies that the above information is true and correct.

Submitted by:

s/ Randi J.Winter
Signature

Name:  Randi J. Winter

Attorney Reg. #: 0391354

Firm/Agency Name: Spencer Fane LLP

Street Address:  100 South Fifth Street, Suite 2500

City/State/Zip Code: Minneapolis, MN 55402

Telephone: (612) 268-7007

Date:  05/07/2025

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD    Doc. 1-1    Filed 05/22/25    Page 126 of 128    Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

## AFFIDAVIT OF SERVICE

| Case: | Court: | | County: | Job: |
|-------|--------|--|---------|------|
| 5031939.20 | Minnesota State District Court, Hennepin County | | Hennepin | 13156107 |

| Plaintiff / Petitioner: | Defendant / Respondent: |
|-------------------------|-------------------------|
| TWN Holdings, Inc. | SS MSP Holdings, Inc. & L Squared Capital Partners LLC |

| Received by: | For: |
|--------------|------|
| Capital Courier, LLC | Spencer Fane LLP |

| To be served upon: |
|--------------------|
| SS MSP Holdings, Inc. |

I, Isaiah Greene, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| **Recipient Name / Address:** | Melissa Wallace authorized to accept on behalf of c/o Cogency Global Inc., 850 New Burton Road Suite 201, Dover, DE 19904 |
|---|---|
| **Manner of Service:** | Registered Agent, Apr 22, 2025, 3:41 pm EDT |
| **Documents:** | Summons and Complaint with Exhibits 1–4 thereto. |

**Additional Comments:**
1) Successful Attempt: Apr 22, 2025, 3:41 pm EDT at 850 New Burton Road Suite 201, Dover, DE 19904 received by Melissa Wallace authorized to accept on behalf of c/o Cogency Global Inc.. Age: 50; Ethnicity: African American; Gender: Female; Weight: 190; Height: 5'9"; Hair: Black;
I entered the building of the registered agent and proceeded upstairs to the second floor. I was greeted by a woman. She went to check her computer for the named entity. Upon returning, she successfully accepted the documents. I asked her name, and she stated Melissa Wallace.

**Fees:**  $135.00

Isaiah Greene    4/23/25
1367519    Date

Capital Courier, LLC
PO Box 38
Dover, DE 19903
3028570811

Subscribed and sworn to before me by the affiant who is personally known to me.

Karen E. Elliott
Notary Public
4/23/2025    11/10/2026
Date    Commission Expires

KAREN E. ELLIOTT
NOTARY PUBLIC
STATE OF DELAWARE
Qualified in Sussex County
Commission Expires November 10, 2026

27-CV-25-8808

CASE 0:25-cv-02210-PJS-JFD     Doc. 1-1     Filed 05/22/25     Page 127 of 128     Filed in District Court
State of Minnesota
5/7/2025 8:33 AM

## AFFIDAVIT OF SERVICE

| Case:<br>5031939.20 | Court:<br>Minnesota State District Court, Hennepin County | County:<br>Hennepin | Job:<br>13156123 |
|---|---|---|---|
| **Plaintiff / Petitioner:**<br>TWN Holdings, Inc. | | **Defendant / Respondent:**<br>5S MSP Holdings, Inc. & L Squared Capital Partners LLC | |
| **Received by:**<br>Capital Courier, LLC | | **For:**<br>Spencer Fane LLP | |
| **To be served upon:**<br>L Squared Capital Partners LLC | | | |

I, Isaiah Greene, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

| **Recipient Name / Address:** | Melissa Wallace authorized to accept on behalf of c/o Cogency Global Inc., 850 New Burton Road Suite 201, Dover, DE 19904 |
|---|---|
| **Manner of Service:** | Registered Agent, Apr 22, 2025, 3:41 pm EDT |
| **Documents:** | Summons and Complaint with Exhibits 1–4 thereto |

**Additional Comments:**
1) Successful Attempt: Apr 22, 2025, 3:41 pm EDT at 850 New Burton Road Suite 201, Dover, DE 19904 received by Melissa Wallace authorized to accept on behalf of c/o Cogency Global Inc.. Age: 50; Ethnicity: African American; Gender: Female; Weight: 190; Height: 5'9"; Hair: Black;
I entered the building of the registered agent and proceeded upstairs to the second floor. I was greeted by a woman. She went to check her computer for the named entity. Upon returning, she successfully accepted the documents. I asked her name, and she stated Melissa Wallace.

**Fees:** $135.00

Isaiah Greene                                    4/23/25
1367519                                          Date

Capital Courier, LLC
PO Box 38
Dover, DE 19903
3028570811

Subscribed and sworn to before me by the affiant who is personally known to me.

Karen E Elliott
Notary Public
4/23/2025          11/10/2026
Date               Commission Expires

KAREN E. ELLIOTT
NOTARY PUBLIC
STATE OF DELAWARE
Qualified in Sussex County
Commission Expires November 10, 2026

Filed in District Court
State of Minnesota
5/7/2025 2:45 PM

State of Minnesota
Hennepin County

District Court
Fourth Judicial District

**Court File Number: 27-CV-25-8808**

Case Type: Civil Other/Misc.

# Notice of Judicial Assignment-
# General Civil Block Cases

FILE COPY

---

**TWN Holdings, Inc. vs SS MSP Holdings, Inc., L Squared Capital Partners LLC**

Date Case Filed: May 07, 2025
All future papers must include the above file number, name of assigned judge, attorney identification number, and must otherwise conform to format requirements or they will be returned.

This case is assigned the following judicial officer for all further proceedings:

**District Court Judge Laurie J. Miller**
612-322-6580

**Mailing Address:** 300 South Sixth Street, MC 332, Minneapolis, MN 55487-0332

**Parties**:        If you receive this notice and have obtained an attorney, notify him/her of this assignment immediately.

**Attorneys**:        Only the first listed attorney for a party is being sent this notice. If you are the attorney receiving this notice, contact all other attorneys representing your party of the judge assignment and requirements.

The filing attorney/party is responsible for notifying all attorneys/parties not listed on the Civil Cover Sheet of the judge assignment and requirements.

Per Supreme Court order, e-filing is mandatory in this case for all attorneys and government agencies. Unrepresented parties are excluded by this order. Attorneys or government agencies must also e-serve all documents required or permitted to be served on other attorneys or government agencies. Upon receipt of this notice, attorneys and government agencies shall immediately add their firm/agency's service contact(s) for this case to the e-filing system. For further information on e-filing, go to: http://www.mncourts.gov/district/4/?page=3953.

All future hearings and trial dates will be scheduled by the courtroom staff. Check with the Court Display Monitors on the Public Service Level for the location on the day of the hearing.

A notice to remove this judicial officer must comply with Minnesota Rules of Civil Procedure 63.03 and Minnesota Statute § 542.16.

Failure to timely file any required document or other failure to comply with the General Rules of Practice for the District Courts may result in the impositions of sanctions, including possible dismissal of the case or striking of the Answer.

The Minnesota Supreme Court has adopted time objectives for the disposition of civil cases. The Fourth Judicial District adheres to these objectives which are: 90% of the cases should be disposed of within 12 months, 97% within 18 months, and 99% within 24 months of filing.

Dated: May 7, 2025                                        Court Administrator
                                        Hennepin County District Court

cc:    TWN Holdings, Inc.
       SS MSP Holdings, Inc.
       L Squared Capital Partners LLC